ORAL ARGUMENT NOT YET SCHEDULED

No. 21-1243
Consolidated with Nos. 21-1244, 21-1245

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL RELIGIOUS BROADCASTERS
NONCOMMERCIAL MUSIC LICENSE COMMITTEE
Appellant,

v.

COPYRIGHT ROYALTY BOARD AND LIBRARIAN OF CONGRESS,
Appellees,

GOOGLE INC, PANDORA MEDIA LLC, AND SIRIUS XM RADIO INC.,
Intervenors.

---

APPEAL FROM A FINAL DETERMINATION OF
THE COPYRIGHT ROYALTY BOARD

---

## OPENING BRIEF FOR APPELLANT NATIONAL RELIGIOUS BROADCASTERS NONCOMMERCIAL MUSIC LICENSE COMMITTEE

---

Karyn K. Ablin
FLETCHER, HEALD & HILDRETH, PLC
1300 N. 17th Street
11th Floor
Arlington, VA 22209
ablin@fhhlaw.com
(703) 812-0443

*Counsel for National Religious Broadcasters Noncommercial Music License Committee*

July 27, 2022

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rules 15(c)(3) and 28(a)(1) and the Court's November 29, 2021 Order, the National Religious Broadcasters Noncommercial Music License Committee ("NRBNMLC") hereby certifies as follows:

## A.    Parties and Amici

In the proceeding below before the Copyright Royalty Board, the following parties appeared by filing a petition to participate:

AccuRadio, LLC*;

The American Association of Independent Music;

The American Federation of Musicians of the United States and Canada;

College Broadcasters Inc.;

Dash Radio, Inc.*;

David Powell;

Educational Media Foundation;

Feed Media, Inc.*;

Google Inc.;

ICON Health & Fitness Inc.*;

iHeart Media Inc.*;

Jagjaguwar Inc.;

Live365 Broadcaster LLC*;

LA RAZA MEDIA GROUP LLC*;

National Association of Broadcasters;

National Public Radio, Inc.;

National Religious Broadcasters Noncommercial Music License Committee;

Pandora Media LLC;

Radio Coalition LLC*;

Radio Paradise Inc.*;

Screen Actors Guild-American Federation of Television and Radio Artists;

Sirius XM Radio Inc.;

Sony Music Entertainment;

SoundExchange, Inc.;

Tunein Inc.*;

UMG Recordings, Inc.; and

Warner Music Group Corp.

*Parties whose names are followed by an asterisk withdrew their petitions to participate.  In addition, David Powell was dismissed from the case.

The parties before this Court are as follows:

In Case No. 21-1243, the Appellant is NRBNMLC, and the Appellees are the Copyright Royalty Board and the Librarian of Congress.  The Intervenors are

Google Inc. ("Google"), the National Association of Broadcasters ("NAB"), Pandora Media LLC ("Pandora"), Sirius XM Radio Inc. ("Sirius XM"), and SoundExchange, Inc. ("SoundExchange").

In Case No. 21-1244 (consolidated with Case No. 21-1243), the Appellant is SoundExchange, Inc., and the Appellees are the Copyright Royalty Board and the Librarian of Congress. The Intervenors are Google, NAB, NRBNMLC, Pandora, and Sirius XM.

In Case No. 21-1245 (consolidated with Case No. 21-1243), the Appellant is the National Association of Broadcasters, and the Appellees are the Copyright Royalty Board and the Librarian of Congress. The Intervenors are Google, NRBNMLC, Pandora, Sirius XM, and SoundExchange.

No amici have appeared before this Court.

## B.     Rulings Under Review

The rulings under review in this consolidated proceeding are the Final Determination of the Copyright Royalty Board ("Board") issued on September 20, 2021 in *Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies To Facilitate Those Performance*s ("*Web V*"), Docket No. 19-CRB-0005-WR (2021-2025), and published in the Federal Register on October 27, 2021 at 86 Fed. Reg. 59452 ("Determination").

(J.A.___).  Also under review is the Board's April 2, 2020 *Order Denying NRBNMLC Motion to Strike* ("*Mediabase Order*") issued in that same docket. (J.A.___).

## C.    Related Cases

There are no cases related to the above-captioned consolidated appeals.

# CORPORATE DISCLOSURE STATEMENT

Appellant the National Religious Broadcasters Noncommercial Music License Committee ("NRBNMLC") is the noncommercial arm of the National Religious Broadcasters Music License Committee ("NRBMLC"). The NRBMLC, in turn, is a standing committee of the National Religious Broadcasters ("NRB"), a trade association representing more than 1,300 radio and television stations, program producers, multimedia developers, and related organizations around the world. The NRB is a non-profit corporation that has no parent companies, and no publicly held company has a 10% or greater ownership interest in the NRB. The purpose of the NRBNMLC is to represent the interests of religious noncommercial radio stations in issues of music licensing. Many of the stations represented by the NRBNMLC simultaneously transmit their broadcast programming online ("simulcast") pursuant to the 17 U.S.C. §§112 and 114 statutory licenses at issue in the decision by the Board challenged in this proceeding.

The NRBNMLC was a party to and an active participant in the proceeding that led to the Determination under review in this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ........................................ v

TABLE OF CONTENTS .................................................................. vi

TABLE OF AUTHORITIES ............................................................. x

GLOSSARY ................................................................................ xvi

INTRODUCTION ......................................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 2

ISSUES PRESENTED.................................................................... 2

STATUTES AND REGULATIONS ..................................................... 4

STATEMENT OF THE CASE............................................................ 4

    A.    Statutory and Regulatory Background ................................. 4

        1.    Statutory Licenses and the Rate-Setting Standard..................... 4

        2.    Noncommercial Rate History ................................... 5

            a.    Favored Licensing Status of Noncommercial Broadcasters.................................... 5

            b.    Insufficiently Differentiated Noncommercial Rates and Noncommercial Webcasters' Response ................. 6

            c.    Post-*Web IV* NPR/Non-NPR Fee Disparity .................... 9

    B.    Distinct Noncommercial Broadcaster Attributes ............................... 10

        1.    Distinct Market Segment of Noncommercial Broadcasters ............................... 10

      2.     Persistence of Noncommercial Market Segmentation Regardless of Listenership .......................................................... 11

   C.    The Proceeding.......................................................................... 12

   D.    The Determination..................................................................... 13

SUMMARY OF ARGUMENT ......................................................................... 15

STANDING ...................................................................................................... 16

ARGUMENT .................................................................................................... 16

I.      STANDARD OF REVIEW ...................................................................... 16

II.     THE BOARD MISAPPLIED PRECEDENT AND ACTED ARBITRARILY IN REJECTING THE NPR AGREEMENTS AS A RATE BENCHMARK FOR NONCOMMERCIAL BROADCASTERS.......................................................................................... 18

   A.    The Board Long Has Recognized the Superiority of Benchmarks in Setting Willing-Buyer-Willing-Seller Rates Because They Reflect Actual Willing-Buyer-Willing-Seller Negotiations....................................................................................... 18

   B.    The NPR Agreements Easily Satisfy the Comparability Test. .......... 21

   C.    The Board's Rejection of the NPR Agreements Due to Allegedly Insufficient Expert Comparability Analysis Ignores the Agreements' Text and Arbitrarily Disregards Its Own Prior Treatment of Analogous Benchmarks................................................. 22

   D.    The Board Acted Arbitrarily in Requiring NRBNMLC, a Benchmark's Proponent, To Quantify Adjustments Despite Repeatedly Placing that Burden on Challengers................................ 26

      1.     The Board Repeatedly Has Required the Challenger, Not the Proponent, of an Otherwise Comparable Benchmark To Quantify Proposed Adjustments......................................... 27

2.  The Board Arbitrarily Rejected the NPR Agreement for Allegedly Insufficient Quantification of Litigation Cost Savings. .................................................................................. 29

3.  The Board Arbitrarily Departed from Precedent by Rejecting the NPR Agreement for Insufficient Adjustment for Consolidated Reporting. ................................. 32

E.  The Board Disregarded Binding Register Precedent in Refusing To Consider SoundExchange's Analysis of [[▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮]]. ........................................................... 34

III.  THE BOARD ARBITRARILY APPLIED DIFFERENT BURDENS OF PROOF TO NRBNMLC AND SOUNDEXCHANGE. ........................ 37

IV.  THE BOARD ABROGATED ITS OBLIGATION TO SET RATES REFLECTING BOTH SELLER- AND BUYER-SIDE DYNAMICS AND OTHERWISE LACKED SUBSTANTIAL EVIDENCE SUPPORTING ITS DETERMINATION. ................................... 40

A.  The Board Abrogated Its Obligation To Set Rates That Both Buyers and Sellers Would Negotiate and Cited No Evidence that Buyers Would Negotiate Above-Threshold Commercial-Level Fees. .......................................................................... 41

B.  Findings From Fifteen-Year-Old *Web II* Do Not Constitute Substantial Evidence Supporting the Determination In *Web V*. ........ 42

C.  Mr. Orszag's Unsupported *Ipse Dixit* Is Not Substantial Evidence. .............................................................................. 43

D.  The Portions of SoundExchange's Rebuttal Case Cited by the Board Are Not Substantial Evidence. ................................. 45

1.  The Board Violated Its Regulations by Admitting the Overlap Study As "Commercial Data" But Using It To Draw Conclusions About a Broader Station Universe. ........... 45

2.  An Internet Blog Related to Two Broadcast Stations Is Not Substantial Evidence. ....................................................... 50

V.      THE BOARD LACKED SUBSTANTIAL EVIDENCE TO DOUBLE
        THE MINIMUM FEE. ................................................................................ 51

VI.     THE DETERMINATION VIOLATES RFRA AND THE FIRST
        AMENDMENT. ......................................................................................... 52

CONCLUSION .................................................................................................... 55

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
        TYPEFACE REQUIREMENTS, AND TYPE-STYLE
        REQUIREMENTS ..................................................................................... 56

CERTIFICATE OF SERVICE .............................................................................. 57

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Abbott v. Perez,*
138 S. Ct. 2305 (2018)........................................................ 37, 38

*\*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014)............................................................ 52, 55

*Butte County v. Hogen,*
613 F.3d 190 (D.C. Cir. 2010).................................................. 17

*Carson ex rel. Makin,*
142 S. Ct. 1996 (2022)......................................................... 53

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993)............................................................ 44

*Independent Petroleum Ass'n v. Babbitt,*
92 F.3d 1248 (D.C. Cir. 1996).................................................. 17

*Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board,*
571 F.3d 69 (D.C. Cir. 2009)................................................... 7

*Johnson v. Copyright Royalty Board,*
969 F.3d 363 (D.C. Cir. 2020).................................................. 26

*Kennedy v. Bremerton School District,*
142 S. Ct. 2407 (2022)......................................................... 53

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
140 S. Ct. 2367 (2020)......................................................... 55

*\*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile
Insurance Co.,*
463 U.S. 29 (1983)........................................................ 17, 34, 41

*Authorities upon which we chiefly rely are marked with asterisks.

*Music Choice v. Copyright Royalty Board,*
   970 F.3d 418 (D.C. Cir. 2020)................................................................ 17, 42

*New York Stock Exchange LLC v. Securities and Exchange Commission*
   962 F.3d 541 (D.C. Cir. 2020)..................................................................... 17

*Petroleum Communications, Inc. v. Federal Communications Commission,*
   22 F.3d 1164 (D.C. Cir. 1994)..................................................................... 17

*Philips Petroleum Co. v. Federal Energy Regulatory Commission,*
   792 F.2d 1165 (D.C. Cir. 1986)................................................................... 17

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015)................................................................................... 54

*Rosenberger v. Rector and Visitors of the University of Virginia,*
   515 U.S. 819 (1995)................................................................................... 54

*Safe Extensions, Inc. v. Federal Aviation Administration,*
   509 F.3d 593 (D.C. Cir. 2007)..................................................................... 17

*Sea Robin Pipeline Co. v. Federal Energy Regulatory Commission,*
   795 F.2d 182 (D.C. Cir. 1986)..................................................................... 44

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board,*
   502 U.S. 105 (1991)................................................................................... 54

*SoundExchange, Inc. v. Copyright Royalty Board,*
   904 F.3d 41 (D.C. Cir. 2018)....................................................................... 28

*TQ Delta, LLC v. CISCO Systems, Inc.,*
   942 F.3d 1352 (Fed. Cir. 2019) ................................................................... 44

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
   137 S. Ct. 2012 (2017)................................................................................ 53

*Turner Broadcasting System, Inc. v. Federal Communications Commission,*
   512 U.S. 622 (1994)................................................................................... 54

## State Cases

*Doe v. Cahill*,
  884 A.2d 451 (Del. 2005) ................................................................... 51

## Federal Statutes

5 U.S.C. §556 ........................................................................... 37, 43

*5 U.S.C. §706 ................................................................................ 16

17 U.S.C. §112 ......................................................................... 1, 2, 4

*17 U.S.C. §114
  ............................. 1, 2, 3, 4, 5, 8, 13, 15, 18, 19, 21, 23, 30, 34, 35, 37, 39, 41, 52

17 U.S.C. §118 .............................................................................. 5

17 U.S.C. §801 ...................................................................... 2, 4, 30

17 U.S.C. §802 ............................................................................. 35

17 U.S.C. §803 ................................................................... 2, 16, 37, 43

26 U.S.C. §501 ....................................................................... 10, 11

*42 U.S.C. §2000bb ............................................................ 52, 54, 55

47 U.S.C. §391 .............................................................................. 5

47 U.S.C. §392 .............................................................................. 5

47 U.S.C. §393 .............................................................................. 5

47 U.S.C. §397(6) .......................................................................... 5

**Public Laws**

*Digital Millennium Copyright Act*,
    Pub. L. No. 105-304, 112 Stat. 2860 (1998) ......................................... 20, 30

*Small Webcaster Settlement Act*,
    Pub. L. No. 107-321, 116 Stat. 2780 (2002) ................................................ 5

*Webcaster Settlement Act of 2008*,
    Pub. L. No. 110-435, 122 Stat. 4974 (2008) ................................................ 5

*Webcaster Settlement Act of 2009*,
    Pub. L. No. 111-36, 123 Stat. 1926 (2009) ................................................ 5

*Music Modernization Act*,
    Pub. L. No. 115-264, 132 Stat. 3676, 3723 (2018) ...................................... 21


**Federal Regulations**

\*37 C.F.R. §351.10 ................................................................................. 14

37 C.F.R. §351.4 ................................................................................... 43

37 C.F.R. §380.32 (2018) ......................................................................... 9

37 C.F.R. §380.33 (2018) ......................................................................... 9

47 C.F.R. §73.503 ............................................................................... 10, 11


**Board and Agency Decisions and Publications**

*\*Determination of Reasonable Rates and Terms for the Digital Performance
    of Sound Recordings and Ephemeral Recordings (Web I)*,
    67 Fed. Reg. 45240 (July 8, 2002)................................................. 6, 20, 24, 30

*Determination of Rates and Terms for Preexisting Subscription Services and
    Satellite Digital Audio Radio Services (SDARS I)*,
    73 Fed. Reg. 4080 (Jan. 24, 2008) ............................................................ 27

*Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services (SDARS II),*
78 Fed. Reg. 23054 (Apr. 17, 2013) ....................................................... 24, 32

*Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings,*
79 Fed. Reg. 23102 (Apr. 25, 2014) ...................... 8, 19, 20, 23, 24, 25, 28, 29

*Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV),*
81 Fed. Reg. 26316 (May 2, 2016) .................... 8, 9, 19, 24, 26, 28, 29, 42, 51

*Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III),*
83 Fed. Reg. 65210 (Dec. 19, 2018) ............................................................. 20

*Digital Performance Right in Sound Recordings and Ephemeral Recordings,*
72 Fed. Reg. 24084 (May 1, 2007) ............................................ 7, 8, 19, 25, 27

*In re Noncommercial Educational Station Fundraising for Third-Party Non-Profit Organizations,*
32 FCC Rcd. 3411 (2017) ............................................................................... 54

*Notification of Agreement Under the SWSA of 2002,*
68 Fed. Reg. 35008 (June 11, 2003) ................................................................ 6

*Notification of Agreements Under the WSA of 2008,*
74 Fed. Reg. 9293 (Mar. 3, 2009) .................................................................... 8

*Notification of Agreements Under the WSA of 2009,*
74 Fed. Reg. 40614 (Aug. 12, 2009) ............................................................... 8

*Memorandum Opinion on Novel Material Questions of Law,*
Docket No. 14-CRB-0001-WR, 13 (Sept. 18, 2015) ......................... 20, 35, 36

*Order Denying in Part SoundExchange's Motion for Rehearing,*
Docket No. 14-CRB-0001-WR, 12 n.l5 (Feb. 10, 2016) ......................... 20, 21

**CARP Reports**

*Report of the CARP,* Docket No. 2000-9 CARP DTRA 1&2
(Feb. 20, 2002) ................................................... 6, 18, 19, 20 25, 31

**Legislative History**

148 Cong. Rec. S11725 (daily ed. Nov. 20, 2002) .................................................. 7

H.R. Rep. No. 94-1476 (1976) .................................................................. 5

# GLOSSARY

The following abbreviations or terms are used in this brief.

| | |
|---|---|
| **ATH** | Aggregate Tuning Hours, or "listener hours," as defined in 37 C.F.R. §380.7. |
| **APA** | The Administrative Procedure Act, as set forth in scattered sections of Title 5 of the United States Code. |
| **Board** | The Copyright Royalty Board, the body of three Copyright Royalty Judges authorized by Congress in 17 U.S.C. §801 to, *inter alia*, set rates and terms under various statutory licenses. |
| **CARP** | A Copyright Arbitration Royalty Panel, the predecessor bodies to the Copyright Royalty Board. |
| **CARP Report** | The Report of the Copyright Arbitration Royalty Panel issued on February 20, 2002, in Docket No. 2000-9 CARP DTRA 1&2 setting rates under the Statutory Licenses, available at https://webharvest.gov/peth04/20041016023627/http:/copyright.gov/carp/webcasting_rates.pdf. |
| **CBI** | Collegiate Broadcasters, Inc. |
| **CCM** | A radio format denoting "Contemporary Christian Music." |
| **CPB** | Corporation for Public Broadcasting. |
| **Determination** | The Final Determination of the Board in the proceeding below, issued on September 20, 2021 (JA___) and published at *Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances*, 86 Fed. Reg. 59452 (Oct. 27, 2021). |
| **DMCA** | Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860 (1998). |

| | |
|---|---|
| ***Mediabase Order*** | The Board's April 2, 2020 *Order Denying NRBNMLC Motion To Strike* the Written Rebuttal Testimony of Travis Ploeger and Jonathan Orszag related to a playlist overlap study using certain radio airplay data collected by Mediabase on (JA__-__). |
| **Music ATH** | ATH of Website Performances of sound recordings of musical works, as defined in the NPR Agreement (TX3020.6-7 (JA__-__)). |
| **NAB** | National Association of Broadcasters. |
| **NPR** | National Public Radio, Inc. |
| **NPR Agreement** | The September 23, 2019 agreement between NPR and SoundExchange setting fees under the Statutory Licenses for 2021-2025 (TX3020 (JA___). |
| **NPR Agreements** | The February 23, 2015 agreement between NPR and SoundExchange setting fees under the Statutory Licenses for 2016-2020 (TX3021 (JA___) and the September 23, 2019 agreement between NPR and SoundExchange setting fees under the Statutory Licenses for 2021-2025 (TX3020 (JA___)). |
| **NRBNMLC** | National Religious Broadcasters Noncommercial Music License Committee. |
| ***Omnibus Order*** | The Board's June 8, 2021 *Omnibus Order on Prehearing Evidentiary Motions* (JA__). |
| **Performance** | As defined in 37 C.F.R. §380.7, "each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission," excluding certain transmissions identified in that section. |
| **Register** | The Register of Copyrights, United States Copyright Office. |

| | |
|---|---|
| *Register Op.* | The September 18, 2015 *Memorandum Opinion on Novel Material Questions of Law*, issued by the Register in Docket No. 14-CRB-0001-WR (*Web IV*), 2015), available at https://www.crb.gov/rate/14-CRB-0001-WR-2016-2020-WEB-IV/2015-9-18-Memorandum-Opinion-Novel-Material-Questions-Law.pdf. |
| **RFRA** | The Religious Freedom Restoration Act, codified as amended at 42 U.S.C. §2000bb *et seq.* |
| *SDARS I* | The determination of the Board of rates and terms under the Statutory Licenses for preexisting subscription services and satellite digital audio radio services, published at *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, 73 Fed. Reg. 4080 (Jan. 24, 2008). |
| *SDARS II* | The determination of the Board of rates and terms under the Statutory Licenses for preexisting subscription services and satellite digital audio radio services, published at *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, 78 Fed. Reg. 23054 (Apr. 17, 2013). |
| *SDARS III* | The determination of the Board of rates and terms under the Statutory Licenses for preexisting subscription services and satellite digital audio radio services, published at *Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III)*, 83 Fed. Reg. 65210 (Dec. 19, 2018). |
| **Section 112 Statutory License** | The statutory license under section 112 of the Copyright Act for the making of ephemeral reproductions of sound recordings to facilitate performances made under the Section 114 Statutory License. |

| | |
|---|---|
| **Section 114 Statutory License** | The statutory license under section 114 of the Copyright Act for the public performance of sound recordings via digital audio transmission by certain types of services. |
| **Statutory Licenses** | The Section 112 and Section 114 Statutory Licenses. |
| **Tr.** | The transcript of the hearings below. |
| **TX** | A trial exhibit admitted in the case under review. |
| *Web I* | The determination of the Librarian of Congress reviewing the CARP Report, found at *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45240 (July 8, 2002). |
| *Web II* | The determination of the Board of rates and terms under the Statutory Licenses for 2006-2010, published at *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24084 (May 1, 2007). |
| *Web III Remand* | The determination of the Board of rates and terms under the Statutory Licenses for 2011-2015 following remand of the case by this Court, published at *Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23102 (Apr. 25, 2014). |
| *Web IV* | The determination of the Board of rates and terms under the Statutory Licenses for 2016-2020, published at *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26316 (May 2, 2016). |

# INTRODUCTION

This appeal provides an opportunity to correct course on rates that long have gone astray for noncommercial services under the 17 U.S.C. §§112(e) and 114(d) statutory licenses ("Statutory Licenses"). The Board re-imposed a threshold structure consisting of a (now-doubled) $1,000 minimum fee/year covering 159,140 Aggregate Tuning Hours ("ATH")/month plus commercial-level per-performance rates for above-threshold webcasting. The Board initially adopted that structure for 2006-2010 based almost entirely on evidence concerning NPR stations. NPR stations, however, have never been subject to those rates because they consistently have negotiated more favorable fees with the record industry. The Board nonetheless persists in imposing that structure on **non**-NPR stations. *Infra* pp. 7-9.

The Board must set rates that best replicate those that willing buyers and sellers would negotiate. 17 U.S.C. §114(f)(1)(B). Yet it has never based noncommercial rates on any agreements between record companies and noncommercial buyers at serious risk of paying above-threshold commercial-level rates. To the contrary, it rejected precisely such agreements between NPR and SoundExchange (representing most record companies) as a benchmark even though they involve noncommercial buyers, the same sellers, and the same rights as those being valued and despite the Board's own prior reliance on NPR evidence

to adopt the structure. Instead, the Board relied on error-prone economic musings regarding rates it believed that **sellers** would accept, yielding a result best described as **un**willing-buyer-willing-seller rates. *Infra* pp. 41-45.

The above-threshold rates harm noncommercial religious broadcasters almost uniquely. Until 2016, they were able to avoid the discriminatory effect of those rates through settlements but thereafter had no alternative. *Infra* pp. 7-9. The Determination charges above-threshold religious broadcasters much more than secular NPR broadcasters to communicate their mission-driven messages. That structure cannot be sustained under the willing-buyer-willing-seller standard, the Religious Freedom Restoration Act ("RFRA"), or the First Amendment.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under 17 U.S.C. §112(e)(3), §114(f)(1), and §801(b)(1). The Determination was published on October 27, 2021. 86 Fed. Reg. 59452. NRBNMLC timely filed its notice of appeal on November 24, 2021. This Court has jurisdiction under 17 U.S.C. §803(d).

## ISSUES PRESENTED

Did the Board act arbitrarily, capriciously, and unlawfully in adopting rates and terms for noncommercial licensees, and should its action be set aside, because:

1. It departed from past precedent without explanation by rejecting use of the SoundExchange-NPR agreements as a benchmark because,

*inter alia*, an expert did not recite comparability factors that are apparent from the agreement's face?

2.     It departed from past precedent without explanation by requiring a benchmark's proponent, not challenger, to quantify adjustments to the benchmark for litigation cost savings and consolidated reporting?

3.     It contravened binding precedent by ruling that 17 U.S.C. §114(f)(4)(C), prohibiting consideration of agreements negotiated under 17 U.S.C. §114(f)(4)(A), barred it from considering a SoundExchange analysis used by NRBNMLC's expert to [[█████ ███████████████████████████████ ]], even though the analysis was not such an agreement?

4.     It misallocated the burden of proof, contrary to the Administrative Procedure Act ("APA"), by requiring NRBNMLC to refute SoundExchange's proposal instead of requiring SoundExchange to support that proposal?

5.     It lacked substantial evidence to support its Determination, including willing-buyer evidence, instead relying on a fifteen-year-old proceeding and witness *ipse dixit*?

6.     It doubled the minimum fee based solely on SoundExchange's increased overall costs?

7.      It violated its regulations by admitting a study as commercial data but using it as a sample study to draw conclusions about a broader universe that were speculative and self-contradictory?

8.      It imposed much higher rates on above-threshold religious broadcasters than on secular NPR stations, in violation of RFRA and the First Amendment?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum.

## STATEMENT OF THE CASE

**A.      Statutory and Regulatory Background**

**1.      Statutory Licenses and the Rate-Setting Standard**

The Determination set 2021-2025 rates under the Statutory Licenses, which enable webcasters to license noninteractive digital audio transmissions and ephemeral recordings of sound recordings.  17 U.S.C. §§112(e), 114(d).  Congress authorized the Board to set rates under these Licenses.  *Id.* §801.

The Board must "establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller." *Id*. §114(f)(1)(B).  Those rates must "distinguish among the different types of services."  *Id.*  The Board may "consider the rates and terms for comparable types of audio transmission services and

comparable circumstances under voluntary license agreements." *Id.*
§114(f)(1)(B)(ii).

### 2. Noncommercial Rate History

#### a. Favored Licensing Status of Noncommercial Broadcasters

Congress has long favored noncommercial broadcasters. In the 1967 Public Broadcasting Act, Congress aimed to "strengthen the capability of existing public television and radio stations" and allocated funds "for the expansion and development of noncommercial radio broadcast station facilities." 47 U.S.C. §§391-393, 397(6). It also created a statutory license to facilitate noncommercial broadcasting of musical works. 17 U.S.C. §118. A related committee report found "that encouragement and support of noncommercial broadcasting is in the public interest" and that "the nature of public broadcasting does warrant special treatment in certain areas." H.R. Rep. No. 94-1476, at 117 (1976). Congress also enacted three Webcaster Settlement Acts ("WSAs") regarding the Statutory Licenses to enable noncommercial and other webcasters to negotiate lower rates than Copyright Arbitration Royalty Panel ("CARP")/Board-set rates. *Small Webcaster Settlement Act*, Pub. L. No. 107-321, 116 Stat. 2780 (2002) ("*SWSA*"); *WSA of 2008*, Pub. L. No. 110-435, 122 Stat. 4974 (2008); *WSA of 2009*, Pub. L. No. 111-36, 123 Stat. 1926 (2009).

### b.    Insufficiently Differentiated Noncommercial Rates and Noncommercial Webcasters' Response

The Board/CARP have set lower noncommercial rates under the Statutory Licenses in each webcasting proceeding to date – to a degree.  Marketplace behavior, however, reveals that the rates have reflected the seller-side, but not buyer-side, perspective and thus do not reflect rates that willing noncommercial buyers and sellers would negotiate.

In *Web I*, the CARP found that setting identical rates for noncommercial and commercial services "affronts common sense" and that "commercial license rates almost certainly overstate fair market value" and "can not appropriately be used as a [noncommercial] benchmark." *Report of the CARP*, Docket No. 2000-9 CARP DTRA 1&2, 89 (Feb. 20, 2002), https://webharvest.gov/peth04/20041016023627/http:/copyright.gov/carp/webcasting_rates.pdf ("*CARP Report*").  It adopted noncommercial rates at one-third the commercial rates, which the Librarian affirmed. *Id.* 94; *Web I*, 67 Fed. Reg. 45240, 45259, 45272 (July 8, 2002).  Noncommercial webcasters contested those rates and, following *SWSA*'s passage, negotiated better non-precedential rates. *Notification of Agreement Under the SWSA of 2002*, 68 Fed. Reg. 35008, 35008-12 (June 11, 2003).  "The legislation reflect[ed] a compromise for," *inter alia*, "noncommercial webcasters … that could not survive with the rates set by the

Librarian." 148 Cong. Rec. S11725, S11726 (daily ed. Nov. 20, 2002) (statement of Sen. Leahy).

The noncommercial threshold structure adopted below originated in *Web II* (2006-2010). There, the Board found that "up to a point, certain 'noncommercial' webcasters may constitute a distinct segment of the noninteractive webcasting market that in a willing buyer/willing seller hypothetical marketplace would produce different, lower rates than" commercial rates. *Web II*, 72 Fed. Reg. 24084, 24097 (May 1, 2007). It found, however, that rates should "include safeguards to assure that" the noncommercial submarket "does not simply converge or overlap" with the commercial submarket. *Id.* 24097-98. It thus adopted a threshold structure whereby noncommercial webcasters paid $500/channel to stream 159,140 ATH/month and commercial-level per-performance rates for above-threshold webcasting. *Id.* 24111.

The Board based its above-threshold rates on "evidence in the record that [submarket] characteristics may be changing for at least some." *Id.* 24098. That evidence, however, overwhelmingly concerned **NPR** stations – none concerned religious stations. *Compare id.* 24098 *with* Proposed Findings of Fact and Conclusions of Law of SoundExchange, Inc., Docket No. 2005-1 CRB DTRA, ¶¶1117-217 (Dec. 12, 2006), https://app.crb.gov/document/download/10443; *Intercollegiate Broad. Sys., Inc. v. CRB*, 571 F.3d 69, 89 (D.C. Cir. 2009) (Board

"looked to evidence of the largest NPR stations for evidence of convergence"). The Board even based its chosen convergence proxy – 159,140 ATH/month – on average **NPR** station listenership. *Web II*, 72 Fed. Reg. at 24099.

As in *Web I*, noncommercial webcasters contested these rates and negotiated better non-precedential rates for 2006-2015 under WSA legislation. 17 U.S.C. §114(f)(4)(A); *Notification of Agreements Under the WSA of 2009*, 74 Fed. Reg. 40614, 40620-26 (Aug. 12, 2009); *Notification of Agreements Under the WSA of 2008*, 74 Fed. Reg. 9293, 9294-99 (Mar. 3, 2009).

The Board readopted its threshold structure in *Web III* (2011-2015), but given the WSA agreements, there were no above-threshold noncommercial participants to contest that result. *Web III Remand*, 79 Fed. Reg. 23102, 23121, 23124 (Apr. 25, 2014). In *Web IV* (2016-2020), there was significant noncommercial participation, but SoundExchange settled with two noncommercial entities – NPR and CBI (representing student-operated stations) – yet refused to settle with religious broadcasters. *See* TX3000 (CBI) (JA__); TX3021 (NPR) (JA__); *Web IV*, 81 Fed. Reg. 26316, 26316-17 (May 2, 2016). The Board readopted the same structure, accepting SoundExchange's seller-side proposal based not on agreements but "economic logic." *Id*. 26391, 26395-96.

Unlike *Web I-III*, *Web IV* rates became the only option for non-NPR above-threshold noncommercial broadcasters, which are almost exclusively religious.

TX5625.27-28 (JA__-__).  For the first time ever, those broadcasters were subjected to above-threshold commercial-level rates.  *Web IV*, 81 Fed. Reg. at 26396.  Of the $[[ ██████ ]] in 2018 above-threshold fees, religious broadcasters paid [ ██ ]]% and constituted 95% of above-threshold entities. TX5625.27-28, 117 (JA__-__, __).

### c.   Post-*Web IV* NPR/Non-NPR Fee Disparity

The 2016 disappearance of alternatives led to starkly higher average per-Music-ATH fees charged to above-threshold broadcasters versus NPR broadcasters.  In 2018, NPR stations, through CPB, paid $560,000 for 285,132,065 Music ATH – $0.00196/Music ATH.  37 C.F.R. §§380.32(a), 380.33(a) (2018); TX3021.9-10 (JA__-__).  By contrast, above-threshold noncommercial licensees paid $[[ ██████ ]] for approximately [[ ██████ ]][1] Music ATH – *i.e.*,

---

[1] These licensees paid $[[ ██████ ]] in 2018 above-threshold fees and $[[ ████ ]] in minimum fees for [[ ██ ]] channels ([[ ████████████ ]] paid $[[ ███ ]] in minimum fees).  TX5068 (JA__); TX5625.23 n.31, 117 (JA__, __).  Using SoundExchange's estimates of 14 recordings/hour for noncommercial Christian music stations and 15 recordings/hour for music-intensive channels, Music ATH from above-threshold fees is approximately [[ ██████ ]] ([[ █████ ]]=$[[ ███████ ]]÷$0.0018/performance÷15 performances/Music ATH).  TX5625.23 n.31, 117 (JA__, __).  Conservatively assuming that each channel hit 159,140 ATH/month, Music ATH from minimum fees is approximately [[ ██████ ]] ([[ ████████ ]]=[[ ██ ]] channels*159,140 ATH/month*12 months*14 noncommercial recordings/hour÷15 recordings/Music ATH).  TX5625 (JA __).  Total Music ATH is approximately [[ ██████ ]] ([[ █████ ]]=[[ ██████ ]]+[[ ██████ ]]).

$[[ ▮▮▮ ]]/Music ATH, over [[ ▮▮▮ ]] the NPR rate.  TX5625.23 n.31, 117 (JA__, __).

## B.    Distinct Noncommercial Broadcaster Attributes

### 1.    Distinct Market Segment of Noncommercial Broadcasters

NRBNMLC represents religious noncommercial radio broadcasters that simulcast.  These broadcasters exhibit the same traits that NAB argued warrant lower rates from other webcasters.  *Determination* 218 (JA__).  But NRBNMLC-represented broadcasters also are nonprofits that have different objectives and behaviors that reduce their willingness to pay license fees and segment them from the for-profit market.  Unlike commercial entities, whose goal is to maximize and distribute profits, nonprofit entities cannot distribute profits.  26 U.S.C. §501(c)(3); Tr. 3263:9-20, 3996:7-3998:11 (JA__, __-__); TX3060.10 (JA__); TX3061.8-9 (JA__-__).  This limits their access to capital, incentivizes less lucrative activities, and lowers their willingness to pay.  Tr. 3265:4-16, 3996:2-3997:15 (JA__, __-__); TX3061.9-10 (JA__-__).

Noncommercial broadcasters also are "organized and operated exclusively" to fulfill charitable missions.  26 U.S.C. §501(c)(3); 47 C.F.R. §73.503(a), (d); Tr. 3259:9-3261:12 (JA__); TX3061.8-10 (JA__-__); TX3062.19-21 (JA__-__).  Their programming must be educational, mission-oriented, and devoid of ads.  47 C.F.R. §73.503(d).  These restrictions "directly affect the fundamental character of

the programming" to differentiate it from commercial programming, render it inherently less profitable, and reduce willingness to pay "to a level that is significantly below that of commercial for-profit webcasters." TX3060.12-14 (JA__-__); TX3061.9-11 (JA__-__); TX3062.20-24 (JA__-__); Tr. 3255:18-3256:3, 4763:2-4764:24 (JA__-__, __-__). Noncommercial religious broadcasters fund their operations largely through voluntary donations that, unlike ad revenues, do not increase proportionally with listenership, which further reduces their willingness to pay. TX3060.13-14 (JA__-__); TX3062.23-25 (JA__-__); Tr. 3997:9-3998:19, 4766:2-4767:12 (JA__-__, __-__).

### 2. Persistence of Noncommercial Market Segmentation Regardless of Listenership

The attributes segmenting the noncommercial submarket "are present even among large noncommercial broadcasters, whether measured by listenership or some other metric, and they are absent even among small commercial services." TX3061.13-14 (JA__-__); Tr. 3271:18-3272:15 (JA__-__). Noncommercial broadcasters remain mission-oriented and offer noncommercial educational programming even as listenership grows. 26 U.S.C. §501(c)(3); 47 C.F.R. §73.503(a), (d); Tr. 3271:17-3272:21 (JA__); TX3061.13-14 (JA__-__). Similarly, the nondistribution constraint "is a defining characteristic of all nonprofits, regardless of size" and precludes profit motives from driving a nonprofit's business decisions even if it exceeds 159,140 ATH/month. Tr.

3264:13-3265:10, 3272:7-3274:25, 4002:25-4003:16 (JA__-__, __-__, __-__);

TX3060.16 (JA__).  Convergence of willingness to buy as a noncommercial

webcaster's audience grows is not expected under economic theory.  TX3060.16

(JA__); TX3061.13-14 (JA__-__).

## C.    The Proceeding

NRBNMLC was the only noncommercial licensee representative following

SoundExchange's NPR and CBI settlements.  *Determination* 3 (JA__).  The Board

adopted those agreed rates for those webcaster categories.  *Id.*

The NPR Agreement charged $800,000/year for annual Music ATH

increasing from 360,000,000 to 400,000,000 over the term for 530 NPR stations,

NPR, and three public media entities to share.  TX3020.7-8 (JA__-__).

NRBNMLC relied on the NPR Agreement to propose two rate alternatives:

(1)    $500/year for the annual equivalent of 159,140 ATH/month plus one-
       third the commercial broadcaster/webcaster per-performance rates for
       above-threshold webcasting; or

(2)    an annual fee for NRBNMLC-represented broadcasters of 1.5 times
       the NPR fee covering 1.5 times the Music ATH and stations.

*Determination* 254 (JA__).  SoundExchange proposed a $1,000 fee for 159,140

ATH/month and commercial-level per-performance fees for above-threshold

webcasting.  *Id.* 250 (JA__).

### D. The Determination

The Board first discussed, and rejected, NRBNMLC's proposed NPR Agreement benchmark and proposal. *Determination* 259-68 (JA__-__). It found that NRBNMLC bore the burden of demonstrating the benchmark's comparability to the noncommercial "target market" and quantifying any adjustments but had not met those burdens. *Id.* 259 (JA__).

The Board faulted NRBNMLC for presenting "insufficient expert testimony" of comparability and not quantifying adjustments for litigation cost savings or consolidated reporting reflected in the NPR Agreement despite previously accepting numerous benchmarks without such testimony or quantification. *Id.* 260-61, 267 (JA__-__, __); *infra* pp. 26-34. It also found that section 114(f)(4) barred it from considering an analysis regarding the [[ ███████ ██████████ ]] that enabled NRBNMLC's economist to [[ ██████ ███████████████████ ]] despite a binding Register ruling that only "WSA agreements themselves" are barred. *Determination* 264-65 (JA__-__); *infra* pp. 34-37.

The Board then considered SoundExchange's proposal. *Determination* 250, 268 (JA__, __). It did not analyze whether SoundExchange had shown that its proposal "most clearly represent[s]" willing-buyer-willing-seller rates. *Id.* 268 (JA__); 17 U.S.C. §114(f)(1)(B). Instead, in a single sentence, it "accept[ed] th[e]

reasoning" underlying SoundExchange's proposal and required NRBNMLC to **disprove** it with "persuasive counterarguments." *Determination* 268 (JA__). After rejecting several counterarguments, the Board adopted SoundExchange's structure. *Id.* 279-80 (JA__-__).

In considering one such "counterargument" – *i.e.*, cannibalization of commercial listeners by noncommercial stations "is unlikely" – the Board cited a SoundExchange study comparing sound recordings played by ten commercial and ten noncommercial CCM stations that Mediabase – a broadcast radio airplay monitoring service – happened to monitor. *Id.* 272-73 (JA__-__). NRBNMLC had moved to exclude the study for violating 37 C.F.R. §351.10(e), the sponsor's lack of knowledge, and unreliability. NRBNMLC Mot. To Strike 4-10 (Mar. 2, 2020) (JA__-__). The Board denied the motion, treating the study as "third-party commercial data" rather than a sample study subject to Section 351.10(e). *Mediabase Order* at 3 (JA__). The Determination nonetheless treated the sample study **as a study** to draw conclusions about a broader station universe. *Determination* 275-76 (JA__-__).

The Board doubled the 2020 $500 minimum fee to $1,000, citing only SoundExchange's overall administrative costs to support that doubling. *Id.* 286-90 (JA__-__).

## SUMMARY OF ARGUMENT

The Board must set rates that most clearly represent those that most willing buyers and willing sellers would negotiate.  As the Board acknowledged, the best way to determine those rates is from comparable "benchmark" agreements involving the same buyers, sellers, and rights as those in the target market.  Those agreements reflect rates that actual buyers and sellers negotiated and thus are strongly favored over error-prone theorizing.

The SoundExchange-NPR Agreements covering 2016-2020 and 2021-2025 ("NPR Agreements") represent the best evidence of noncommercial willing-buyer-willing-seller rates because they are demonstrably comparable to the noncommercial target market.  NRBNMLC proposed rates based on these benchmarks, but the Board rejected the Agreements, arbitrarily erecting new obstacles not required of prior benchmarks.  The Board also erroneously held that 17 U.S.C. §114((f)(4)(C) barred it from considering a SoundExchange analysis valuing the [[ ]], contrary to binding precedent.

Conversely, the Board accepted SoundExchange's rate proposal unquestioningly, incorrectly shifting the burden to require NRBNMLC to **disprove** it by counterargument.  SoundExchange's proposal to charge noncommercial broadcasters above-threshold commercial-level rates was not supported by substantial evidence, as required, but by fifteen-year-old reasoning premised on

**NPR**-centric evidence and cursory expert *ipse dixit*. SoundExchange's Board-cited rebuttal evidence regarding NRBNMLC's proposal was similarly insubstantial, consisting of an unrepresentative playlist study whose admission violated the Board's regulations and an unreliable blog that NRBNMLC was precluded from refuting. The Board discussed no evidence that willing **buyers** would support above-threshold commercial-level rates.

The Board-set rates harm above-threshold religious broadcasters almost uniquely, charging them far more than secular NPR broadcasters to communicate religious messages. Those rates thus violate the willing-buyer-willing-seller standard, RFRA, and the First Amendment.

## STANDING

NRBNMLC fully participated below, representing noncommercial broadcasters that are bound by the Determination. 17 U.S.C. §803(d)(1). Thus, it has standing to appeal.

## ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews Board determinations under 5 U.S.C. §706. 17 U.S.C. §803(d)(3). It must set aside determinations that are "unsupported by substantial evidence," "arbitrary" or "capricious," "contrary to constitutional right," "short of statutory right," or "otherwise not in accordance with law." 5 U.S.C. §706(2). When "the agency's decision is based on an erroneous view of the law, its decision

cannot stand." *Philips Petroleum Co. v. FERC*, 792 F.2d 1165, 1169 (D.C. Cir.

1986).

An agency acts arbitrarily if, *inter alia*, it:

- did not "consider[] … the relevant factors";

- "entirely failed to consider an important aspect of the problem"; or

- failed to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43

(1983) (citation and quotation marks omitted) ("*State Farm*"); *N.Y. Stock Exch.*

*LLC v. SEC*, 962 F.3d 541, 553 (D.C. Cir. 2020).

"An agency cannot … treat[] type A cases differently from similarly situated

type B cases" and must adequately explain its action if it does. *Indep. Petroleum*

*Ass'n v. Babbitt*, 92 F.3d 1248, 1260 (D.C. Cir. 1996); *Petroleum Commc'ns, Inc.*

*v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994). "[A]n agency's ipse dixit cannot

substitute for reasoned decisionmaking." *Music Choice v. CRB*, 970 F.3d 418, 429

(D.C. Cir. 2020).

An agency must support its decisions by substantial evidence found in the

record itself. *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007). It

"cannot ignore evidence contradicting its position." *Butte County v. Hogen*, 613

F.3d 190, 194 (D.C. Cir. 2010).

## II. THE BOARD MISAPPLIED PRECEDENT AND ACTED ARBITRARILY IN REJECTING THE NPR AGREEMENTS AS A RATE BENCHMARK FOR NONCOMMERCIAL BROADCASTERS.

The Board acted arbitrarily and contrary to its precedent in rejecting the NPR Agreements as a benchmark on grounds that it did not require prior similar benchmarks to satisfy, while providing no explanation for the changed treatment. It also misapplied binding Register precedent regarding the admissibility of WSA-related documents, wrongfully excluding an analysis.

### A. The Board Long Has Recognized the Superiority of Benchmarks in Setting Willing-Buyer-Willing-Seller Rates Because They Reflect Actual Willing-Buyer-Willing-Seller Negotiations.

The CARP/Board long have held that benchmark agreements pricing comparable rights are the best tool for determining willing-buyer-willing-seller rates "that would have been negotiated in the marketplace." 17 U.S.C. §114(f)(1)(B). In *Web I*, the CARP found that "the quest to derive" such rates "is best based on a review of actual marketplace agreements, if they involve comparable rights and comparable circumstances." *CARP Report* 43. It reasoned that "[a]ctual agreements contain embedded information that cannot be captured fully in the projections and estimates of theoretical analysts." *Id.* 39.

By contrast, it found that "rate-setting based upon theoretical market projections is" "highly susceptible to error" because "it is virtually impossible for a theoretician to identify all of the factors that might influence the structure of a

market and the manner in which these factors will interact to establish rates." *Id.*

38-39. The CARP concluded that "because … it is extraordinarily difficult to

predict marketplace results from purely theoretical premises, it is clearly safer to

rely upon the outcomes of actual negotiations." *Id.* 43, 46 (using benchmark).

The Board continued its reliance on benchmarks in *Web II-IV*. *Web II*, 72

Fed. Reg. at 24091-92, 24094-95 (acknowledging parties' agreement that

benchmarks represent "best approach" to determining willing-buyer-willing-seller

rates); *Web III Remand*, 79 Fed. Reg. at 23110 (finding it "appropriate to rely on

benchmarks to establish rates"); *Web IV*, 81 Fed. Reg. at 26329, 26331 n.67

(adopting "benchmark method of determining rates" and rejecting certain "non-

benchmark approaches"). The Board recognized "a presumption that marketplace

benchmarks demonstrate how parties to the underlying agreements commit real

funds and resources, which serve as strong indicators of their understanding of the

market." *Id.* 26327.

The test for determining whether a benchmark is comparable to the target

market is well-settled:

> [T]he Section 114(f)(2) hypothetical marketplace is one where the
> buyers are DMCA-compliant services, the sellers are record
> companies, and the product being sold consists of blanket licenses for
> each record company's repertory of sound recordings. Accordingly,
> the most reliable benchmark rate would be established through license
> agreements negotiated between these same parties for the rights
> described.

*CARP Report* 24, 44.  The Register endorsed this same-parties-same-rights test,

finding that the Yahoo!-RIAA benchmark used in *Web I*:

> met all the criteria identified by the CARP (discussed above) that
> characterized the hypothetical marketplace: Yahoo! was a DMCA-
> compliant Service; RIAA represented the interests of five independent
> record companies, and the license granted the same rights as those
> offered under the webcasting and the ephemeral recording licenses.

*Web I*, 67 Fed. Reg. at 45245; *accord Web III Remand*, 79 Fed. Reg. at 23111

(finding SoundExchange's NAB/Sirius XM settlements comparable because they

involved similar buyers and same rights, services, term, and sellers); *SDARS III*, 83

Fed. Reg. 65210, 65214 (Dec. 19, 2018).

Agreements covering statutorily compliant services are the precise type of

benchmark that Congress invited the rate-setter to consider when it enacted the

*DMCA* – namely, agreements for "comparable types of … services" that were

"negotiated under subparagraph (A)."  *DMCA*, Pub. L. No. 105-304, §405, 112

Stat. 2860, 2896 (1998); *Mem. Op. on Novel Material Questions of Law*, Docket

No. 14-CRB-0001-WR, 13 (Sept. 18, 2015), https://www.crb.gov/rate/14-CRB-

0001-WR-2016-2020-WEB-IV/2015-9-18-Memorandum-Opinion-Novel-

Material-Questions-Law.pdf ("*Register Op.*") (agreements under the Statutory

Licenses "would appear to be [the very] type of evidence that … Congress had in

mind"); *Order Denying in Part SoundExchange's Mot. for Reh'g*, Docket No. 14-

CRB-0001-WR, 12 n.l5 (Feb. 10, 2016), https://www.crb.gov/orders/2016/order-

sx-motion-for-rehearing.pdf ("voluntary noninteractive direct license agreements" are a "category of benchmarks that Congress has explicitly identified as pertinent to the establishment of the statutory rate").[2]

### B. The NPR Agreements Easily Satisfy the Comparability Test.

The NPR Agreements on which NRBNMLC's rate proposal is based are by far the most comparable agreements to those that noncommercial buyers and record company sellers would negotiate. These Agreements reflect broad noncommercial buyer, and near universal seller, buy-in, and they set rates for the same rights as those valued below. They thus easily satisfy the Board's comparability test.

*First*, the buyers – hundreds of noncommercial broadcast simulcasters – are the **same types of noncommercial buyers** as those represented by NRBNMLC. TX3020.6 (JA__) (defining covered "Originating Public Radio Station" as "a noncommercial terrestrial radio broadcast station" that meets certain requirements, "[q]ualifies as a 'noncommercial webcaster' under 17 U.S.C. 114(f)(4)(E)(i)," and "[o]ffers Website Performances only as part of the mission that entitles it to" tax-exempt status); TX3021.8 (JA__).

---

[2] Congress expanded these benchmarks to include **all** voluntary agreements covering comparable services negotiated under comparable circumstances. *Music Modernization Act*, Pub. L. No. 115-264, §103, 132 Stat. 3676, 3723 (2018).

*Second*, the sellers – record companies represented by SoundExchange, which represents all major record companies and independent labels – are the **same sellers** as those in the target market.  TX3020.2 (JA__); TX3021.2 (JA__); TX5625.52 (JA__).

*Third*, the works and rights licensed – blanket licenses to webcast record companies' sound recording repertories under the Statutory Licenses – are the **same works and rights** licensed in the target market.  TX3020.7 (JA__) (licensing "public performances by means of digital audio transmissions of sound recordings … in accordance with all requirements of 17 U.S.C. 114" and "Ephemeral Recordings"); TX3021.8-9 (JA__-__).

*Fourth*, the term of the 2021-2025 NPR Agreement is the **same term** as that in the target market.  TX3020.7 (JA__).

Thus, the NPR Agreements easily satisfy the Board's comparability test and are excellent benchmarks.

C.    **The Board's Rejection of the NPR Agreements Due to Allegedly Insufficient Expert Comparability Analysis Ignores the Agreements' Text and Arbitrarily Disregards Its Own Prior Treatment of Analogous Benchmarks.**

Even though these Agreements' comparability is apparent from their text, the Board rejected them, finding "insufficient expert testimony" to determine whether they were "sufficiently comparable to the target market."  *Determination* 261 (JA__).  It cited SoundExchange's argument that the agreements involved

"**different** buyers (CPB as opposed to individual webcasters), **different** sellers (SoundExchange as opposed to individual record companies), **different** sets of works (all commercial sound recordings as opposed to an individual record company's repertoire), and **different** rights and obligations." *Id.* (emphasis added). It thus found that the agreements "differ in their particulars" from the target market. *Id.* But these so-called "differences" are not differences at all and were present in prior benchmarks that the Board accepted.

*First*, the "buyers" – *i.e.*, licensees – are not CPB but noncommercial broadcasters webcasting under the Statutory Licenses, like the target market's buyers. CPB, along with NPR, was the buyers' negotiating agent. TX3020.1 (JA__) (licensing "transmissions made by Public Broadcasters"); TX3021.1 (same) (JA__); *see* 17 U.S.C. §114(e)(1) (authorizing "entities performing sound recordings" to "designate common agents … to negotiate … payments"). The Board recognized this "agent-buyer" distinction in *Web III*, finding that the "buyers" in its accepted NAB-SoundExchange benchmark were "broadcasters represented as a group by the NAB." *Web III Remand*, 79 Fed. Reg. at 23111.

*Second*, the "sellers" are not SoundExchange but the copyright owners for whom SoundExchange negotiated. TX3020.2 (JA__) (SoundExchange represents about 112,000 copyright owners); TX3021.2 (JA__). The Board recognized this "agent-seller" distinction in *Web III*, finding that for the NAB-SoundExchange

benchmark, "[t]he sellers are the same copyright owners whose copyrights are at issue in this case, albeit represented by SoundExchange." *Web III Remand*, 79 Fed. Reg. at 23111. Indeed, the Board previously accepted numerous agent-negotiated benchmarks without suggesting this mattered. *See Web I*, 67 Fed. Reg. at 45252 (seller-agent-negotiated RIAA-Yahoo! benchmark); *Web III Remand*, 79 Fed. Reg. at 23111, 23123 (buyer/seller-agent-negotiated CBI-SoundExchange and NAB-SoundExchange benchmarks); *Web IV*, 81 Fed. Reg. at 26355-56, 26394, 26405 (seller-agent-negotiated Merlin-Pandora benchmark, where Merlin represented independent record companies, and buyer/seller-agent-negotiated CBI-SoundExchange benchmark).

If anything, agent-negotiated agreements representing multiple buyers and sellers is a **strength**, not a weakness, as it provides more robust evidence of the rates to which "most" buyers and sellers would agree. *Web I*, 67 Fed. Reg. at 45244-45; *SDARS II*, 78 Fed. Reg. 23054, 23063, 23065 (Apr. 17, 2013) (criticizing benchmark for only "represent[ing] a sliver of the universe of" sellers). The NPR Agreement, by contrast, was agreed to by the representative of some 112,000 copyright owners, and applied by the Board to **all** copyright owners. TX3020.2 (JA__). It thus is **more** useful, not less.

*Third*, the "works" are not different but the same – sound recordings. The product is also the same – "blanket licenses for each record company's repertory of

sound recordings." *CARP Report* 44.  Here, the product encompasses **multiple** such blanket licenses, which makes it more useful, not less.

*Fourth*, the NPR Agreements confirm that they do not license "different rights" but the same statutory rights as those in the target market.  TX3020.7 (JA__); TX3021.8-9 (JA__-__).  The Board did not identify a single way in which the rights licensed in the NPR Agreements differed.

Where, as here, the NPR Agreements themselves establish their comparability to the target market, there is no need for an expert to recite "same buyers," "same sellers," etc., to demonstrate comparability.  If there were significant differences in buyers, sellers, rights, or works between the benchmark and target markets, expert testimony could help reconcile those differences.  *See Web II*, 72 Fed. Reg. at 24094-95 (musical works agreements proffered for sound recording rates); *id.* 24092 (interactive (on-demand) subscription agreements proffered for noninteractive nonsubscription rates).  Here, however, there were none.  It was arbitrary for the Board to impose, without notice, a new mandate for expert testimony showing comparability when such comparability is established by documentary evidence.

The Board's rejection arbitrarily departs from its prior acceptance of agent-negotiated noncommercial settlements as comparable benchmarks.  *See Web III Remand*, 79 Fed. Reg. at 23120, 23123 (accepting CBI-SoundExchange settlement

as "persuasive evidence that SoundExchange's proposal satisfies the willing buyer/willing seller standard" without discussing expert comparability testimony); *Web IV*, 81 Fed. Reg. at 26393-94 (finding that SoundExchange-CBI settlement "lends support for some elements of SoundExchange's rate proposal" without discussing expert testimony). The Board's imposition of a new, unannounced testimonial requirement, without explanation, is arbitrary and violates NRBNMLC's due process right to have notice of the change to enable it to present testimony that includes the comparability recitations. *Cf. Johnson v. CRB*, 969 F.3d 363, 380-81 (D.C. Cir. 2020).

In any event, NRBNMLC did present testimony from an economist specializing in nonprofits regarding the different characteristics of noncommercial webcasters and suitability of the NPR Agreements as benchmarks. TX3060.18-22 (JA__-__); TX3064.2-7 (JA__-__); Tr. 3994:21-4003:16, 4023:16-4029:21 (JA__-__, __-__).

### D. The Board Acted Arbitrarily in Requiring NRBNMLC, a Benchmark's Proponent, To Quantify Adjustments Despite Repeatedly Placing that Burden on Challengers.

The Board also acted arbitrarily in requiring NRBNMLC to quantify alleged differences between the benchmark and target markets and rejecting the NPR Agreement absent such evidence. Previously, the Board required **challengers** to an otherwise comparable benchmark to quantify such differences and would accept

the benchmark unadjusted absent such evidence. *See Web II*, 72 Fed. Reg. at

24095; *SDARS I*, 73 Fed. Reg. 4080, 4094-95 (Jan. 24, 2008). Here, by contrast,

the Board shifted that burden to the benchmark's **proponent** – NRBNMLC – to

quantify alleged differences in value from litigation cost savings and consolidated

reporting reflected in the NPR Agreement. *Determination* 260, 267 (JA__, __).

That unexplained departure from precedent is arbitrary.

1. **The Board Repeatedly Has Required the Challenger, Not the Proponent, of an Otherwise Comparable Benchmark To Quantify Proposed Adjustments.**

The Board long has required the challenger of an otherwise comparable

benchmark to quantify proposed adjustments to that benchmark and considered the

benchmark without adjustment if the challenger failed to do so. In *Web II*, the

Board refused to adjust SoundExchange-proffered benchmarks with interactive

services for differences in promotional value vis-à-vis noninteractive services. It

did not fault SoundExchange but the webcaster-challengers for "present[ing] no

acceptable empirical basis for quantifying promotion/substitution for purposes of

adjusting rates." *Web II*, 72 Fed. Reg. at 24095. It accepted the unadjusted

benchmarks, finding that:

> Because only the relative difference between the benchmark market and the hypothetical target market would necessitate an adjustment, the absence of solid empirical evidence of such a difference obviates the need for such further adjustment.

*Id.*; *accord SDARS I*, 73 Fed. Reg. at 4093-95 (accepting benchmark without

requested adjustment and faulting challenger for "assert[ing] that their service is promotional" but "present[ing] no persuasive evidence that would be useful for quantifying the magnitude of this asserted effect or for deriving a method for translating such magnitudes into a rate adjustment"); *Web III Remand*, 79 Fed. Reg. at 23111-12, 23114 (accepting unadjusted benchmark because "Live365 has not quantified or otherwise estimated the monetary value of [alleged] differences" such that Board "could not make any specific adjustment"); *Web IV*, 81 Fed. Reg. at 26383, 26386 (accepting benchmark without requested adjustment because "neither party through a fact or expert witness presented any basis to create a monetary value"). The *Web IV* Board emphasized that:

> [I]f the party that seeks to increase (or decrease) an otherwise effective benchmark rate to account for other items of potential value cannot or has not provided evidence of such value, when it was in its self-interest to do so, the Judges cannot arbitrarily adjust or ignore that otherwise proper and reasonable benchmark.

*Id.* 26387; *accord SoundExchange, Inc. v. CRB*, 904 F.3d 41, 52 (D.C. Cir. 2018).

Despite this long history of requiring challengers to quantify proposed benchmark adjustments, the Board required the **proponent** – NRBNMLC – to quantify two challenger-raised alleged differences between the benchmark and target markets. *Determination* 260, 267 (JA__, __). That was arbitrary.

### 2. The Board Arbitrarily Rejected the NPR Agreement for Allegedly Insufficient Quantification of Litigation Cost Savings.

The Board first faulted NRBNMLC for an alleged "absence of evidence concerning the effect of avoidance of litigation costs on the royalty rate agreed to by SoundExchange and NPR/CPB." *Id.* 260 (JA___). It thus rejected the NPR Agreement, unfavorably distinguishing "settlement agreements" from "voluntary agreements reached outside the context of litigation" because the former allegedly embodied "trade-offs motivated by avoiding litigation cost." *Id.* The Board's rejection, however, arbitrarily contravenes longstanding Board precedent adopting the same types of settlements as benchmarks without discussing litigation cost savings. *See Web III Remand*, 79 Fed. Reg. at 23123-24 (accepting SoundExchange-CBI settlement as "persuasive" benchmark without analyzing litigation cost savings); *Web IV*, 81 Fed. Reg. at 26393-94 (finding that SoundExchange-CBI settlement "lends support for some elements of SoundExchange's rate proposal" without analyzing litigation cost savings).

Even where challengers raised litigation cost savings as a difference, the Board required **challengers** to quantify that difference and **accepted** the unadjusted benchmark absent such quantification. *See Web III Remand*, 79 Fed. Reg. at 23113 (rejecting litigation cost savings challenge to SoundExchange's settlements with NAB and Sirius XM because "**neither party presented evidence**

… regarding how to quantify" these costs such that Board "**cannot adjust the marketplace rates to reflect" such savings** (emphasis added)); *Web I*, 67 Fed. Reg. at 45255 (affirming use of Yahoo!-RIAA agreement as benchmark even though "the record contain[ed] no information quantifying" litigation cost savings).

The Board also legally erred by treating as disqualifying an inherent trait of the very types of agreements that Congress invited the rate-setter to consider when Congress created the Section 114 Statutory License for nonsubscription webcasters – *i.e.*, agreements for comparable services "negotiated under subparagraph (A)." *DMCA*, §405, 112 Stat. at 2896. Those "subparagraph (A)" agreements were agreements under the Statutory Licenses "submit[ted] to the Librarian of Congress" to avoid the need for a rate-setting proceeding. *Id.* 2895-96 (authorizing Librarian to convene CARP "[i]n the absence of license agreements negotiated under subparagraph (A)"); *see also id.* 2900-01 (section 112). The very reason for submission of these agreements was litigation avoidance.

Only by submitting "agreements" to the rate-setter (now the Board) "during the proceeding" for adoption as statutory rates may those agreements bind all non-party copyright owners and other services, thus removing the need to litigate. 17 U.S.C. §801(b)(7)(A). Indeed, NPR and SoundExchange submitted their agreement during *Web V* "only so that it will be binding on all artists and copyright

owners, including those that are not members of SoundExchange"; setting rates in this manner has been those parties' longstanding practice.  TX3020.2-3 (JA_-_).

In short, the submission of agreements as "settlements" to facilitate their broader adoption is a feature, not a bug, of the very agreements that Congress invited the Board to consider.  Congress cannot have meant any lack of quantification of litigation cost savings to disqualify those agreements from consideration, as the Board arbitrarily did here.

Further, Professor Steinberg did analyze such savings for the analogous CBI Agreement.  He found that CBI avoided litigation altogether by settling but SoundExchange "gain[ed] no comparable reduction" due to "non-settlers" and that "[t]herefore, the CBI settlement rates are above the upper bound of a reasonable rate."  TX3060.19 (JA__).  *Cf. CARP Report* 68-69.  Like CBI, NPR "avoided litigation altogether" when it settled but SoundExchange "gain[ed] no comparable reduction," as it still litigated both commercial **and** noncommercial rates.  Given the similar nature and timing of the NPR and CBI agreements, litigation cost savings would render NPR rates **higher** than willing-buyer-willing-seller rates. TX3020.5 (JA__); TX3019.4 (JA__).  It was arbitrary for the Board to reject the NPR Agreement and instead set much **higher** rates when this factor, if anything, would have **decreased** willing-buyer-willing-seller rates in the target market vis-à-vis NPR Agreement fees.

### 3. The Board Arbitrarily Departed from Precedent by Rejecting the NPR Agreement for Insufficient Adjustment for Consolidated Reporting.

The Board also arbitrarily contravened its precedent by requiring NRBNMLC to adjust for the Agreement's consolidated reporting. *Determination* 267 (JA__). The Board previously rejected precisely such a challenge by SoundExchange based on "defrayed administrative costs" similar to the consolidated reporting challenge here. *SDARS II*, 78 Fed. Reg. at 23068-69. The Board found that such differences were "more a matter of administrative convenience than of differences in the substantive rights of the parties with respect to the public performance right" and accepted the proffered agreements as benchmarks. *Id.*

Here, by contrast, the Board required the benchmark's **proponent** – NRBNMLC – to quantify SoundExchange's asserted difference from the "administrative convenience" of consolidated reporting. *Determination* 259-61 (JA__-__). Finding that "[i]t is not SoundExchange's … responsibility to … propos[e] an appropriate adjustment," and "[i]n the absence of an appropriate adjustment" from NRBNMLC, the Board rejected the NPR benchmark instead of accepting it unadjusted, as it repeatedly had done previously. *Id.* 267 (JA__). That unexplained departure from precedent is arbitrary.

The rejection is particularly problematic because NRBNMLC repeatedly sought quantification evidence from SoundExchange – the party allegedly benefiting from consolidation and thus the only party that could provide evidence that might quantify an adjustment – but SoundExchange [[███████████]]. TX2056.36-37 (JA__-__); TX2057.21 (JA__).  While SoundExchange identified two documents valuing [[████████████████████]], neither [[████████ ████████████████████]].  *Id.* 22-23 (JA__-__) (referencing TX3022 and TX3041 (JA___, ___)).  Beyond these documents, SoundExchange admitted that it, [[███████████████████████████ █████]] of the NPR Agreements' components.  TX2057.23 (JA__).  Further, SoundExchange's Director of License Management, Travis Ploeger, admitted that he was unsure whether reporting terms had even been agreed to when the NPR agreement was submitted.  Tr. 5824:13-16 (JA__-__).  He also admitted that consolidation leads to error, reducing consolidation's value.  *Id.* 5885:18-19 (JA__-__).

Further, the NPR Agreements themselves suggest that the value is negligible.  The parties explicitly identified the key elements of value as "[a]n annual minimum fee," "[a]dditional usage fees for certain" stations, and an "administrative convenience" discount from receiving advance "annual lump sum

payments" but nowhere mentioned consolidated reporting. TX3020.8 (JA___);
TX3021.9 (JA__).

In short, the Board's unexplained departure from precedent in handling
"administrative convenience" adjustment challenges was arbitrary. Moreover, its
reliance on this factor "runs counter to the evidence" given clear evidence that
consolidated reporting's value was insignificant. *State Farm*, 463 U.S. at 43.

### E. The Board Disregarded Binding Register Precedent in Refusing To Consider SoundExchange's Analysis of [[███████████ ██████████████]].

The Board also legally erred in holding that 17 U.S.C. §114(f)(4)(C) barred
it from considering an analysis related to the [[███████████]]. *Determination*
264-65 (JA__-__). As a binding opinion by the Register establishes, the statute
does no such thing.

The analysis is entitled "[[███████████]]" and was prepared by
SoundExchange for purposes of its [[██████████████]]. TX3022
(JA__). SoundExchange characterized the document as "reflecting its analysis of
potential value" of the [[███████]]. TX2057.21-22 (JA__-__). The
document was used by NRBNMLC's expert to [[████████████
████████████████]]. TX3064.3-7 (JA__-__);
Tr. 4029:22-4039:18 (JA__-__). The document showed that the [[██████
████████████████████████]]

using a threshold structure in place at the time. *Compare* TX3022 (JA__)

($[[          ]]) *with* TX3021.10 (JA__) ($560,000).

The Board, however, erroneously held that 17 U.S.C. §114(f)(4) barred it

from considering the analysis because it used some [[                

                      ]]. *Determination* 264-65 (JA__-__).

Section 114(f) permitted parties to reach agreements different from the Board's

2006-2015 determinations but provided that no "provisions of any [such]

agreement … shall be admissible as evidence or otherwise taken into account in

any" webcasting rate-setting proceeding. 17 U.S.C. §114(f)(4)(C).

In a binding opinion, the Register held that "the material excluded under

subparagraph (C) is limited to the provisions of actual settlement agreements

entered into pursuant to the WSA." *Register Op.* 11 (JA__); 17 U.S.C.

§802(f)(1)(B)(i). It found that section 114(f)(4)(C) only bars consideration of

"WSA agreements themselves" but does not bar consideration of license

agreements, or provisions therein, that include any terms that are

- "**copied verbatim** from,"

- "**substantively identical to**," or

- "**influenced by**"

any WSA agreement's terms. *Register Op.* 3-4, 11. It reasoned that "[n]owhere

does the statute suggest that the mere existence of such [WSA] agreements, or their

general effect on the marketplace or particular negotiations, may not be considered." *Id.* 14. Otherwise, "'it would be difficult to deal with the facts on the ground as they exist and to set a rate that is reasonable in the context of the facts.'" *Id.* 15 (quoting Trial Tr. 731:1-7, *In re Pandora Media, Inc.*, 6 F. Supp. 3d 317 (S.D.N.Y. 2014) (Nos. 12-CV-8035, 41-CV-1395)).

Here, the analysis is not a WSA agreement but a [[██████████ ████████████████████████████████████████████ ████████████████]]. The Board itself recognized that the analysis reflected rates merely "derived from" a WSA agreement, not that it is a WSA agreement itself. *Determination* 265 (JA__). Moreover, the numbers were used by NRBNMLC to [[████████████████████████████████████ ████████████████]], not to ask the Board to consider prior **WSA** rates in setting rates. TX3064.3-7 (JA__-__); Tr. 4029:22-4039:18 (JA__-__). The analysis thus falls squarely within the Register's holding that the statute permits consideration of the effect of WSA rates on "particular negotiations." *Register Op.* 14. The Board legally erred in disregarding it.

Further, the Board arbitrarily ignored contrary evidence in finding that the purpose of the analysis "is not apparent from the document itself" and that there was not a "strong probability" that it was prepared for purposes of the [[████████ ████████████████████████████████]]. *Determination* 263 (JA__). The

analysis on its face is labeled "[[ ███████████ ]]" and states that it was

prepared "[[ ████████████████████ ]]." TX3022 (JA__).

Moreover, it was prepared during the precise timeframe when the [[ ██████

████████ ]] were occurring. *Compare* TX3022 (JA__) ([[ ██████████ ]]

data) *with* TX3045.1 (JA__) ([[ █████████████ ]]). It also recites explicit

[[ ██████████ ]] of SoundExchange in the [[ ████████ ]], such as

"[[ ████████████████████ ]]." TX3022 (JA__).

Thus, the Board's finding that the document has an unclear purpose and "primarily

[[ █████████████████████ ]] disregards the explicit

stated purpose, date, and content of the document, which is arbitrary.

*Determination* 263 (JA__).

## III. THE BOARD ARBITRARILY APPLIED DIFFERENT BURDENS OF PROOF TO NRBNMLC AND SOUNDEXCHANGE.

Apart from imposing new burdens on NRBNMLC regarding its own

proposal, the Board also required NRBNMLC to **disprove** SoundExchange's

proposal. "[T]he proponent of a rule or order has the burden of proof." 5 U.S.C.

§556(d); 17 U.S.C. §803(a)(1) (subjecting Board to APA). The burden thus is not

one-sided but applies evenhandedly to require **each** party to establish that its

proposed rates "most clearly represent" willing-buyer-willing-seller rates. *Id.*

§114(f)(1)(B). Whether the correct burden of proof was applied "is a question of

law subject to plenary review." *Abbott v. Perez*, 138 S. Ct. 2305, 2326 (2018).

"[W]hen a finding of fact is based on the application of an incorrect burden of proof, the finding cannot stand." *Id.*

The Board held that NRBNMLC, as the NPR Agreement's proponent, "bears the burden of demonstrating that the agreement is sufficiently comparable to the target market to serve as a benchmark" and considered whether NRBNMLC had met that burden. *Determination* 259-68 (JA__-__). When it discussed SoundExchange's rate proposal, however, it did not consider whether SoundExchange had met its burden showing a sound basis for its proposal. It did not, for example, require SoundExchange to establish that charging noncommercial webcasters above-threshold commercial-level rates was warranted by the record or that its proffered benchmarks with multibillion-dollar interactive services such as Google, Apple, and Amazon were sufficiently comparable to charge rates derived therefrom to above-threshold webcasting. Instead, the Board simply accepted SoundExchange's proposal based on past "reasoning" and **again** placed the burden of proof on **NRBNMLC** to **refute** the proposal via counterargument:

> SoundExchange relies on the same reasoning adopted by the Judges in webcasting proceedings going back to *Web II* to support its proposed rate structure. **Absent persuasive counterarguments**, the Judges will accept that reasoning.

*Id.* 268 (JA__) (footnote omitted; emphasis added). It then considered NRBNMLC's "counterarguments" **against** SoundExchange's proposal and repeatedly faulted NRBNMLC for not meeting its burden to refute that proposal.

*Id.* For example, the Board rejected NRBNMLC's observation that SoundExchange did not provide evidence of cannibalization to justify SoundExchange's proposal; instead, it excused SoundExchange's failure of proof, acknowledging that "little if any actual cannibalization" is "expected." *Id.* 279 (JA__).

Similarly, the Board required **NRBNMLC** to prove that noncommercial webcasters' lower willingness to pay **requires** lower marginal rates." *Determination* 269 (JA__) (emphasis added). Instead of finding that SoundExchange bore the burden of showing that noncommercial webcasters would negotiate above-threshold commercial-level rates, it found that "NRBNMLC has not adequately developed this argument." *Id.* 269-70 (JA__-__).

Nowhere did the Board analyze whether SoundExchange's proposed rate structure "most clearly represent[s]" willing-buyer-willing-seller rates. *Id.* 250-59, 268-80 (JA__-__, __-__); 17 U.S.C. §114(f)(1)(B). It concluded that "**NRBNMLC's counterarguments** do not persuade the Judges to **reject** the rationale for setting" above-threshold commercial-level rates. *Determination* 279 (JA__) (emphasis added). It was SoundExchange's burden to prove that its rate proposal met the statutory standard. The Board's decision to place the burden on NRBNMLC to refute that proposal, absent substantial evidence of its validity, inverts that burden and is reversible error.

## IV. THE BOARD ABROGATED ITS OBLIGATION TO SET RATES REFLECTING BOTH SELLER- AND BUYER-SIDE DYNAMICS AND OTHERWISE LACKED SUBSTANTIAL EVIDENCE SUPPORTING ITS DETERMINATION.

The Board also disregarded its obligation to reflect not only seller- but buyer-side negotiating dynamics in its rates and lacked substantial evidence supporting those rates. Nowhere does the Board cite evidence showing that noncommercial **buyers** would negotiate above-threshold commercial-level rates. The Board's two-sentence acceptance of the "reasoning" underlying SoundExchange's proposal did not itself cite evidence but incorporated SoundExchange's "Rationale and Justification" for that proposal. *Determination* 250-52, 268 & n.331 (JA__-__, __). That "Justification" cited purported "economic insight" from a fifteen-year-old case based on **NPR**-centric evidence and 1.5 pages of expert *ipse dixit*. *Id.* 250-51 (JA__-__). That is not "substantial evidence." Nor does SoundExchange's rebuttal evidence the Board cited – an improperly admitted and unreliable overlap study and a blog post about Atlanta broadcast stations that NRBNMLC was precluded from countering – support the rates. The Determination should be vacated.

**A.  The Board Abrogated Its Obligation To Set Rates That Both Buyers and Sellers Would Negotiate and Cited No Evidence that Buyers Would Negotiate Above-Threshold Commercial-Level Fees.**

The Board must set rates that "most clearly represent" those that not only willing sellers, but willing buyers, would negotiate.  17 U.S.C. §114(f)(1)(B).  A determination is arbitrary if the Board "entirely failed to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.  The Board did exactly that in not considering whether above-threshold commercial-level rates are ones that willing **buyers** would negotiate.  The Determination cites no such evidence; instead, it focused almost entirely on an alleged risk of cannibalization by larger noncommercial webcasters, a **seller**-side consideration.  *Determination* 250-52 (JA__-__).

The Board's only buyer-side discussion addressed NRBNMLC's **counterargument** regarding noncommercial entities' lower willingness to pay.  *Id.* 268-69 (JA__-__).  That discussion, however, did not support a conclusion that above-threshold commercial-level rates "most clearly represent" rates that willing buyers would negotiate.  To the contrary, the Board cited testimony by SoundExchange's economist, Catherine Tucker, that "as an economist one would have to acknowledge that [marginal rates] would play into [noncommercial broadcasters'] decision-making."  *Id.* 269 (JA__); *see also* Tr. 2206:18-2207:23 (JA__-__) (marginal rates "definitely matter as an economist for incentives"); *id.*

4772:24-4773:6 (JA__-__) (noncommercial broadcaster testifying that "the jump in the usage rates … has been killing us" and "incentivizes us to … suppress our listeners, which is completely anathema to our mission").  If anything, that testimony **undercuts** the proposition that willing buyers would negotiate above-threshold commercial-level rates.

Without citing evidence to rebut Professor Tucker's acknowledgments or support its above-threshold structure, the Board conclusorily opined that its structure is not "inconsistent with" a finding that noncommercial entities have lower willingness to pay.  *Determination* 270 (JA__).  Such *ipse dixit*¸ however, is not substantial "willing-buyer" evidence and "cannot substitute for reasoned decisionmaking."  *Music Choice*, 970 F.3d at 429.

Moreover, the Board violated its own precedent.  It previously rejected a noncommercial rate proposal for being "unsupported by any marketplace evidence and any evidence of sellers who would be willing to accept" the proposed rates because the evidence told it "nothing about the **sellers'** side of the equation."  *Web IV*, 81 Fed. Reg. at 26394 (emphasis added).  Yet here, it adopted a seller-side rate proposal that was unsupported by any buyer-side evidence.  That was arbitrary.

### B.    Findings From Fifteen-Year-Old *Web II* Do Not Constitute Substantial Evidence Supporting the Determination In *Web V.*

The evidence the Board did cite does not support its Determination.  The Board referenced its fifteen-year-old *Web II* findings, but they do not support *Web*

*V* rates.  The Board must support its findings based on this record, not other records.  5 U.S.C. §556(e) (providing that "testimony and exhibits," plus filings "in the proceeding, constitutes the exclusive record for decision"); 17 U.S.C. §803(c)(3) (determination must be "supported by the written record").  While parties may designate past evidence under 37 C.F.R. §351.4(b)(2), the Board pointed to no such *Web II* evidence here.  *Determination* 15 (JA__).

Even if reliance on *Web II* findings were appropriate, those findings were overwhelmingly based on **NPR** stations.  *Supra* pp. 7-8.  But NPR stations are the very licensees who are **not** – and long have not been – subject to the Board's noncommercial rates, as they negotiated alternative rates, which NRBNMLC proffered as a benchmark.  TX3020-TX3021 (JA__-__).  The Board acted arbitrarily in relying on the NPR-centric findings of *Web II* to set non-NPR noncommercial rates on the implicit assumption that NPR stations are comparable to non-NPR noncommercial stations yet rejecting as benchmarks the very rates that NPR stations agreed to as willing buyers.

### C.    Mr. Orszag's Unsupported *Ipse Dixit* Is Not Substantial Evidence.

The Board also cited testimony from Jonathan Orszag to support its noncommercial rates, but that conclusory testimony does not constitute "substantial evidence."

"[I]nordinate faith in the conclusory assertions of an expert … cannot satisfy the requirement that [an agency] act only upon substantial evidence." *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 188 (D.C. Cir. 1986); *TQ Delta, LLC v. CISCO Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019) ("Conclusory expert testimony does not qualify as substantial evidence."); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993) ("scientific knowledge" requirement for expert testimony under Federal Rule of Evidence 702 "connotes more than subjective belief or unsupported speculation" and "establishes a standard of evidentiary reliability").

Mr. Orszag's entire written direct testimony on noncommercial rates was less than 1.5 pages. TX5602.87-89 (JA__-__). He relied on no identified agreements, sponsored no exhibits, and conducted no analyses regarding noncommercial services. *Id.* Rather, he offered, and the Board cited, his unsupported opinion that "he saw 'no reason why commercial and noncommercial services would be treated differently with respect to the rates they pay' in an unregulated market." *Determination* 251 (JA__) (citing TX5602 ¶185). The Board also cited his conclusory opinion that there was "'no empirical evidence'" or "'reason based in economic theory'" to believe that record companies would agree to much lower rates for "'large noncommercial services that compete meaningfully with commercial services.'" *Id.* The Board also cited Mr. Orszag's claim that

SoundExchange's proposal was "'supported by precedent and settlements,'" but Mr. Orszag could not identify those settlements. *Id.* (citing TX5602 ¶187); Tr. 2005:7-25 (JA__).[3] Unidentified agreements and Mr. Orszag's *ipse dixit* are not substantial evidence.

### D. The Portions of SoundExchange's Rebuttal Case Cited by the Board Are Not Substantial Evidence.

The Board also cited parts of SoundExchange's rebuttal case – a playlist overlap study and testimony quoting an unadmitted Internet blog article – but neither constitutes substantial evidence. *Determination* 272-78 (JA__-__). These materials aimed to rebut NRBNMLC's case rather than support SoundExchange's affirmative case and are otherwise not substantial evidence. *Id.* 271-73 (JA__-__).

### 1. The Board Violated Its Regulations by Admitting the Overlap Study As "Commercial Data" But Using It To Draw Conclusions About a Broader Station Universe.

The Board-cited playlist overlap study does not constitute substantial evidence. The study was not cited as affirmative evidence of cannibalization but as evidence purportedly rebutting NRBNMLC's contention that cannibalization "is

---

[3] The Board also cited Professor Tucker (*Determination* 251 (JA__)), but her testimony is not substantial evidence of willing-buyer-willing-seller rates. She admitted that she was "not looking at willingness to pay" but "ability to pay," that the willing-buyer/willing-seller analysis looks at "willingness to pay, not ability to pay," and that "ability to pay is quite separate from what a willing buyer and willing seller would agree to in a negotiation." Tr. 2095:7-25, 2139:9-15, 2342:20-2343:9 (JA__, __, __-__).

unlikely." *Determination* 273 (JA__).  The study used selected data from

Mediabase – which monitors airplay on selected radio stations – and compared the

sound recordings (but not other programming) broadcast by a ten-commercial-

station group versus a ten-noncommercial-station group in a single format (CCM)

in a calendar quarter.  *Id.*  The study was not designed or conducted by a witness

but an outside company, and the two witnesses who discussed it – Messrs. Ploeger

and Orszag – were unaware of basic design information.  Tr. 2019:2-2020:3,

5845:24-5849:14 (JA__-__, __-__).

The Board "review[s] the admissibility of studies under Rule 351.10(e)."

*Omnibus Order on Prehearing Evidentiary Mots.* 5 (June 8, 2021) ("*Omnibus

Order*") (JA__):

> Under that rule, studies must state clearly the study plan, the
> principles and methods underlying the study, all relevant assumptions,
> all variables considered in the analysis, the techniques of data
> collection, the techniques of estimation and testing, and the results of
> the study's actual estimates and tests presented in a format commonly
> accepted within the relevant field of expertise … .

*Id.*  Studies that lack this information are inadmissible.  *Id.*

The overlap study lacked much of this required information and was

improperly admitted.  Mr. Ploeger, the study's sponsor, did not explain key

"principles … underlying the study" or "all relevant assumptions," such as the

number of all commercial/noncommercial general format and CCM stations versus

Mediabase-monitored ones, how Mediabase decides which stations to monitor,

whether he views Mediabase-monitored CCM stations as representative of all such stations (and, if so, why), whether he views the ten-station groups as representative of all commercial/noncommercial CCM stations (and, if so, why), or why he believes that the stations and period monitored would yield meaningful results. TX5625.14-16 (JA__); Tr. 5845:13-19 (JA__).

Mr. Ploeger also did not explain "all variables considered in the analysis," such as why ten-station groups, only CCM, and a three-month period were chosen, and why one-to-one comparisons of individual stations' contemporaneous programming were not conducted. TX5625.14-16 (JA__); Tr. 5847:2-5849:8 (JA__). Nor did he adequately explain the "methods underlying the study," "techniques of data collection," or "techniques of estimation and testing." While he stated that the station draws were random, he did not explain how they were conducted, how the sample was redrawn following an overweighting problem, or which group was overweighted. TX5625.14-16 (JA__); Tr. 5849:15-5851:8 (JA__). The Board dismissed the lack of information regarding the sample draw as "unimportant" instead of recognizing it as a basis for exclusion under section 351.10. *Determination* 276 n.337 (JA__).

Despite these shortcomings, the Board admitted the study over NRBNMLC's challenge. *Mediabase Order* at 3 (JA__). The Board did not treat it

as a sample study but "third-party commercial data" and did not analyze its compliance with section 351.10. *Id.*

In the Determination, however, the Board used the sample study to draw conclusions about a broader station universe – namely, "commercial and noncommercial stations broadcasting in the Christian AC format." *Id.* 274 (JA___). The Board acted arbitrarily by admitting the study as "commercial data" but then using it as a sample study. The Mediabase information either is data concerning only ten stations in each group that cannot be used to draw broad conclusions, or it is a study about a broader universe that is inadmissible for violating section 351.10. Either way, it is not substantial evidence.

Moreover, the Board's finding that the study was representative of webcasters "likely to be subject to per-performance royalties" is arbitrary. *Id.* 275-76 (JA___); *see* Tr. 2025:5-2028:20 (JA___). Mediabase tracks terrestrial stations, not webcasters, and the Board repeatedly refused to impute broadcasting traits to simulcasting. TX5625.14-15 (JA___); *Determination* 226 (JA___) (promotional value); *id.* 227 (JA___) (non-music programming). Also, Mediabase excludes webcast-only channels (*e.g.*, Pandora), yet used five commercial stations from the same broadcaster – Salem – and none from 850-station iHeart. TX2152.3 (JA___); TX3049 (JA___); TX3069.1 (JA___); TX4000.2 (JA___); TX5625.113 (JA___). The Board dismissed the Salem criticism, asserting that Salem is "one of the larger

players," but Salem only operates twelve CCM stations.  *Determination* 276 (JA__); TX3049 (JA__).

Further, the study did not compare any programming except CCM sound recordings and thus "did not examine all of the information that a listener would have in the context that that listener would listen to religious stations in the marketplace" or attempt "to replicate the real world in behavior of consumers."  Tr. 2038:4-2040:10 (JA__-__).  This is the very "context that offers listeners quite different listening experiences and thereby removes the chance that they would be indifferent between the two listening experiences."  TX3061.14-15 (JA__-__).

Even for sound recordings, the study did not make head-to-head contemporaneous playlist comparisons but only considered aggregated groups over an entire quarter.  Tr. 2029:19-2033:16 (JA__-__).  If a song was played once on one noncommercial station (*e.g.* "[[███████████]]") and many (189) times on many (six) commercial stations, all plays were considered overlapping.  *Id.* 2032:15-19 (JA__); TX3040."Full Data" (JA__).

While the Board agreed that the study "does not support any conclusion … whether the overlap actually results in audience diversion," it held that the study "supports a conclusion that there is sufficient similarity in the music content of these stations to make diversion a **realistic possibility**" and could be used to infer what listeners "**might listen**" to.  *Determination* 274, 277-78 (JA__, __-__)

(emphasis added).  The fact that two stations might play the same song with different frequency in different contexts surrounded by different programming says nothing about the possibility of listener diversion.  The Board's reliance on this study not only violates its admissibility rules but is internally inconsistent speculation, not substantial evidence.

### 2.    An Internet Blog Related to Two Broadcast Stations Is Not Substantial Evidence.

The Board also cited a blog post asserting purported competition between two Atlanta radio stations as "cast[ing] doubt on" testimony regarding the unlikelihood of significant commercial/noncommercial competition, but that blog is not substantial evidence.  *Id.* 272 (JA__) (citing TX5603.96).  *First*, the blog discusses broadcast stations, not simulcasts.  *Id.*; *supra* p. 48.  One blogger's opinion about two radio stations does not constitute substantial evidence about an alleged industry-wide characteristic regarding simulcasting.

*Second*, there was no showing that the blog's assertions were reliable.  The blog itself was never admitted into evidence; rather, the Board quoted Mr. Orszag, who quoted the blog.  *Determination* 272 (JA__).  There was no showing that he had first-hand knowledge of the asserted facts.  TX5603.96-97 (JA__-__).  Mr. Ploeger, who also discussed this article, admitted that he hadn't met the author and "did not do any independent verification of anything."  Tr. 5833:19-5837:14

(JA__-__).  *Cf. Doe v. Cahill*, 884 A.2d 451, 467 (Del. 2005) (recognizing "the normally (and inherently) unreliable nature of assertions posted … on blogs").

*Third*, NRBNMLC was deprived of a fair opportunity to refute the blog. The blog was discussed in rebuttal testimony, so NRBNMLC could not submit written testimony to contradict it.  TX5603.96 (JA__).  NRBNMLC's economist had information from a first-hand source to refute it, but NRBNMLC was prohibited from presenting that testimony and unable to cross-examine the author. Tr. 4015:9-4018:16 (JA__).  The Board also did not tell NRBNMLC whether the blog quotes would be admitted, as they were the subject of a challenge that was not ruled on until nine-and-a-half months later.  *Id.* 4018:7-16 (JA__); *Omnibus Order* 37, 56 (JA__, __).

Given these circumstances, the blog quotes regarding two radio stations are not substantial evidence regarding simulcasting.

## V.  THE BOARD LACKED SUBSTANTIAL EVIDENCE TO DOUBLE THE MINIMUM FEE.

NRBNMLC joins Part II of Appellant NAB's opening brief.  The Board also erred in rejecting the 2020 $500 fee agreed to by *Web IV* parties as irrelevant. *Determination* 288-89 (JA__).  There, it found that "the convergence of the parties' proposals on the existing $500 minimum fee … counsels strongly in favor of its retention."  *Web IV*, 81 Fed. Reg. at 26396.  But here, it called the fee "a position taken in a regulatory proceeding, not the action of a willing seller."

*Determination* 288-89 (JA\_\_).  The Board's statutory task is to set willing-buyer-willing-seller rates.  17 U.S.C. 114(f)(1)(B).  If it fulfilled its task, then $500 represents a willing-buyer-willing-seller rate.  Its contrary decision was arbitrary.

## VI.  THE DETERMINATION VIOLATES RFRA AND THE FIRST AMENDMENT.

The Determination also violates RFRA and religious broadcasters' free speech and free exercise First Amendment rights.  Under RFRA, the Government cannot "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it demonstrates that "application of the burden" furthers "a compelling governmental interest" and "is the least restrictive means of furthering" that interest.  42 U.S.C. §2000bb-1.  "[A] law that operates so as to make the practice of religious beliefs more expensive in the context of business activities imposes a burden on the exercise of religion." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (quoting *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961)).  Like *Burwell*, the Determination substantially burdens religious broadcasters' ability to communicate religious content by charging them much more than secular NPR stations if they become too effective in reaching listeners.  *Supra* pp. 9-10.  Thus, strict scrutiny applies.

The Determination also triggers strict scrutiny under the Free Exercise Clause, which "'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special

disabilities' based on their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)). Where the Government has burdened a "sincere religious practice" in a manner "that is not 'neutral' or 'generally applicable,' a violation will be found "unless the government can satisfy 'strict scrutiny.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (quoting *Lukumi*, 508 U.S. at 546). "To satisfy strict scrutiny, government action 'must advance interests of the highest order and must be narrowly tailored in pursuit of these interests.'" *Carson ex rel. Makin*, 142 S. Ct. 1996, 1997 (2022) (quoting *Lukumi*, 508 U.S. at 546).

The Determination is neither neutral nor generally applicable. It is not neutral because the Board adopted noncommercial rates that charge above-threshold (overwhelmingly religious) broadcasters much more than NPR-affiliated broadcasters. TX5625.27 (JA__) ("Religious broadcasters are disproportionately represented among the noncommercial webcasters making the greatest usage of sound recordings under the statutory license."); *supra* pp. 8-10. It is not generally applicable because its rates do not apply to all noncommercial licensees – NPR broadcasters are exempt. NPR programming is overwhelmingly **secular**, as those stations "receive[] substantial funding from CPB" and cannot receive that funding for programming that "further[s] the principles of particular … religious

philosophies." TX3020.2 (JA__); *In re Noncommercial Educational Station Fundraising for Third-Party Non-Profit Organizations*, 32 FCC Rcd. 3411, 3414 n.15 (2017) (citation omitted).

The Determination similarly triggers strict scrutiny under the Free Speech Clause, as it discriminates on the basis of content, favoring secular NPR content to religious content. *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). "Regulations that discriminate … among different speakers within a single medium[] often present serious First Amendment concerns." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659 (1994). "Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115-16 (1991) (citation omitted). "[T]he government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995); *accord Simon & Schuster,* 502 U.S. at 115.

The Determination fails strict scrutiny. The Board has not demonstrated "a compelling governmental interest" for its discriminatory scheme. 42 U.S.C. §2000bb-1(b)(1). "[O]nly the gravest abuses, endangering paramount interest could give occasion for [a] permissible limitation on the free exercise of religion."

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2392 (2020) (quotation marks and citation omitted; second alteration in original). Here, the Board failed to identify **any** government interest for its scheme, much less a compelling interest.

The Board also has not shown that its regulations are "the least restrictive means" – an "exceptionally demanding" standard – or sufficiently narrowly tailored to advance its interest. 42 U.S.C. §2000bb-1(b)(2); *Burwell*, 573 U.S. at 728. The Board could have used the NPR Agreement as a benchmark to ensure evenhanded treatment but did not. Thus, the Determination violates RFRA and the First Amendment.

## <u>CONCLUSION</u>

The Determination should be vacated and the matter remanded for further proceedings.

Respectfully submitted,

/s/  Karyn K. Ablin
Karyn K. Ablin
FLETCHER, HEALD & HILDRETH, PLC
1300 N. 17th Street
11th Floor
Arlington, VA 22209
(703) 812-0443

*Counsel for the National Religious Broadcasters Noncommercial Music License Committee*
*(Appellant in No. 21-1245)*

July 27, 2022

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned certifies the following:

1.      The foregoing document complies with the word limit specified in the Court's April 28, 2022 Order because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), this document contains 10,962 words.

2.      This document complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Times New Roman.

/s/ *Karyn K. Ablin*
Karyn K. Ablin

July 27, 2022