PUBLIC COPY - SEALED MATERIAL DELETED

**APPEAL NO. 21-1243**

**Consolidated with Nos. 21-1244, 21-1245**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL RELIGIOUS BROADCASTERS NONCOMMERCIAL MUSIC LICENSE COMMITTEE,

*Appellant,*

v.

COPYRIGHT ROYALTY BOARD AND LIBRARIAN OF CONGRESS,

*Appellees,*

GOOGLE INC., PANDORA MEDIA LLC, AND SIRIUS XM RADIO INC.,

*Intervenors.*

On Appeal from the Copyright Royalty Board

### PETITION FOR REHEARING EN BANC

JOHN J. BURSCH
ERIN M. HAWLEY
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org
ehawley@ADFlegal.org

RORY T. GRAY
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd.
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
rgray@ADFlegal.org

KARYN K. ABLIN
FLETCHER, HEALD & HILDRETH, PLC
1300 N. 17th Street
11th Floor
Arlington, VA 22209
(703) 812-0443
ablin@fhhlaw.com

*Counsel for Appellant National Religious Broadcasters Noncommercial Music License Committee*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ......................................................................................vi

INTRODUCTION AND FRAP 35(b) STATEMENT ................................1

BACKGROUND ...................................................................................3

PROCEEDINGS ...................................................................................4

ARGUMENT ........................................................................................6

I.   THE   PANEL'S   RFRA/FREE   EXERCISE   ANALYSIS
     CONFLICTS WITH *TANDON* AND VIOLATES RELIGIOUS
     WEBCASTERS'   FIRST   AMENDMENT   RIGHTS,   IN
     CONFLICT WITH *MINNEAPOLIS STAR*. ...................................6

     A.   The   Government   Cannot   Excuse   Discrimination
          Against Religious Webcasters Based on Additional
          Discrimination Against Some Secular Webcasters. ..............6

     B.   The Panel's Holding Conflicts with *Minneapolis Star*. ..........9

II.  THE   PANEL'S   DECISION   GIVES   A   PASS   TO   THE
     BOARD'S   ARBITRARY,   UNEXPLAINED   DEPARTURES
     FROM PRECEDENT. ...................................................................10

III. THE   PANEL   PERPETUATED   THE   BOARD'S   LEGAL
     ERRORS   IN   DISREGARDING   BINDING   PRECEDENT
     INTERPRETING   THE   COPYRIGHT   ACT   AND   IN
     MISINTERPRETING THE APA. ...................................................16

CONCLUSION ....................................................................................19

CERTIFICATE OF COMPLIANCE.......................................................21

CERTIFICATE OF SERVICE...............................................................22

ADDENDUM ........................................................................... A-1

PANEL OPINION ................................................................ A-2

CERTIFICATE OF PARTIES AND AMICI ...................................... A-44

CORPORATE DISCLOSURE STATEMENT .................................... A-47

# TABLE OF AUTHORITIES*

**Page(s)**

## Cases

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ...................................................................... 1, 7

*Carson v. Makin*,
    142 S. Ct. 1987 (2022) ....................................................................... 6

*Johnson v. Copyright Royalty Board*,
    969 F.3d 363 (D.C. Cir. 2020)......................................................... 16

*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*,
    460 U.S. 575 (1983) ............................................................. 2-3, 9, 10

*Music Choice v. Copyright Royalty Board*,
    774 F.3d 1000 (D.C. Cir. 2014)....................................................... 19

*Ponte v. Real*,
    471 U.S. 491 (1985) ........................................................................ 10

*Ramaprakash v. FAA*,
    346 F.3d 1121 (D.C. Cir. 2003)....................................................... 10

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) .......................................................................... 8

*SoundExchange, Inc. v. Copyright Royalty Board*,
    904 F.3d 41 (D.C. Cir. 2018) .................................................... 13, 14

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ............................................................. 2, 7, 8

*The Florida Star v. B.J.F.*,
    491 U.S. 524 (1989) .......................................................................... 9

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Turner Broadcasting System, Inc. v. FCC,*
    512 U.S. 622 (1994) ........................................................................... 9

**Statutes**

17 U.S.C. §106 .................................................................................... 3, 4

17 U.S.C. §112 .................................................................................... 1, 4

*17 U.S.C. §114 .................................................. 1, 4, 16, 16-17, 19

17 U.S.C. §802 ....................................................................................... 17

17 U.S.C. §804 ................................................................................ 4, 19

*42 U.S.C. §2000bb-1 ........................................................................ 1

Webcaster Settlement Act of 2008, Pub. L. No. 110-435, 122 Stat.
    4974 ................................................................................................ 17

Webcaster Settlement Act of 2009, Pub. L. No. 111-36, 123 Stat.
    1926 ................................................................................................ 17

**Rules**

Fed. R. App. P. 35(b)(1)(A) ................................................................ 2

**Regulations**

37 C.F.R. §380.10(a)(2) ....................................................................... 5

**Agency, Copyright Office, and CARP Decisions**

*Determination of Rates and Terms for Preexisting Subscription
    Services and Satellite Digital Audio Radio Services (SDARS I),*
    73 Fed. Reg. 4080 (Jan. 24, 2008) ................................................. 13

*Determination of Reasonable Rates and Terms for the Digital
    Performance of Sound Recordings and Ephemeral Recordings,*
    67 Fed. Reg. 45240 (July 8, 2002) ................................................. 11

*Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26316 (May 2, 2016) ............................... 12, 13, 14

*Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III)*, 83 Fed. Reg. 65210 (Dec. 19, 2018) ...................................................................... 11

\*Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings, 79 Fed. Reg. 23102 (Apr. 25, 2014) .................................................. 11, 12, 13, 15

*Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24084 (May 1, 2007) ............................. 13

\*Memorandum Opinion on Novel Material Questions of Law, Docket No. 14-CRB-0001-WR (Sept. 18, 2015) .......................................... 17

\*Report of the CARP, Docket No. 2000-9 CARP DTRA 1&2 (Feb. 20, 2002) ........................................................................... 11

# GLOSSARY

The following abbreviations or terms are used in this petition.

| | |
|---|---|
| **ATH** | Aggregate Tuning Hours, or "listener hours," as defined in 37 C.F.R. §380.7. |
| **APA** | The Administrative Procedure Act, as set forth in scattered sections of Title 5 of the United States Code. |
| **Board** | The Copyright Royalty Board, the body of three Copyright Royalty Judges authorized by Congress in 17 U.S.C. §801 to, *inter alia*, set rates and terms under various statutory licenses.nab |
| **CARP** | A Copyright Arbitration Royalty Panel, the predecessor bodies to the Copyright Royalty Board. |
| **CARP Report** | The Report of the Copyright Arbitration Royalty Panel issued on February 20, 2002, in Docket No. 2000-9 CARP DTRA 1&2 setting rates under the Statutory Licenses, available at https://webharvest.gov/peth04/20041016023627/ http:/copyright.gov/carp/webcasting_rates.pdf. |
| **CPB** | Corporation for Public Broadcasting. |
| **Determination** | The Final Determination of the Board in the proceeding below, issued on September 20, 2021 (JA295-605 (public); JA1113-423 (sealed)) and published at *Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate Those Performances*, 86 Fed. Reg. 59452 (Oct. 27, 2021). |

| **Music ATH** | ATH of Website Performances of sound recordings of musical works, as defined in the NPR Agreement (TX3020.6-7 (JA930-31)). |
|---|---|
| **NAB** | National Association of Broadcasters. |
| **NPR** | National Public Radio, Inc. |
| **NPR Agreement** | The September 23, 2019 agreement between NPR and SoundExchange setting fees under the Statutory Licenses for 2021-2025 (TX3020 (JA925-34). |
| **NPR Agreements** | The February 23, 2015 agreement between NPR and SoundExchange setting fees under the Statutory Licenses for 2016-2020 (TX3021 (JA935-48) and the September 23, 2019 agreement between NPR and SoundExchange setting fees under the Statutory Licenses for 2021-2025 (TX3020 (JA925-34)). |
| **NRBNMLC** | National Religious Broadcasters Noncommercial Music License Committee. |
| **NRBNMLC Br.** | The final principal brief filed in this appeal by NRBNMLC on January 12, 2023. |
| **Performance** | As defined in 37 C.F.R. §380.7, "each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission," excluding certain transmissions identified in that section. |
| **Register** | The Register of Copyrights, United States Copyright Office. |

| | |
|---|---|
| ***Register Op.*** | The September 18, 2015 *Memorandum Opinion on Novel Material Questions of Law*, issued by the Register in Docket No. 14-CRB-0001-WR (*Web IV*), 2015), available at https://www.crb.gov/rate/14-CRB-0001-WR-2016-2020-WEB-IV/2015-9-18-Memorandum-Opinion-Novel-Material-Questions-Law.pdf. |
| **RFRA** | The Religious Freedom Restoration Act, codified as amended at 42 U.S.C. §2000bb *et seq.* |
| ***SDARS I*** | The determination of the Board of rates and terms under the Statutory Licenses for preexisting subscription services and satellite digital audio radio services, published at *Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services*, 73 Fed. Reg. 4080 (Jan. 24, 2008). |
| ***SDARS III*** | The determination of the Board of rates and terms under the Statutory Licenses for preexisting subscription services and satellite digital audio radio services, published at *Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III)*, 83 Fed. Reg. 65210 (Dec. 19, 2018). |
| **Section 112 Statutory License** | The statutory license under section 112 of the Copyright Act for the making of ephemeral reproductions of sound recordings to facilitate performances made under the Section 114 Statutory License. |
| **Section 114 Statutory License** | The statutory license under section 114 of the Copyright Act for the public performance of sound recordings via digital audio transmission by certain types of services. |

| | |
|---|---|
| **Statutory Licenses** | The Section 112 and Section 114 Statutory Licenses. |
| **TX** | A trial exhibit admitted in the case under review. |
| ***Web I*** | The determination of the Librarian of Congress reviewing the CARP Report, found at *Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings*, 67 Fed. Reg. 45240 (July 8, 2002). |
| ***Web II*** | The determination of the Board of rates and terms under the Statutory Licenses for 2006-2010, published at *Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 72 Fed. Reg. 24084 (May 1, 2007). |
| ***Web III Remand*** | The determination of the Board of rates and terms under the Statutory Licenses for 2011-2015 following remand of the case by this Court, published at *Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings*, 79 Fed. Reg. 23102 (Apr. 25, 2014). |
| ***Web IV*** | The determination of the Board of rates and terms under the Statutory Licenses for 2016-2020, published at *Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (Web IV)*, 81 Fed. Reg. 26316 (May 2, 2016). |

## INTRODUCTION AND FRAP 35(B) STATEMENT

The Religious Freedom Restoration Act ("RFRA") prohibits federal agencies from substantially burdening religious exercise "even if the burden results from a rule of general applicability." 42 U.S.C. §2000bb-1(a). If "a law that operates so as to make the practice of … religious beliefs more expensive in the context of business activities imposes a burden on the exercise of religion," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (quotation omitted), that is doubly so when religious broadcasters pay *17 times* more than the secular NPR rate to webcast to listeners above a minimal audience. And when, as here, an agency imposes such a burden, it must grant a religious exemption unless it satisfies strict scrutiny. 42 U.S.C. §2000bb-1(b).

Those principles control here. Under limited statutory licenses, the Copyright Royalty Board ("Board") establishes rates under which noninteractive webcasters—those whose listeners cannot select the content—pay royalties to sound recording copyright owners where parties cannot agree to rates. The Board must set rates that represent what "would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. §§112(e)(4), 114(f)(1)(B).

Among large noncommercial webcasters, there are two relevant groups: NPR webcasters and non-NPR webcasters, who are almost exclusively religious. TX5625.27-28 (JA1846-47). For NPR, the Board

adopted rates that NPR and SoundExchange—representing record company sellers—proposed as willing buyers and sellers, which are excellent evidence of large, noncommercial, willing-buyer-willing-seller rates. *Determination* 3 (JA1115). Yet instead of adopting those rates—or anything close—for religious webcasters, the Board forced them to pay a rate for webcasting above an audience of 218 average listeners (the size of a small college lecture hall) over 17 times the average NPR rate. That's a RFRA violation.

The panel rejected the National Religious Broadcasters Noncommercial Music License Committee's ("NRBNMLC's") RFRA and First Amendment claims because (1) there was "no record finding" of a disparity and, (2) to the extent a disparity exists, it penalizes secular, non-NPR webcasters as much as religious, non-NPR webcasters. SlipOp.33-34 (Add.). But the Government's briefing conceded a disparity, and the respective rates speak for themselves. Moreover, the panel's holding conflicts with Supreme Court precedent establishing that it is no answer to a religious discrimination allegation that the Government "treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam) (citation omitted). Accordingly, en banc review is warranted. Fed. R. App. P. 35(b)(1)(A).

There are numerous other reasons for en banc review. The panel's decision separately conflicts with *Minneapolis Star & Tribune Co. v.*

*Minnesota Commissioner of Revenue*, 460 U.S. 575, 585, 590-92 (1983), because the Board's fee structure singles out large, non-NPR noncommercial webcasters for disparate treatment. The decision violates due process by (a) requiring NRBNMLC to provide expert testimony regarding a benchmark's comparability and (b) requiring a benchmark's proponent to anticipate and quantify a *challenger's* proposed adjustments—each unexplained and previously unannounced departures from the Board's long-followed rules. SlipOp.25-27 & n.5. The panel also legally erred in misinterpreting the Copyright Act, *id.* at 27-28, and misallocating the burden of proof, *id.* at 14, 30 n.6.

The end result is that noncommercial religious webcasters are greatly disincentivized from disseminating religious speech beyond a minimal audience, whereas Government-favored NPR webcasters face no such speech suppression. This disparity is even starker because NPR webcasters do not have to pay the fees; the Government pays them. TX3020.2-3 (JA926-27). These issues are of exceptional importance; the en banc Court should resolve them.

## **BACKGROUND**

Congress granted copyright owners certain exclusive rights in their works, including the right to make public performances of certain types of works. 17 U.S.C. §106. For sound recording performances, Congress limited the right by (a) restricting it to digital audio

transmissions (including webcasting) and (b) creating statutory licenses for noninteractive transmissions to facilitate access. *Id.* §106(6); *id.* §§112(e), 114(d). Congress ordered the Board to set rates under these licenses anew every five-year period if parties were unable to negotiate rates. *Id.* §804(b)(3).

The Board must distinguish among service types and, for each, establish willing-buyer-willing-seller rates. *Id.* §114(f)(1)(B). It may consider voluntary agreements as "benchmarks." *Id.* §114(f)(1)(B)(ii).

## PROCEEDINGS

This appeal involves the Board's rate setting for 2021-2025. Following long practice, the Board again found that noncommercial webcasters differed from commercial webcasters and warranted different rates. *Determination* 270 (JA1382). Large noncommercial webcasters include only two relevant groups—NPR-affiliated and non-NPR-affiliated—the latter of which are almost exclusively religious. TX5625.27-28 (JA1846-47).

For noncommercial NPR webcasters, the Board adopted rates jointly proposed by NPR and SoundExchange. *Determination* 3 (JA1115). Those rates charged $800,000/year for an annual allotment of music aggregate tuning hours ("Music ATH") (380,000,000 in 2023).

TX3020.6-8 (JA930-32). The 2023 rate equals $0.0021/Music ATH and $0.00014/performance.[1]

For noncommercial, non-NPR webcasters, NRBNMLC proposed two rate alternatives modeled after the negotiated NPR rates. *Determination* 254-58 (JA1366-70). The Board rejected both and instead accepted SoundExchange's proposal, setting a $1,000 minimum fee per channel for 159,140 ATH/month (218 average listeners) plus commercial-level per-performance rates for additional webcasting (currently $0.0024), where one sound recording transmitted to one listener is one performance. *Id.* at 250, 279-80 (JA1362, 1391-92); 37 C.F.R. §380.10(a)(2). Thus, above 218 average listeners, noncommercial webcasters—almost all of whom are religious—pay over 17 times more than the NPR rate. [2] TX5625.27-28 (JA1846-47).

NRBNMLC challenged the Board's Determination as violative of the Copyright Act, RFRA, the First Amendment, and the Administrative Procedure Act ("APA"). A panel of this Court affirmed, necessitating en banc review.

---

[1] $800,000/380,000,000 Music ATH equals $0.0021/Music ATH. $0.0021/Music ATH equals $0.00014/performance using SoundExchange's conversion factor of 15 performances/Music ATH. TX5625.23 n.31 (JA1844).

[2] $0.0024/$0.00014 equals 17.14.

## ARGUMENT

I. **THE PANEL'S RFRA/FREE EXERCISE ANALYSIS CON-FLICTS WITH *TANDON* AND VIOLATES RELIGIOUS WEBCASTERS' FIRST AMENDMENT RIGHTS, IN CON-FLICT WITH *MINNEAPOLIS STAR*.**

A. **The Government Cannot Excuse Discrimination Against Religious Webcasters Based on Additional Discrimination Against Some Secular Webcasters.**

The panel summarily rejected NRBNMLC's RFRA claim, assert-ing that (1) there was "no record finding" of a disparity and, (2) to the extent a disparity exists, it penalizes secular, non-NPR stations as much as religious, non-NPR stations. SlipOp.33-34. These assertions are wrong and conflict with Supreme Court precedent.

Regarding the first point, the discrimination is stark, not only under the respective rates but because NPR webcasters pay no fees at all; the Government does. TX3020.2-3 (JA926-27). Whether this favorable treatment is itself a Free Exercise problem is an open question. *See Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) (noting that Supreme Court has "repeatedly held" that Government "violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits"). But at minimum, the Govern-ment's subsidization shows a fee disparity.

In addition, consistent with the evidence, the Government conceded in its briefing that, "the [noncommercial] rates … were higher than the rates agreed to by the settling noncommercial services" *i.e.*, the

secular NPR webcasters. Final Br. for Appellees 85 (Jan. 12, 2023). So while the rates themselves establish that religious webcasters pay over 17 times the secular NPR webcaster rates for every above-threshold performance, this Court need not analyze that specific ratio under RFRA. If a law burdens religion when it "operates so as to make the practice of … religious beliefs more expensive in the context of business activities," *Burwell*, 573 U.S. at 710 (quoting *Braunfield v. Brown*, 366 U.S. 599, 605 (1961)), then charging religious webcasters more than secular webcasters certainly does.

On the merits, the panel was wrong to brush off the religious webcasters' RFRA and First Amendment claims merely because the noncommercial rate structure "applies to all noncommercial webcasters," including secular webcasters. SlipOp.34. That is not true; the structure does *not* apply to NPR webcasters, as the Board adopted different statutory rates for them. And to the extent both religious and secular noncommercial, non-NPR webcasters are subject to the Board's threshold structure, the Supreme Court rejected that rationale in *Tandon*. There, California imposed COVID-19 restrictions that treated "some comparable secular activities," including theaters and restaurants, "more favorably than at-home religious exercise," which was a Free Exercise problem. 141 S. Ct. at 1297. It was "no answer that" California "treat[ed] some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise

MATERIAL UNDER SEAL DELETED

at issue." *Id.* at 1296 (citation omitted). So, too, here, RFRA and the Free Exercise Clause require the Board to treat noncommercial religious webcasters at least as well as the best treated noncommercial secular webcasters. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 73 (2020) (per curiam) (Kavanaugh, J., concurring).

Nor is it correct to say that the NPR agreement was an inappropriate comparator. SlipOp.33. The agreement easily satisfied the Board's comparability test, and until now, the Board has required the proponent of any adjustments to quantify them. NRBNMLCBr.21-34; *infra* Part II. Further, NRBNMLC asked SoundExchange – the alleged beneficiary of advanced payment and consolidated reporting and thus the only party able to value them – for evidence quantifying these factors, but SoundExchange [[                    ]]. NRBNMLCBr. 33; TX2056.36-37 (JA1563-64); TX2057.21-23 (JA1568-70). And adjusting for litigation cost savings would have, if anything, made the NPR-non-NPR fee disparity even starker, as NPR benefited more by exiting the litigation altogether, while SoundExchange still presented commercial and noncommercial cases. *See* TX3060.19 (JA970); NRBNMLCBr.31. Adjustments would not remotely justify the 17x disparity appliable to above-threshold webcasting.

Finally, the panel was wrong to shift the burden to NRBNMLC, no matter the statutory scheme. *Compare* SlipOp.26 (burden on NRBNMLC to show why NPR agreement was appropriate comparator)

*with Tandon*, 141 S. Ct. at 1297 (requiring government to show why alleged comparators are not comparable). The Court should grant en banc review.

### B. The Panel's Holding Conflicts with *Minneapolis Star.*

The panel's decision separately conflicts with *Minneapolis Star*'s holding that imposing differential fees that target only a handful of larger entities engaged in speech violates the First Amendment. 460 U.S. at 585, 590-92. There, the Supreme Court invalidated an ink-and-paper tax because it targeted a small group of newspapers. Such differential taxation, said the Court, burdens First Amendment interests and cannot be sustained absent a "counterbalancing interest of compelling importance," *id.* at 585, *i.e.*, surviving strict scrutiny.

As in *Minneapolis Star*, one subgroup—above-threshold webcasters—bear the weight of the most burdensome part of the *Web V* noncommercial rate structure. Yet large, secular NPR stations do not have to pay the same discriminatorily high fees that religious broadcasters must. The targeted rate here is unconstitutional, just like the ink-and-paper tax in *Minneapolis Star*.

It makes no difference whether the Board's rate structure is technically a "tax." The Supreme Court has applied *Minneapolis Star* to protect First Amendment freedoms in contexts where there was no tax at all. *E.g.*, *The Florida Star v. B.J.F.*, 491 U.S. 524 (1989) (First Amendment violation to prohibit printing name of sexual-offense

victim); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) (must-carry provisions for cable operators and special burdens for cable programmers triggered heightened First Amendment scrutiny). The constitutional concern is the Board's targeting of a small group of religious webcasters who reach more than a minimal audience—*i.e.*, the most effective ones in their reach. *Accord Minneapolis Star*, 460 U.S. at 591 ("Minnesota's ink and paper tax violates the First Amendment not only because it singles out the press, but also because it targets a small group of newspapers."). In *Minneapolis Star*, "only a handful of publishers pa[id] any tax at all, and even fewer pa[id] any significant amount of tax." *Id.* Here, a small group of overwhelmingly religious webcasters must pay the discriminatory fees that NPR webcaster stations avoid. En banc review is appropriate.

## II.    THE PANEL'S DECISION GIVES A PASS TO THE BOARD'S ARBITRARY, UNEXPLAINED DEPARTURES FROM PRECEDENT.

"The touchstone of due process is freedom from arbitrary governmental action …." *Ponte v. Real*, 471 U.S. 491, 495 (1985). "[A]gency action is arbitrary and capricious if it departs from agency precedent without explanation." *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003). The panel's decision upheld the Board's arbitrary departures from its precedent in two respects, both of which deprived NRBNMLC of fair notice of the Board's rate-setting rules.

*First*, the panel upheld the Board's unexplained and previously unannounced new requirement that parties provide expert testimony regarding a proffered benchmark's comparability. SlipOp.25. The Board and its predecessor CARP have long employed a comparability test that examines whether an agreement involves the same buyers, sellers, and statutory rights as those in the rate-setting proceeding:

> [T]he Section 114(f)(2) hypothetical marketplace is one where the buyers are DMCA-compliant services, the sellers are record companies, and the product being sold consists of blanket licenses for each record company's repertory of sound recordings. Accordingly, the most reliable benchmark rate would be established through license agreements negotiated between these same parties for the rights described.

*Report of the CARP* at 24, 44, Docket No. 2000-9 CARP DTRA 1&2 (Feb. 20, 2002);[3] *accord Web I*, 67 Fed. Reg. 45240, 45245 (July 8,2002); *Web III Remand*, 79 Fed. Reg. 23102, 23111 (Apr. 25, 2014); *SDARS III*, 83 Fed. Reg. 65210, 65214 (Dec. 19, 2018). The NPR Agreements on their face satisfy this test; they involve statutorily compliant noncommercial broadcaster buyers, record company sellers represented by SoundExchange, and the precise statutory rights at issue. *See* NRBNMLC.Br.21-22; TX3020.2, 6-7 (JA926, 930-31); TX3021.2, 8-9 (JA936, 942-43); TX5625.52 (JA1848).

---

[3] https://webharvest.gov/peth04/20041016023627/http:/copyright.gov/carp/webcasting_rates.pdf

The panel did not consider whether the NPR Agreements satisfied the Board's simple test but instead upheld the Board's unexplained new requirement. SlipOp.25. The requirement flies in the face of past Board precedent, which adopted analogous noncommercial benchmarks without requiring any expert comparability testimony. *E.g.*, *Web III Remand*, 79 Fed. Reg. at 23120, 23123 (accepting SoundExchange settlement with noncommercial entity as "persuasive evidence that SoundExchange's proposal satisfies the willing buyer/willing seller standard" without discussing expert comparability testimony). More-over, the requirement makes no sense in light of the Board's own test: identifying the buyers, sellers, and licensed rights in a proffered benchmark agreement is not a matter of economics or other expertise but involves simply reading the benchmark.

The panel held that the new *per se* rule should come as no surprise because the Board "previously demanded expert testimony in an analogous situation." SlipOp.25 (citing *Web IV*, 81 Fed. Reg. 26316, 26327 (May 2, 2016). But that situation was not "analogous." It involved an analysis of the extent to which webcasting services substitute for or promote other forms of music consumption (*e.g.*, on-demand listening or sound recording purchases). *Web IV*, 81 Fed. Reg. at 26327. There, the parties proffered both fact and expert testimony regarding these effects; the Board found that the issue was "technical"

and favored expert over lay testimony. *Id.* No such "technical" issue is involved in identifying parties to, and rights licensed in, a benchmark.

 *Second*, the panel blessed the Board's arbitrary departure from its long precedent requiring a benchmark's challenger proposing an adjustment to quantify that adjustment and accepting the benchmark unadjusted if the challenger failed to do so. SlipOp.25-27; *see Web III Remand*, 79 Fed. Reg. at 23111-12, 23114 (accepting unadjusted benchmark because challenger "has not quantified or otherwise estimated the monetary value of [alleged] differences"); *accord Web II*, 72 Fed. Reg. 24084, 24095 (May 1, 2007); *SDARS I*, 73 Fed. Reg. 4080, 4093-95 (Jan. 24, 2008); *Web IV*, 81 Fed. Reg. at 26383, 26386. The *Web IV* Board emphasized that:

> [I]f the party that seeks to increase (or decrease) an otherwise effective benchmark rate to account for other items of potential value cannot or has not provided evidence of such value, when it was in its self-interest to do so, the Judges cannot arbitrarily adjust or ignore that otherwise proper and reasonable benchmark.

*Id.* at 26387; *accord SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 52 (D.C. Cir. 2018); NRBNMLC.Br.26-28. Here, by contrast, the Board arbitrarily required a benchmark's *proponent*—NRBNMLC— to quantify various adjustment factors proffered by SoundExchange. *Determination* 259-60, 266-67 (JA1371-72, JA1378-79).

The panel affirmed the Board's arbitrary inversion of its rule, finding that the Board "properly placed the burden on [NRBNMLC] to make the appropriate adjustments" to its benchmark. SlipOp.26. The panel cited the Court's affirmance of the Board's 2016-2020 determination (*Web IV*), but that case contradicts the panel's ruling. SlipOp.25 (citing *SoundExchange*, 904 F.3d at 47). The *Web IV* Board found that the party *proposing* a benchmark adjustment must quantify it. *Web IV*, 81 Fed. Reg. at 26387 (accepting iHeart-Warner benchmark without making SoundExchange-proposed adjustments because SoundExchange had not "established values for these items"). On appeal, this Court affirmed, stating that "SoundExchange again fails to point to any evidence in the record on which the Board could have relied in adjusting the benchmark per-performance rates." *SoundExchange*, 904 F.3d at 51.

The panel distinguished *Web IV* as applicable only to benchmarks that were "otherwise proper and reasonable" and said the NRBNMLC-proffered NPR benchmark was not. SlipOp.27 n.5. But the Board did *not* rely on whether the benchmark was "proper and reasonable" in arbitrarily inverting its adjustment rule. Rather, it found that NRBNMLC bore the burden of anticipating and quantifying SoundExchange's proposed adjustments "*[e]ven if the Judges found the 2019 NPR/CPB Agreement to be a sound benchmark.*" *Determination* 266 (JA1378) (emphasis added).

The panel acknowledged that "*Web IV* accepted a settlement-based benchmark without litigation cost adjustments"—one of SoundExchange's proffered adjustments here. SlipOp.27 n.5. Yet it distinguished that decision because the Board only accepted the benchmark for "some elements of SoundExchange's rate proposal" but not for the above-threshold rate, implying that it would be improper to use a settlement-based benchmark without adjusting for this factor. SlipOp.27 n.5. But the Board could not have relied on the *Web IV* benchmark to set an above-threshold rate because that benchmark *did not set one*. TX3000.7-8 (JA908-09) (including minimum fee and 159,140 monthly ATH threshold but requiring above-threshold webcasters to pay default Board-set noncommercial rates). *Web IV* does not support any inference that it would be improper to rely on a settlement-based benchmark to set above-threshold fees without adjusting for litigation cost savings.

Moreover, in *Web III*, the Board accepted a noncommercial settlement-based benchmark that did include above-threshold commercial-level usage fees, calling that benchmark "persuasive evidence that SoundExchange's proposal satisfies the willing buyer/willing seller standard," without limiting its acceptance to specific benchmark elements. *See Web III Remand*, 79 Fed. Reg. at 23123-24. *Compare id.* at 23136 (noncommercial benchmark above-threshold rates) *with id.* at

23131 (identical commercial broadcaster rates). Based on this benchmark and other evidence, the Board adopted SoundExchange's proposal, including that noncommercial webcasters "pay at the commercial usage rates for any overage" above 159,140 ATH/month. *Id.* at 23121, 23124, 23128. The panel did not distinguish this case other than calling it "off-point" without explanation. SlipOp.27 n.5.

In short, rehearing is warranted to correct the panel's affirmance of the Board's imposition of arbitrary new benchmark comparability and adjustment rules. These rules violate the APA and NRBNMLC's due process right to have notice of such requirements to give NRBNMLC the opportunity to satisfy them. *Cf. Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 380-81 (D.C. Cir. 2020).

## III.  THE PANEL PERPETUATED THE BOARD'S LEGAL ERRORS IN DISREGARDING BINDING PRECEDENT INTERPRETING THE COPYRIGHT ACT AND IN MISINTERPRETING THE APA.

The panel also perpetuated at least two legal errors concerning the Copyright Act's interpretation. *First*, it affirmed the Board's holding that 17 U.S.C. §114(f)(4)(C) barred it from considering an analysis valuing NPR rates despite contrary binding Register precedent. SlipOp.27-28. That provision renders inadmissible agreements negotiated under the 2008 or 2009 Webcaster Settlement Acts ("WSA"), which applied only to certain agreements in force before 2016. 17 U.S.C. §114(f)(4)(A), (C)-(D); WSA of 2008, Pub. L. No. 110-435, 122 Stat. 4974; WSA of 2009,

Pub. L. No. 111-36, 123 Stat. 1926. In a binding opinion, the Copyright
Office interpreted 17 U.S.C. §114(f)(4)(C) as barring *only* "WSA
agreements themselves" from consideration. *Mem. Op. on Novel
Material Questions of Law* at 3-4, 11, Docket No. 14-CRB-0001-WR
(Sept. 18, 2015), https://www.crb.gov/rate/14-CRB-0001-WR-2016-2020-
WEB-IV/2015-9-18-Memorandum-Opinion-Novel-Material-Questions-
Law.pdf ("*Register Op.*"); 17 U.S.C. §802(f)(1)(B)(i). It found that the
"general effect on the marketplace or particular negotiations" of WSA
agreements was fair game, as were non-WSA agreements "copied
verbatim from," "substantively identical to," or "influenced by" WSA
agreements. *Register Op.* 3-4, 11, 14; NRBNMLC.Br.34-36.

Here, the analysis at issue is not a WSA agreement but a Sound-
Exchange-described "analysis of potential value" of a non-WSA Agree-
ment. TX2057.21-22 (JA1568-69). The Board nonetheless erroneously
held that 17 U.S.C. §114(f)(4) barred it from considering the analysis
because it used some now-expired WSA rates to value non-WSA 2016-
2020 NPR rates. *Determination* 264-65 (JA1376-77). The panel
affirmed, holding that "the Board was not required to accept
[NRBNMLC's] inference that the rates were actually used in the non-
WSA settlement agreement relied upon by [NRBNMLC]." SlipOp.27-28.
But no inference is needed to find that the document was used in
SoundExchange's non-WSA negotiations with NPR—SoundExchange
itself said that it was, and the face of the document confirmed it.

MATERIAL UNDER SEAL DELETED

Specifically, SoundExchange identified this document as responsive to NRBNMLC's request for any "Analysis …reviewed or considered by SoundExchange … that SoundExchange … considered, reviewed, or relied upon in valuing, negotiating, or agreeing to rates and terms with … NPR for all or any part of the time period *from 2016-2025*"—*i.e.*, a non-WSA period. TX2057.21 (JA1568) (emphasis added).

SoundExchange characterized the document as "reflecting its analysis of potential value" of the non-WSA NPR Agreement and its efforts "to quantify the value of minimum fees, additional usage fees, and administrative convenience discounts/protection from bad debt" under the 2016-2025 agreements. TX2057.22 (JA1569). Further, the document itself states that it was prepared "[[ ███████████████ ]]," establishing that it was used for forward-looking settlement negotiations with NPR. TX3022-Estimations.1 (JA1616). The panel legally erred in affirming the Board's decision to disregard this document.

*Second*, the panel legally erred in affirming the Board's imposition of the burden of proof on the party seeking to change prior rates rather than on all parties equally. SlipOp.14, 30 n.6; *Determination* 268 (JA1380) (requiring NRBNMLC to disprove SoundExchange's proposal by "persuasive counterarguments"). Congress established a statutory license with defined five-year rate periods, not continuing rates subject to adjustment. 17 U.S.C. §114(f)(1)(B). Section 114 requires the Board

to "determine" rates anew for each five-year period. *Id.* §114(f)(1)(A); *accord id.* §804(b)(3)(A). In each proceeding, the Board must "establish" rates that, *for that period*, "most clearly represent" willing-buyer-willing-seller rates, *id.* §114(f)(1)(A)-(B), not assess whether prior rates should be adjusted. That process contrasts with "adjustment" proceedings, which this case is not. *Id.* §804(b)(1)(A).

The panel said that its ruling is not new, citing *Music Choice v. Copyright Royalty Board*, 774 F.3d 1000, 1012 (D.C. Cir. 2014). SlipOp.30 n.6.  But that case involved a different rate-setting standard, directing the Board to consider the "disruptive impact" of new rates (necessarily implicating prior rates) rather than the standard here—rates for the current period to which willing buyers and sellers would agree—and thus is inapposite. *Music Choice*, 774 F.3d at 1004, 1012. The panel and the Board erred by not equally requiring *all* parties to support their proposals. The en banc court should correct that error as well.

## <u>CONCLUSION</u>

The Court should grant rehearing en banc.

Respectfully submitted,

By: */s/ John J. Bursch*

| | |
|---|---|
| JOHN J. BURSCH | KARYN K. ABLIN |
| ERIN M. HAWLEY | FLETCHER, HEALD & HILDRETH, PLC |
| ALLIANCE DEFENDING FREEDOM | 1300 N. 17th Street |
| 440 First Street, NW, Suite 600 | 11th Floor |
| Washington, DC 20001 | Arlington, VA 22209 |
| (616) 450-4235 | (703) 812-0443 |
| jbursch@ADFlegal.org | ablin@fhhlaw.com |
| ehawley@ADFlegal.org | |

RORY T. GRAY
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd.
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
rgray@ADFlegal.org

*Counsel for Appellant National Religious Broadcasters Noncommercial
Music License Committee*

September 11, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1), this petition complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) and Circuit Rule 35 because the petition contains 3,863 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), as determined by the word counting feature of Microsoft Office 365.

This petition complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6), as required by Fed. R. App. P. 32(c)(2), because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook.

Dated: September 11, 2023

*/s/ John J. Bursch*
John J. Bursch

*Counsel for Appellant National Religious Broadcasters Noncommercial Music License Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2023, I electronically filed the public version of the foregoing Petition with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system. I further certify that on September 11, 2023, I served the sealed version of the foregoing petition on counsel for all parties by electronic transfer.

*/s/ John J. Bursch*
John J. Bursch
*Counsel for Appellant*

# ADDENDUM

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 17, 2023          Decided July 28, 2023

No. 21-1243

NATIONAL RELIGIOUS BROADCASTERS NONCOMMERCIAL
MUSIC LICENSE COMMITTEE,
APPELLANT

v.

COPYRIGHT ROYALTY BOARD AND LIBRARIAN OF CONGRESS,
APPELLEES

GOOGLE LLC, ET AL.,
INTERVENORS

———

Consolidated with 21-1244, 21-1245

———

On Appeals from a Final Determination
of the Copyright Royalty Board

———

*Samir Deger-Sen* argued the cause for appellant National
Association of Broadcasters.  With him on the briefs were
*Joseph R. Wetzel*, *Andrew M. Gass*, *Sarang V. Damle*, and
*Blake E. Stafford.*

A-2

2

*Karyn K. Ablin* argued the cause and filed the briefs for appellant National Religious Broadcasters Noncommercial Music License Committee. *John J. Bursch*, *Rory T. Gray*, and *Erin M. Hawley* entered appearances.

*Matthew S. Hellman* argued the cause and filed the briefs for appellant SoundExchange, Inc. *Previn Warren* entered an appearance.

*Jennifer L. Utrecht*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Michael D. Granston*, Deputy Assistant Attorney General, and *Daniel Tenny*, Attorney.

*David P. Mattern* argued the cause for intervenors Google LLC, et al. in support of appellees. With him on the brief were *Sarang V. Damle*, *Blake E. Stafford*, *Kenneth L. Steinthal*, *Joseph R. Wetzel*, *Andrew M. Gass*, *Samir Deger-Sen*, *Joshua N. Mitchell*, and *Karyn K. Ablin*. *John J. Bursch*, *Jason B. Cunningham*, *Rory T. Gray*, and *Erin M. Hawley* entered appearances.

*Matthew S. Hellman* was on the brief for intervenor SoundExchange, Inc. in support of appellees. *Previn Warren* entered an appearance.

Before: MILLETT, WILKINS, and PAN, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Every five years, the Copyright Royalty Board (the "Board") issues a statutory license that establishes the terms and rates under which certain entities that stream copyrighted songs over the internet make royalty payments to the songs' copyright owners. The "webcasters" that are subject to the

3

license are "noninteractive" — i.e., they stream music without letting their listeners choose songs on demand.  This appeal challenges on various grounds the Board's most recent noninteractive webcaster license Final Determination, covering calendar years 2021 through 2025.  We sustain the Board's Final Determination in all respects.

**I**

The Copyright Act, 17 U.S.C. § 101 *et seq.*, provides the statutory framework for regulating copyrights.  Under that framework, a recorded song has two components with distinct rights:  (1) the "musical work," which is the song's underlying composition (i.e., the lyrics and melody); and (2) the "sound recording," which is a recorded version of the song.  *See SoundExchange, Inc. v. Copyright Royalty Board*, 904 F.3d 41, 46 (D.C. Cir. 2018).

Historically, the owner of a musical work had an exclusive right of public performance but the owner of a sound recording did not.  *SoundExchange*, 904 F.3d at 46.  Thus, an FM radio station could broadcast a sound recording without permission from its copyright owner.  But in 1995, Congress amended the Copyright Act to grant sound-recording owners the exclusive right of public performance "by means of a digital audio transmission."  Digital Performance Right in Sound Recordings Act of 1995, Pub. L. No. 104-39, § 2, 109 Stat. 336, 336 (codified at 17 U.S.C. § 106(6)).  Under the amended statute, a webcaster cannot stream a sound recording without paying royalties to its copyright owner.

In defining the scope of this new right, Congress distinguished between webcasters (also known as "digital audio services") that are "interactive" and "noninteractive." Interactive services let users choose the particular songs they

4

want to listen to on demand, e.g., Spotify, while noninteractive services do not, e.g., Pandora. *See* 17 U.S.C. § 114(j)(7). Interactive webcasters must contract directly with copyright owners to obtain public performance rights for their sound recordings. *Id.* § 114(d)(2)(A)(i). By contrast, Congress tasked the Copyright Royalty Board with creating a compulsory license covering the use of sound recordings by all noninteractive webcasters. *Id.* § 114(f)(1). The license is "compulsory" because copyright owners cannot opt out of it unless they negotiate individual settlement agreements with noninteractive webcasters. *Id.* §§ 114(f)(1)–(2). Royalties under the compulsory license are paid to a "nonprofit collective," which distributes the funds to performing artists or other copyright owners. *Id.* § 114(g)(2). Meanwhile, traditional AM/FM radio, also known as terrestrial or over-the-air radio, still plays by the old rules: those radio stations pay no royalties to broadcast songs to listeners, and copyright owners instead treat AM/FM radio as a promotional opportunity.

The Board must set the rates and terms of the compulsory license for noninteractive webcasters every five years. 17 U.S.C. § 114(f)(1)(A). Interested parties may negotiate settlement agreements amongst themselves to opt out of the compulsory license. *Id.* § 114(f)(2). If a particular record label and a webcaster negotiate a settlement agreement that sets terms for the webcaster's use of the record label's copyrighted sound recordings, that agreement controls instead of the Board's compulsory license. Non-settling parties are subject to the license, and the Board holds an evidentiary proceeding to determine the applicable terms and rates under that license. *SoundExchange*, 904 F.3d at 46–47. Noninteractive webcasting produces hundreds of billions of streams per year, the vast majority of which are covered by the compulsory license rather than by a settlement.

5

Congress set forth instructions for the Board's compulsory license determinations in 17 U.S.C. § 114(f)(1)(B). The statute directs the Board to "distinguish among the different types of [webcasting] services then in operation" based on, among other factors, the "quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers." *Id.* Applying that standard, the Board has previously distinguished between commercial and noncommercial webcasting services and between subscription-based and nonsubscription-based commercial services. *See* Determination of Royalty Rates and Terms for Ephemeral Recording and Webcasting Digital Performance of Sound Recordings (*Web IV*), 81 Fed. Reg. 26,316, 26,409 (May 2, 2016). For each different type of service, the Board must establish rates and terms that represent what "would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(1)(B). This is called the "willing buyer/willing seller" standard. *SoundExchange*, 904 F.3d at 56. In so doing, the Board must consider factors including the effect of the license's rates and terms on other sources of sound recording revenue, such as whether a service tends to boost or deflate interactive streaming royalties. 17 U.S.C. § 114(f)(1)(B)(i)(I). The Board may also consider voluntary license agreements negotiated for comparable services as "benchmarks" that provide reference points in its analysis. *SoundExchange*, 904 F.3d at 47; *see* 17 U.S.C. § 114(f)(1)(B)(ii). And the Board's rates and terms must "include a minimum fee" that each webcaster must pay to use the compulsory license. 17 U.S.C. § 114(f)(1)(B). As we have made clear, "the statute does not require that the [hypothetical] market assumed by the [Board] achieve metaphysical perfection." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Board* (*Intercollegiate II*), 796 F.3d 111 (D.C. Cir. 2015).

6

This appeal concerns the Board's fifth noninteractive webcaster rate Final Determination, which set the rates and terms of the statutory license for calendar years 2021 through 2025. Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies To Facilitate Those Performances (*Web V*), 86 Fed. Reg. 59,452 (Oct. 27, 2021). The Board's previous four noninteractive webcaster rate determinations were reviewed and largely upheld by this court. *See SoundExchange*, 904 F.3d 41 (reviewing *Web IV*); *Intercollegiate II*, 796 F.3d 111 (reviewing *Web III*); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Board* (*Intercollegiate I*), 574 F.3d 748 (D.C. Cir. 2009) (reviewing *Web II*); *Beethoven.com LLC v. Librarian of Cong.*, 394 F.3d 939 (D.C. Cir. 2005) (reviewing *Web I*).[1]

The *Web V* evidentiary hearing lasted from August 4, 2020, to September 9, 2020. Ten parties participated, including the appellants and intervenors in this consolidated case: (1) the National Association of Broadcasters (the "NAB"), an association of radio and television stations; (2) the National Religious Broadcasters Noncommercial Music License Committee (the "Committee"), an arm of a trade association that represents religious radio and television stations; (3) SoundExchange, Inc., a collective management organization that represents sound-recording copyright holders

---

[1]    For the underlying Board determinations, *see Web IV*, 81 Fed. Reg. 26,316; Determination of Royalty Rates for Digital Performance Right in Sound Recordings and Ephemeral Recordings (*Web III*), 79 Fed. Reg. 23,102 (April 25, 2014); Digital Performance Right in Sound Recordings and Ephemeral Recordings (*Web II*), 72 Fed. Reg. 24,084 (May 1, 2007); Determination of Reasonable Rates and Terms for the Digital Performance of Sound Recordings and Ephemeral Recordings (*Web I*), 67 Fed. Reg. 45,240 (July 8, 2002).

7

and artists; and (4) Google LLC, a technology company.  The Board heard oral testimony from thirty-three witnesses and received written testimony from eight, which together included thirteen qualified experts.  The Board admitted 748 exhibits into evidence, comprising more than 900,000 pages of documents.  After the hearing, the parties submitted proposed findings and conclusions, and responses thereto, and made closing arguments on November 19, 2020.  The Librarian of Congress published the Board's Final Determination on October 27, 2021.

In its Final Determination, the Board identified three relevant categories of webcasters:  commercial subscription webcasters, commercial nonsubscription webcasters, and noncommercial webcasters.  *See Web V*, 86 Fed. Reg. at 59,589.  Commercial subscription webcasters are services like Pandora Plus that collect payments from their listeners.  *See SoundExchange*, 904 F.3d at 48.  Commercial nonsubscription, i.e., "ad-supported," webcasters are services like Free Pandora that collect payment from advertisers rather than listeners.  *See id.* at 48, 58.  Noncommercial webcasters are services owned by a government entity or a nonprofit, such as National Public Radio ("NPR") and certain religious webcasters.  *See Web V*, 86 Fed. Reg. at 59,593; 17 U.S.C. § 114(f)(4)(E)(i).  Besides noncommercial, educational, and public webcasters, all other webcasters are commercial.  *Web V*, 86 Fed. Reg. at 59,592.

For all webcasters, the Board set a minimum fee of $1,000 per channel or station.  *Web V*, 86 Fed. Reg. at 59,589.  Commercial webcaster license fees were capped at $100,000.  *Id.* at 59,589.  Payment of the minimum fee grants a webcaster access to the compulsory license.  *See* 17 U.S.C. § 114(f)(1)(B).  Each licensee can have multiple channels, but with the $100,000 cap, a large commercial webcaster licensee pays the minimum fee only for its first one hundred channels.

8

This provision doubled the prior minimum-fee payment—which was $500 per channel and capped at $50,000 per licensee. *See Web IV*, 81 Fed. Reg. at 26,409; *Web III*, 79 Fed. Reg. at 23,132.

Beyond the minimum fee, when setting royalty rates for all webcasters, the Board puts forward an amount to be paid "per performance." One copyrighted song heard by one listener is a performance. *Web V*, 86 Fed. Reg. at 59,593. So, for instance, if the Board set a royalty rate at $0.002 per performance, and if a webcaster subject to that rate streamed two copyrighted songs to one thousand listeners each, it would have to pay for two thousand performances, amounting to $4.00 total.

For commercial subscription webcasters, the Board set a 2021 royalty rate of $0.0026 per performance, adjusted annually for inflation. *Web V*, 86 Fed. Reg. at 59,589. For all commercial webcasters, the minimum fee of $1,000 covers a service's first $1,000 in royalty payments, *id.*, or about 385,000 performances for commercial subscription webcasters in 2021.

For commercial nonsubscription webcasters, the Board set a 2021 royalty rate of $0.0021 per performance, adjusted annually for inflation. *Web V*, 86 Fed. Reg. at 59,589. The minimum fee of $1,000 covered roughly 475,000 performances for commercial nonsubscription webcasters in 2021.

For noncommercial webcasters, the Board set a payment structure under which the webcaster receives a monthly allowance of 159,140 aggregate tuning hours ("ATH") by paying the minimum fee; and pays a 2021 royalty rate of $0.0021 per performance above that threshold, adjusted annually for inflation—the same rate that applies to

9

commercial nonsubscription webcasters. *Web V*, 86 Fed. Reg. at 59,589. ATH is, essentially, the cumulative time spent listening to copyrighted songs. *See id.* at 59,592. For instance, if 1,000 individuals each listened to one hour of copyrighted songs, that would amount to 1,000 ATH. *See id.*

Four aspects of the Board's decision are challenged on appeal. First, the NAB argues that the Board should have adopted its proposal to distinguish simulcasters from other commercial nonsubscription webcasters. Simulcasters are traditional AM/FM stations that simultaneously stream their programming on the internet. The NAB sought a lower rate for those stations. Second, the NAB and the Committee (collectively, the "Services") argue that the Board should have rejected SoundExchange's proposal to double the minimum fee to $1,000 per channel and $100,000 per licensee. The Services proposed keeping the incumbent minimum fee structure instead. Third, the Committee argues that the Board should have set a lower rate for noncommercial webcasters, based on a settlement agreement between SoundExchange, NPR, and the Corporation for Public Broadcasting ("CPB") that the Committee proffered as a benchmark. And fourth, SoundExchange argues that the Board should have set a higher commercial nonsubscription rate, contending that the Board's rate is lower than copyright owners' opportunity costs.

The NAB, the Committee, and SoundExchange timely appealed the aforementioned aspects of the Board's Final Determination under 17 U.S.C. § 803(d)(1). SoundExchange intervened on behalf of the government in the appeals brought by the Services, while the Services and Google intervened on behalf of the government in SoundExchange's appeal.

10

## II

We review the Board's rate determinations under Section 706 of the Administrative Procedure Act. *See* 17 U.S.C. § 803(d)(3). We uphold the results of the Board's proceedings "unless they are arbitrary, capricious, contrary to law, or not supported by substantial evidence." *Intercollegiate I*, 574 F.3d at 755. Our "[r]eview of administratively determined rates is 'particularly deferential' because of their 'highly technical' nature." *Id.* (quoting *East Ky. Power Coop. v. FERC*, 489 F.3d 1299, 1306 (D.C. Cir. 2007)). Applying that standard, we sustain the Board's Final Determination against the appellants' challenges.

## III

## A

As an association of radio and television stations, the NAB represents hundreds of simulcasters nationwide. Its members range in size from larger broadcasters, such as iHeartMedia—a company operating around 850 radio stations—to smaller broadcasters, such as individuals operating only a handful of stations. Focusing on the three identified categories of webcasters, the NAB contests the Board's decision to place simulcasters in the broad commercial nonsubscription webcaster category, thus subjecting them to the same rate as what the NAB argues are fundamentally different custom radio services. Custom radio refers to services like Pandora, which allow users to skip songs and to "curate the listening experience." *Web V*, 86 Fed. Reg. at 59,547. By contrast, simulcasters are traditional AM/FM stations that simultaneously stream their programming on the internet without allowing for customization.

11

During the Board's proceedings, the NAB put forth a rate structure under which simulcasters would pay $0.0008 per play, and other eligible commercial nonsubscription webcasters would pay $0.0016 per play. If adopted, the Board would have distinguished simulcasters from other webcasters for the first time. *Web V*, 86 Fed. Reg. at 59,547. According to the NAB, the Board's statutory obligation to distinguish between different services, *see* 17 U.S.C. § 114(f)(1)(B), required it to adopt this proposal because simulcasting is critically distinct from other types of commercial webcasting. As support, the NAB offered various voluntary agreements as benchmarks, including "[d]irect license agreements between sound recording rights owners and webcaster iHeart and license agreements for musical compositions between performing rights organizations and webcasters Pandora and iHeart." *Web V*, 86 Fed. Reg. at 59,547. Ultimately, the Board found that a new distinction was unwarranted based on the record, and more specifically, that "significant evidence" showed "simulcasters and other commercial webcasters compete in the same submarket and therefore should be subject to the same rate." *Id.* at 59,565.

A second point of contention arose regarding the statutorily mandated minimum fee. *See* 17 U.S.C. § 114(f)(1)(B). Having maintained the same $500 minimum fee since 2006, the Board considered SoundExchange's proposal to double the fee to $1,000 in order "at least to cover [its] administrative cost." *Web V*, 86 Fed. Reg. at 59,579 (internal quotation marks omitted). The Services collectively challenged SoundExchange's request, arguing that, because the fee is solely meant to cover "incremental administrative costs"—meaning fees associated with administering the webcasting license—SoundExchange's average administrative cost was "irrelevant." *Id.* at 59,580 (emphasis omitted). In the Services' view, what the Board accepted as "average

12

administrative cost" in fact encompasses SoundExchange's "total costs," including fees unrelated to license administration. NAB Opening Br. 17–18 (emphasis omitted); *see* Committee Opening Br. 51–52. Thus, the Services asked the Board to adopt their narrower view of the minimum fee. But finding no statutory basis that supported it doing so, the Board rejected the Services' proposal and explained why the record justified doubling the minimum fee.

On appeal, the NAB advances a two-part theory, arguing the Board's determination is arbitrary, capricious, or otherwise contrary to law. First, the NAB challenges the Board's refusal to distinguish simulcasters from other nonsubscription commercial services as violating 17 U.S.C. § 114(f)(1)(B)'s plain language. It also argues that the Board's analysis justifying its decision was arbitrary and capricious. Second, the Services challenge the Board's decision to double the minimum fee in consideration of SoundExchange's average administrative costs.

Unpersuaded by either theory, we affirm both aspects of the Board's determination.

**1**

Looking first to the NAB's categorization-related arguments, we uphold the Board's determination, finding this record failed to establish that simulcasters warrant a different royalty rate than other commercial nonsubscription services. According to the NAB, the Board violated its statutory obligation to distinguish services when it acknowledged that simulcasters differ from custom radio, yet still subjected both groups to the same rate. After reviewing this record, however, we confirm that the Board reasonably evaluated the NAB's differentiation evidence and appropriately exercised its

13

discretion in declining to set a separate, lower rate for simulcasters.

Recall that the Board "shall distinguish among the different types of services then in operation" when "establish[ing] rates and terms that most clearly represent" what "would have been negotiated in the marketplace between a willing buyer and a willing seller." 17 U.S.C. § 114(f)(1)(B). The Copyright Act also instructs the Board to base its decision on criteria such as "the quantity and nature of the use of sound recordings and the degree to which use of the service may substitute for or may promote the purchase of phonorecords by consumers." *Id.*

Here, the Board satisfied 17 U.S.C. § 114(f)(1)(B) by maintaining the preexisting rate categories and distinguishing royalty rates for (1) commercial subscription services; (2) commercial nonsubscription services; and (3) noncommercial services. When setting rates, we have explained that the Board has discretion in determining what to use as a starting point, so long as it explains itself. *Music Choice v. Copyright Royalty Board*, 774 F.3d 1000, 1012 (D.C. Cir. 2014) (finding that the Board "did not err when [it] used the prevailing rate as the starting point of [its] analysis," given "the lack of creditable benchmarks in the record" and the Board's "reasoned explanation"). Furthermore, Section 114(f)(1)(B) contemplates the Board will "make adjustments to the prevailing rate" and also "consider prior determinations" in its decisionmaking. *Music Choice*, 774 F.3d at 1012 (internal quotation marks omitted).

The Board has never set a lower rate for simulcasters. So its decision not to here is not an "unexplained presumption in favor of uniform rates." NAB Opening Br. 29. Rather, the Board was justified in relying on its three preexisting rate

14

category distinctions to at least determine a starting point. *Web V*, 86 Fed. Reg. at 59,547; *see also Web I*, 67 Fed. Reg. at 45,252 (adopting a single rate for commercial webcasters); *Web II*, 72 Fed. Reg. at 24,095 (refusing to establish a separate rate for simulcasters); *Web IV*, 81 Fed. Reg. at 26,323 (rejecting arguments for a separate simulcaster rate). It was thus up to the NAB to establish a record showing why, and how, this starting point should be altered to reflect the willing buyer/willing seller standard. *See Web IV*, 81 Fed. Reg. at 26,320 ("As the proponent of a rate structure that treats simulcasters as a separate class of webcasters, the NAB bears the burden of demonstrating not only that simulcasting differs from other forms of commercial webcasting, but also that it differs in ways that would cause willing buyers and willing sellers to agree to a lower royalty rate in the hypothetical market."); *Web I*, 67 Fed. Reg. at 45,254 (referring to "the burden of proof on the broadcasters to present evidence to distinguish between the direct transmission of their programs over the Internet and the retransmission of the same programming made by a third-party").

Our reasoning here also resolves the NAB's secondary challenges to the Board's decision, rejecting the new simulcast distinction. First, the NAB argues that the Board improperly made a presumption in favor of uniform rates, which required the NAB to present contrary evidence to rebut the Board's presumption. The NAB asserts that the Board instead should have supported its decision with substantial evidence. This argument gets things backwards. The Board is allowed to consider its prior determinations, and the NAB failed to meet its burden to show this record warranted something different. Second, the NAB argues that the Board's analysis discussing competition between simulcasters and other commercial webcasters was "far too generalized to have any relevance" and rendered the determination arbitrary and capricious. NAB

15

Opening Br. 37–40. We disagree because, as explained throughout this section, the Board appropriately exercised its discretion in finding the differentiation evidence failed to support a new simulcast rate category under the willing buyer/willing seller standard.

The Board reasonably declined to interpret the NAB's evidence as supporting a separate rate for simulcasters. The NAB presented benchmark agreements that it claimed were evidence that simulcasters should be subject to a lower rate than custom radio. The Board rejected the NAB's iHeart/Indie Agreements as benchmarks because they only covered "a small portion of the sound recordings performed by iHeart, and an *even smaller* portion of the entire market for simulcast, custom radio, and internet radio performances." *Web V*, 86 Fed. Reg. at 59,549 (emphasis added). The NAB also introduced survey evidence that it argued showed simulcasters should be subject to a lower rate. Importantly, the Board also declined to rely on the NAB's Hauser Survey—a survey intended to reveal the "percentage of respondents that, in the absence of simulcasts, would consume content from" other alternative activities. *Id.* at 59,551. Doing so was permissible given the Board's concerns with the survey's design, such as its failure to include services like internet radio services covered by the statutory license. *Id.* at 59,563–59,565.

Nevertheless, the NAB insists that the differences between simulcasts and custom radio show the Board was required to distinguish a separate, simulcaster rate. But the Board acted reasonably in taking issue with the fact that "the bulk" of the NAB's evidence "regarding differentiated use of music versus non-music content" was limited to comparing simulcasts against custom radio services, when the NAB's proposal was to establish a simulcast rate separate from "the *full* scope of

16

noninteractive webcasting[.]" *Web V*, 86 Fed. Reg. at 59,551 (emphasis added).

Critically, the NAB also failed to show that internet simulcasters constitute a distinct market segment. The absence of distinct market segmentation evidence is detrimental to the NAB's case because the statutory distinction requirement "mean[s] that *distinct segments* of webcasters—such as noncommercial services—receive their own rates and terms." *SoundExchange*, 904 F.3d at 47 (emphasis added). This emphasis on evidence of competition is rooted in the willing buyer/willing seller standard. It is unclear whether a willing buyer and a willing seller would agree to a new rate for a service, falling under a preexisting rate category, absent evidence showing that the service constitutes a distinct segment of webcasters. In *SoundExchange*, we shed light on the distinction requirement when discussing how to determine if a service constitutes a distinct segment of webcasters. There, we affirmed the Board's decision to distinguish between ad-based and subscription-based services because the record showed each service "appeal[ed] to a different segment of the market[.]" *Id.* at 58. But the NAB never argues that any such market segmentation would actually result in a lower rate for simulcasters based on a rate that a willing buyer and a willing seller would accept.

Our *SoundExchange* decision also addressed the Board's prior determinations more generally and upheld the process through which it determines how to distinguish between services. 904 F.3d at 58–59. The Board's process began in *Web II*, when it established that "the key question in ascertaining the propriety of differentiation is whether the services occupy 'distinct segment[s]' of the market or instead compete for listeners." *Id.* at 58 (quoting *Web II*, 72 Fed. Reg. at 24,097–24,098). To answer this question, the Board

17

assesses service competition by "examin[ing] whether the services compete with each other for listeners, or whether one service instead operate[d] in a submarket separate from and noncompetitive with the other[.]" *Id.* (internal quotation marks and citation omitted).  And as for market segmentation, the Board considers various factors, "including whether comparable agreements have been negotiated in which one service paid a lower rate than the other." *Id.*  In short, our precedent counsels that when evaluating categorization challenges under 17 U.S.C. § 114(f)(1)(B), we consider whether the record shows the Board reasonably distinguished between the "types of services then in operation[,]" *id.*, and established rates for each "distinct segment[,]" *SoundExchange*, 904 F.3d at 58, under the willing buyer/willing seller standard. *See Intercollegiate II*, 796 F.3d at 128 (emphasizing that the minimum fee distinction requirement applies to each "*type* of service," 17 U.S.C. § 114(f)(1)(B)—"not for each individual webcaster").

Instead of structuring its position around why simulcasters constitute a distinct segment of the market from all other commercial nonsubscription services, the NAB dedicated most of its argument to distinguishing simulcasters from a mere subset of other commercial webcasters—custom internet radio. In doing so, the NAB argued that the Board failed to justify its refusal to establish a separate rate for simulcasters despite its acknowledgment of certain differences between simulcasters and custom radio.  But the NAB does not argue that simulcasting is different from commercial webcasting more generally—only that it differs from custom radio.  There are other types of commercial webcasting that may not have the same features as custom radio, but the NAB does not argue that a willing buyer and a willing seller would agree to a lower rate for simulcasting than for any other types of commercial webcasting.  Although such an argument could succeed if the

A-18

18

record showed that willing buyers and willing sellers would agree to lower royalty rates for simulcasting than for other types of commercial webcasting, the NAB did not do so here. Moreover, we underscore the "technical nature" of rate determinations and find the NAB failed to meet its burden here. *Intercollegiate II*, 796 F.3d at 127 (quoting *Intercollegiate I*, 574 F.3d at 755). We acknowledge, however, that future records may warrant new rate category distinctions. *SoundExchange,* 904 F.3d at 58 (describing evidence appropriately distinguishing between ad-based and subscription-based services).

**2**

Together, the Services contest the minimum fee, arguing the Board erroneously raised the fee to account for costs *other than* the incremental cost of administering webcasting licenses. As explained below, we reject the Services' challenge and uphold the $1,000 minimum fee as reasonable.

Although Congress requires the Board to establish a minimum fee for each service under 17 U.S.C. § 114(f)(1)(B), it never enumerated a list of specific costs that such a fee should cover. Starting in 2006, the Board has continuously maintained the annual minimum fee at $500 for each channel, including an aggregate cap of $50,000 per commercial webcaster. Here, the Board accepted SoundExchange's proposal to raise the minimum fee to $1,000 per channel and raise the aggregate cap to $100,000. In doing so, it reasonably relied upon three evidentiary findings.

Most importantly, the Board was persuaded by SoundExchange's evidence demonstrating an increase in its average administrative costs. SoundExchange calculated this increased average "by dividing its total administrative costs by

A-19

19

its total number of licensees" and dividing that amount "by the estimated number of channels or stations per licensee." *Web V*, 86 Fed. Reg. at 59,582. This calculation revealed that SoundExchange's estimated average administrative cost per channel "increased from approximately $1,900 to approximately $4,448 between 2013 and 2018, an increase of 2.34 times." *Id.* While acknowledging that this was an estimate, the Board concluded that the "relative increase in average administrative costs"—134%—"would yield a minimum fee of $1170[,]" and noted that this amount exceeded SoundExchange's proposed $1000 minimum fee. *Id.*

The other two points that the Board found supported increasing the minimum fee included: (1) a settlement between SoundExchange and College Broadcasters, Inc. ("CBI"), agreeing to a minimum fee of $750 by 2025; and (2) inflation. As relevant here, the Board concluded that the CBI settlement generally indicated willing buyers and willing sellers would agree to a higher minimum fee. And to the second point, the record utilized the Bureau of Labor Statistics' Consumer Price Index for All Urban Consumers to show that a minimum fee of $656.77 would be necessary to account for general inflation since the minimum fee was set at $500 in 2006. *Web V*, 86 Fed. Reg. at 59,583. The Board considered this evidence in finding that the record supported a "zone of reasonable minimum fees" from $656.77 to $1,170. *Id.* Ultimately, the Board adopted the proposed $1,000 minimum fee because it was most persuaded by SoundExchange's average administrative cost evidence, and because the proposed fee fell within the reasonable zone. *Id.* at 59,583–59,584.

On appeal, the Services again contest the Board's consideration of SoundExchange's average administrative costs, arguing that the minimum fee should be limited to the

20

incremental cost of administering the webcasting license.  We disagree.

The Services point to nothing in either the statutory scheme, or in the Board's prior determinations, that requires the Board to adopt such a restrictive view of 17 U.S.C. § 114(f)(1)(B).  Indeed, the statute only instructs that the statutory rates and terms "shall include a minimum fee for each such type of service," and that such a fee will reflect the willing buyer/willing seller standard.  *Id.* § 114(f)(1)(B); *see Intercollegiate II*, 796 F.3d at 128 ("[T]he Board must set a fee that both a willing buyer and a willing seller would negotiate, not just one that is acceptable to the buyer (the webcaster).") (emphasis omitted).  And as the Board explained, it has consistently rejected the interpretations of the minimum fee as limited to incremental administrative costs.  *Web V*, 86 Fed. Reg. at 59,581 ("To be sure, the Services have made that [incremental administrative costs] argument consistently since *Web I*.  However, the Judges and their predecessors have never embraced it.").

Not only does the Services' minimum fee challenge lack support based on the statute, as well as from the Board's prior determinations, but the Services' position also conflicts with our precedent under which we have held that the minimum fee may reflect average—as opposed to incremental—administrative costs.  *Intercollegiate II*, 796 F.3d at 131 (noting that "the Board did not set the [minimum] fee based solely on SoundExchange's administrative costs" but also "relied on the evidence of industry-wide average administrative cost").  In *Intercollegiate II*, we concluded that while "[e]vidence of average cost may not be perfect," nothing prohibited us from upholding its use.  *Id.* ("This court's task is 'only [to] assess the reasonableness of the [Board's] interpretation of the

21

inherent ambiguity' in Congress' directive.") (quoting *Intercollegiate I*, 574 F.3d at 757). So too here.

The Services have demonstrated no reason to bar the Board's consideration of SoundExchange's increased average administrative cost, and the Board's determination comports with our precedent as well as with the Board's prior determinations. Given the evidence of (1) SoundExchange's estimated increase in average administrative cost, (2) a voluntary agreement to a higher minimum fee between SoundExchange and CBI, and (3) general inflation since 2006, we find the Board had substantial evidence to support its decision that a $1,000 minimum fee reasonably satisfied the willing buyer/willing seller standard. Thus, we uphold the increased minimum fee.

**B**

The Committee is the arm of a trade association that "represent[s] the interests of religious noncommercial radio stations in issues of music licensing." Committee Opening Br. v. "Many of the [radio] stations represented by the [Committee] simultaneously transmit their broadcast programming online" under the terms of the statutory license at issue in this appeal. Committee Opening Br. v. The Committee challenges the Board's rate determination for all noncommercial webcasters, including the nonprofit religious stations that are its members.

The Committee proposed two alternative rate structures that would have lowered the rates paid by noncommercial webcasters. *Web V*, 86 Fed. Reg. at 59,567. The Board, however, rejected the Committee's proposals and instead accepted SoundExchange's recommendation to essentially maintain the incumbent rate structure that had been in effect

22

from 2006 to 2020. *Id.* at 59,579. In support of its decision, the Board noted that "SoundExchange relies on the same reasoning adopted by the Judges in webcasting proceedings going back to *Web II* to support its proposed rate structure." *Id.* at 59,573. The Board adopted that long-standing reasoning in the absence of "persuasive counterarguments" from the Committee. *Id.* at 59,573, 59,579.

Under the preexisting rate structure, a noncommercial webcast station paid the minimum fee to gain access to 159,140 ATH of monthly usage. *See Web IV*, 81 Fed. Reg. at 26,405–26,406. Above that usage threshold, noncommercial webcasters paid the same rates as commercial nonsubscription webcasters. *See id.* The Committee proposed alternative rates that (1) would have maintained the same usage allowance and minimum fee, while allowing noncommercial webcasters to pay one-third of the commercial rate for above-threshold usage; or (2) would have allowed certain Committee-designated noncommercial webcasters to pay a lump sum for an aggregate usage allowance. *Web V*, 86 Fed. Reg. at 59,567.[2]

---

[2]  The Committee's proposed rate structures for noncommercial webcasters were deemed "Alternative 1" and "Alternative 2." *Web V*, 86 Fed. Reg. at 59,567. Under Alternative 1, noncommercial webcasters would pay an annual minimum fee of $500 that would entitle them to 1,909,680 ATH of usage per year. For usage above that threshold, noncommercial webcasters would pay one-third of the rate for commercial webcasters for the same type of transmission (subscription versus nonsubscription). Under Alternative 2, the Committee would pay a flat annual fee of $1.2 million to SoundExchange, for a group of up to 795 noncommercial religious radio stations designated by the Committee. Those stations would have an aggregate usage cap of 540 million ATH in 2021, increasing by 15 million ATH per year. The proposal set no terms for usage above that cap. Meanwhile, stations not designated for inclusion in that group would be subject to the terms of Alternative 1. *Id.*

23

The Committee's rate proposals were based on a settlement agreement between NPR, CPB, and SoundExchange (the "NPR Agreement") that covered the years 2021 through 2025. The Committee sought to introduce the NPR Agreement as a benchmark to support its rate proposals for noncommercial webcasters. *Web V*, 86 Fed. Reg. at 59,567–59,569. But the Board rejected the NPR Agreement as a benchmark and rejected the Committee's rate proposals. The Board provided three primary reasons for its decision: (1) the Committee neglected to offer any expert testimony to establish that the NPR Agreement was "comparable" to a compulsory license for noncommercial webcasters; (2) the Committee's rate proposals failed to make adjustments for economically significant aspects of the NPR Agreement; and (3) one aspect of the Committee's proposal was based on dated information that the Board was statutorily barred from considering. *See id.* at 59,569–59,573.

On appeal, the Committee argues that the Board (1) violated the APA by arbitrarily and capriciously rejecting the NPR Agreement as a benchmark; (2) violated the APA by arbitrarily and capriciously setting the noncommercial webcaster royalty rate too high; and (3) violated the federal Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, and the First Amendment by setting a rate that was less favorable to large, predominantly religious webcasters than the rate enjoyed by secular NPR affiliates under the NPR Agreement.[3]

---

[3]    The Committee also joined the NAB's challenge to the Board's minimum fee, and essentially relied on the NAB's briefing and oral argument. Its only additional argument was that the Board should have adjusted the $500 minimum fee for inflation from 2020 rather

24

We sustain the Board's rate determination for noncommercial webcasters and its rejection of the Committee's proposals.

**1**

The Board's decision to reject the NPR Agreement as a benchmark, as well as the Committee's rate proposals that were based on the NPR Agreement, was reasonable and supported by substantial evidence. We note that

> appellants face[] an uphill battle in challenging the Board's selection of its benchmarks. We have repeatedly recognized that it is "within the discretion of the [Board] to assess evidence of an agreement's comparability and to decide whether to look to its rates and terms for guidance." The Board's "broad discretion" encompasses its selection or rejection of benchmarks, as well as its adjustment of benchmarks to "render them useful."

*SoundExchange*, 904 F.3d at 50–51 (first quoting *Intercollegiate I*, 574 F.3d at 759; then quoting *Music Choice*, 774 F.3d at 1009). Here, the Board properly exercised its discretion.

---

than from 2006, because the $500 figure was last set in 2020. That argument did not affect the Board's ultimate determination of the minimum fee. *See Web V*, 86 Fed. Reg. at 59,583 (using the inflation-adjusted minimum fee as a lower bound of the "zone of reasonable minimum fees" and relying primarily on SoundExchange's rising administrative costs to set a new minimum fee). The NAB's proposal to maintain the lower minimum fee is addressed Part III.A, *supra*.

25

First, the Board reasonably concluded that the Committee presented insufficient evidence to establish the NPR Agreement's comparability to the compulsory license for noncommercial webcasters. In a benchmark analysis, the Board "may consider the rates and terms for *comparable* types of audio transmission services and *comparable* circumstances under voluntary license agreements." 17 U.S.C. § 114(f)(1)(B)(ii) (emphasis added). Yet, the Committee presented no expert testimony on comparability; it addressed the issue only in arguments made by its attorneys in post-hearing briefing. *Web V*, 86 Fed. Reg. at 59,570. Moreover, SoundExchange disputed whether the NPR Agreement was comparable. The Board reasonably decided that expert testimony was necessary to establish comparability. *See id.* Requiring expert testimony in this case was consistent with the "highly technical nature" of administrative rate determinations. *SoundExchange*, 904 F.3d at 50 (quoting *Intercollegiate II*, 796 F.3d at 127). Although the Committee argues that the Board has never explicitly announced an expert-testimony requirement, that does not render the Board's decision in this case arbitrary, particularly where the Board has previously demanded expert testimony in an analogous situation. *See Web IV*, 81 Fed. Reg. at 26,327 (rejecting lay testimony and considering only expert testimony to determine whether to adjust a benchmark).

Second, the Board reasonably rejected the Committee's rate proposals due to their failure to account for economically significant aspects of the NPR Agreement. When a party derives a proposed rate from a benchmark agreement, it is required to account for economically significant, non-rate aspects of the benchmark. *See SoundExchange*, 904 F.3d at 47. For instance, if a benchmark contains a relatively low royalty rate but imposes other costs on webcasters, the rate derived from that benchmark should be adjusted upward to capture

26

those costs.  The Board properly placed the burden on the Committee to make the appropriate adjustments to its rate proposals derived from the NPR Agreement.  *See Music Choice*, 774 F.3d at 1009 ("While the Judges might have made further adjustments to [a proponent's] benchmarks to render them useful, the Judges were not required to do so." (citation omitted)); *see also id.* at 1012 ("The Judges were under no obligation to salvage benchmarks they found to have fundamental problems.").  The Board faulted the Committee for failing to account for the following aspects of the NPR Agreement that benefited one or both of the settling parties but were not reflected in the Committee's proposed rates:  (1) the avoidance of litigation costs by the parties to the NPR Agreement; (2) the value of NPR's advance, lump-sum payments to SoundExchange; and (3) NPR's consolidated reporting of data from individual stations to SoundExchange. *See Web V*, 86 Fed. Reg. at 59,570, 59,572–59,573.  The Board's determination that those adjustments were necessary to adequately capture the value of the Agreement reflected rational economic reasoning, even though the Board did not determine the precise amount by which each of these factors distorted the Agreement's pricing.[4]  The Committee argues that

---

[4]  *See Web V*, 86 Fed. Reg. at 59,570 ("[S]ettlement agreements, unlike voluntary agreements reached outside the context of litigation, are not 'free from trade-offs motivated by litigation cost, as distinguished from the underlying economics of the transaction.'" (quoting Determination of Royalty Rates and Terms for Making and Distributing Phonorecords (*Phonorecords III*), 84 Fed. Reg. 1918, 1935 (Feb. 5, 2019))); *id.* at 59,572 (The NPR Agreement's "rate reflects * * * [a] discount that reflects the administrative convenience to [SoundExchange] of receiving annual lump sum payments that cover a large number of separate entities, as well as the protection from bad debt that arises from being paid in advance."); *id.* at 59,573 ("The record reflects that consolidated

27

the Board acted contrary to agency precedent and the statutory scheme, but its citations are all inapposite.[5]

Third, the Board appropriately concluded that it was statutorily barred from considering the royalty rates contained in the "NPR Analysis," an internal SoundExchange document created in 2015. *See Web V*, 86 Fed. Reg. at 59,570–59,572. In the NPR Analysis, SoundExchange performed calculations using a royalty-rate structure that included per-performance payments at one-third the commercial rate. The Board found,

_____

reporting has value to SoundExchange. * * * '[O]ne of the things that NPR does is it collects together the messy data of the individual stations and reports it as part of the agreement.'" (quoting 8/17/20 Tr. 2232 (Professor Catherine Tucker))).

[5] For example, the Committee misstates that Board precedent required SoundExchange to make the necessary adjustments. Although *Web IV* required the challenger of an "otherwise proper and reasonable benchmark" to quantify further proposed adjustments, *Web IV*, 81 Fed. Reg. at 26,387, that case is distinguishable because the NPR Agreement was not an "otherwise proper and reasonable" benchmark. Moreover, the Committee notes that *Web IV* accepted a settlement-based benchmark without litigation cost adjustments; but *Web IV* accepted that benchmark only as "support for *some* elements of SoundExchange's rate proposal" and "*not* for the proposed rate for usage beyond the ATH threshold," *id.* at 26,394 (emphasis added), which is exactly what the Committee attempted here. The Committee's remaining citations, *see* Committee Opening Br. 29–32, are similarly off point. *See Web III*, 79 Fed. Reg. at 23,123–23,124; Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services (*SDARS II*), 78 Fed. Reg. 23,054, 23,068–23,069 (April 17, 2013); Digital Millennium Copyright Act, Pub. L. No. 105-304, § 405, 112 Stat. 2860, 2895–2896 (1998); 17 U.S.C. § 801(b)(7)(A).

28

however, that the rate structure came from an old settlement agreement negotiated pursuant to the Webcaster Settlement Act ("WSA") of 2009, Pub. L. No. 111-36, 123 Stat. 1926. *See Web V*, 86 Fed. Reg. at 59,572. The Board properly determined that it was statutorily barred from considering that rate structure under 17 U.S.C. § 114(f)(4)(C), which prohibits "admi[tting] as evidence or otherwise tak[ing] into account" the "provisions of any agreement entered into pursuant to [the WSA], including any rate structure * * * set forth therein." *Id.* The Committee argued that the Board could rely on the rate structure because the NPR Analysis was prepared for use in future, non-WSA settlement negotiations. But the Board was not required to accept the Committee's inference that the rates were actually used in the non-WSA settlement agreement relied upon by the Committee. *See Web V*, 86 Fed. Reg. at 59,571. We disagree with the Committee's contention that the Board's decision contradicted a binding opinion issued by the Register of Copyrights, as set forth in Scope of the Copyright Royalty Judges' Continuing Jurisdiction, 80 Fed. Reg. 58,300 (Sept. 28, 2015). Although the Register's opinion allows the Board to consider voluntary license agreements that incorporate WSA settlement terms, as well as the effect of the WSA on private-settlement negotiations, it does not require or even allow the Board to consider documents like the NPR Analysis. *See id.* at 58,305. The Register found that, if parties incorporate terms from their WSA settlements into subsequent agreements, those are fair game for the Board's consideration. But the NPR analysis does not fall into that category; it documents WSA rates that may have been used to *propose* terms for a subsequent agreement. It does not document any post-WSA terms. Without the NPR Analysis, the Committee lacked support for a discounted above-threshold rate for noncommercial webcasters, which became a critical flaw in its proposal.

29

**2**

We are unpersuaded by the Committee's argument that the Board arbitrarily and capriciously set the noncommercial webcaster rate. In the absence of acceptable benchmarks, the Board properly used the incumbent rate structure as the starting point in its analysis. *See Music Choice*, 774 F.3d at 1012 ("[G]iven the lack of creditable benchmarks in the record, the Judges did not err when they used the prevailing rate as the starting point of their Section 801(b) analysis."). Moreover, substantial evidence supported the Board's decision to maintain the prevailing rate structure.

The incumbent rate structure originated in *Web II*. It reflected an "economic insight" that noncommercial webcasters that compete with the commercial market tend to be larger, so that size is "a 'proxy' for determining when a noncommercial webcaster poses a competitive threat[.]" *Web V*, 86 Fed. Reg. at 59,565–59,566 ("[L]arger noncommercial webcasters have the same or similar competitive impact in the marketplace as similarly sized commercial webcasters."). Because large noncommercial webcasters can divert listeners away from commercial webcasters, the Board found that copyright holders would not willingly license sound recordings to large noncommercial webcasters at a discount, because that would decrease overall royalty revenue by cannibalizing commercial royalty revenue. *See Web II*, 72 Fed. Reg. at 24,097–24,100. The noncommercial webcasters that exceed the ATH threshold tend to be larger ones, and they are charged the same rates as commercial webcasters for above-threshold usage. In the instant rate-setting proceeding, the Board relied on expert testimony to conclude that the same competitive dynamics remained in effect and justified retaining the pre-existing rate structure. *See Web V*, 86 Fed. Reg. at 59,575

30

(discussing testimony of Mr. Jon Orszag, Professor Joseph Cordes, and Professor Richard Steinberg).[6]

The Board appropriately rejected the Committee's attempts to undermine the analysis that justified the previous rate structure.  The Committee argued that cannibalization was unlikely because noncommercial webcasters' missions differed from those of commercial webcasters.  But the Board reasonably declined to rely on the webcasters' motivations in evaluating market dynamics.  *See Web V*, 86 Fed. Reg. at 59,575 ("The concerns about cannibalization that the Judges articulated in past webcasting proceedings focus on potential displacement in listenership from commercial to noncommercial webcasters and is independent of noncommercial webcasters' *motivations*.").  Moreover, the Board permissibly relied on an "overlap study" and other evidence to reject the Committee's argument that noncommercial webcasting would not cannibalize commercial webcasters because they each offer different programming.  The overlap study compared the songs played by commercial and noncommercial Christian Adult Contemporary radio stations.  *Id.* at 59,576.  It revealed that "commercial and noncommercial stations broadcasting in the Christian [Adult Contemporary] format play many of the same songs." *Id.*[7]  The

---

[6] The Committee's argument that this expert testimony is mere "*ipse dixit*" that cannot constitute substantial evidence to maintain the incumbent rate, Committee Opening Br. 40, understates the Board's reasoned analysis of the expert testimony and overlooks our precedent allowing the Board to start with the incumbent rate in the absence of a suitable benchmark.  *See Web V*, 86 Fed. Reg. at 59,575–59,578; *Music Choice*, 774 F.3d at 1012.

[7] The Committee argues that the overlap study should not have been admitted under 37 CFR § 351.10(e).  As an initial matter, it is unclear

31

Board also pointed to competition between two Atlanta-based commercial and noncommercial religious radio stations.  *See id.* at 59,575.[8]  The Board permissibly inferred from that evidence that noncommercial and commercial webcasters' programming did not differ enough that cannibalization was unlikely.

Finally, the Board reasonably rejected the Committee's argument that the incumbent rate structure failed to consider noncommercial webcasters' lower willingness to pay, thus violating the Copyright Act's willing buyer/willing seller standard.  According to the Committee, the Board overlooked whether willing buyers would negotiate "above-threshold commercial-level rates," and accounted for only what willing sellers would negotiate.  Committee Opening Br. 40.  That argument, however, unduly focuses on the above-threshold rates without considering the entire rate structure.  The Board noted that the minimum-fee rate structure gives

_____

whether the Committee actually moved to exclude the study, or only the testimony of SoundExchange's witnesses about the study.  *See* Committee Mot. to Strike Test. Written Rebuttal Test. Related to Mediabase Study.  In any event, the Board reasonably concluded that both the study and the witnesses' testimony were admissible.  *See* Order Denying Committee Mot. to Strike 2–3 (noting that the study simply compiled data "that industry participants rely on and that the Judges have relied upon in past proceedings when presented by lay witnesses," and relying on the Board's discretion to admit hearsay testimony from witnesses about such data).

[8]  The Committee's arguments against this evidence are meritless.  Contrary to the Committee's suggestions, an expert witness need not have "first-hand knowledge of the asserted facts," Committee Opening Br. 50, to testify about an issue, and the evidence fell well within the proper scope of rebuttal.  Moreover, the Board expressly acknowledged the anecdotal nature of the evidence and treated it with appropriate restraint.  *See Web V*, 86 Fed. Reg. at 59,575.

32

noncommercial webcasters of all sizes a hefty discount through the monthly ATH allowance. *See Web V*, 86 Fed. Reg. at 59,566 (discussing testimony of Professor Catherine Tucker); *id.* at 59,574 (discussing effective discount for noncommercial webcasters). For instance, if the average copyrighted song is four minutes long, *see id.* at 59,570–59,571, then 159,140 ATH per month would let a noncommercial webcaster play roughly 28.5 million performances in a year for the $1,000 minimum fee. That same number of performances would cost a commercial subscription webcaster roughly $75,000 and a commercial nonsubscription webcaster roughly $60,000. Thus, the significant benefit conferred on noncommercial webcasters by their access to the ATH allowance takes account of their unwillingness to pay the same rates as commercial webcasters. The Board justifiably concluded that the incumbent rate structure adequately balanced noncommercial webcasters' lower willingness to pay with the risk of large noncommercial webcasters cannibalizing copyright owners' royalty revenue from commercial webcasters, thereby satisfying the willing buyer/willing seller standard. *See id.* at 59,573–59,574.

**3**

The Committee argues that the Board's rate determination violates the First Amendment's Free Exercise Clause and the federal RFRA, because the terms that it adopts for noncommercial religious webcasters are less favorable than the terms enjoyed by NPR, a noncommercial secular webcaster. We disagree.

The Free Exercise Clause provides that "Congress shall make no law * * * prohibiting the free exercise" of religion. U.S. CONST. Amend. I. Under that clause, a government entity may not "burden[] [a person's] sincere religious practice

A-33

33

pursuant to a policy that is not 'neutral' or 'generally applicable'" unless the action is "narrowly tailored in pursuit of" a "compelling state interest." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (quoting *Employment Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872, 881 (1990)). "But the First Amendment is not the only potential refuge for [a litigant's] religious claim—the RFRA offers religious exercise greater protection from intrusion by religion-neutral federal laws." *Kaemmerling v. Lappin*, 553 F.3d 669, 677 (D.C. Cir. 2008). Under the RFRA, federal government action cannot "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless it is "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. §§ 2000bb-1(a)–(b). The statute's protection reaches "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A).

The Committee's RFRA and Free Exercise arguments are premised on a factual assertion that the rate for noncommercial webcasters under the compulsory license is higher than the rate enjoyed by NPR under the NPR Agreement. *See* Committee Opening Br. 53–54. But there is no record finding to support that assertion. As we have explained, the Board reasonably rejected the NPR Agreement as a benchmark for noncommercial webcasters and faulted the Committee's proposals based on the NPR Agreement for failing to make necessary adjustments to account for economically significant features of the Agreement. The Board also appropriately refused to consider the NPR Analysis proffered by the Committee, thereby eliminating the evidence that enabled the Board to compare the above-threshold per-play royalty rates of the compulsory license with the NPR Agreement's lump-sum payments. The record therefore contains no basis for the Board, or this court, to effectively determine whether

34

noncommercial webcasters subject to the compulsory license are paying higher rates than the NPR stations covered by the NPR Agreement. Without making that initial showing of unfavorable treatment of religious webcasters, the Committee cannot establish a violation of the RFRA or the First Amendment.

We note that the Committee's arguments are also problematic in other respects. For example, the Committee attempts to challenge the rates paid by the religious broadcasters that are members of its trade association, but the compulsory license applies to all noncommercial webcasters. Even if the above-threshold noncommercial webcasters are "almost exclusively religious," as the Committee asserts, Committee Opening Br. 8, the Committee does not explain why it does not have to consider the overall rate structure, which applies to all noncommercial webcasters. Indeed, the Committee fails to cite any precedent that would give the Board the power to impose a statutory license that, like the Committee's Alternative 2, would be available only to select members of a particular trade organization, rather than to a category of webcasters. *See Web V*, 86 Fed. Reg. at 59,567. We are aware of none. Nor did the Committee argue to the Board that the religious broadcasters it represents form a distinct market segment for purposes of the 2021–2025 proceeding. We need not address that substantial and open question, given the absence of any factual basis to compare the rates at issue.

## C

Finally, SoundExchange challenges as arbitrary and capricious the royalty rate the Board set for commercial, nonsubscription "ad-supported" webcasters, i.e., noninteractive streaming services like Free Pandora that collect

35

payment from advertisers.    Specifically, SoundExchange argues that the Board acted arbitrarily and capriciously by making an express finding that the opportunity cost for sellers was a particular value, but then adopting a royalty rate that falls below that opportunity cost without further explanation.

The very premise of SoundExchange's argument is wrong. The Board never found as fact the opportunity cost value on which SoundExchange hangs its argument.    As a result, its arbitrary and capricious challenge fails before it even starts.

**1**

To understand SoundExchange's argument and the Board's conclusions, some background on the Board's analytical process for setting royalty rates.

The Board's statutory obligation is to "establish rates and terms that most clearly represent the rates and terms that would have been negotiated in the marketplace between a willing buyer and a willing seller."    17 U.S.C. § 114(f)(1)(B).    The Board views this hypothetical market to be one that is "effectively competitive."    *SoundExchange*, 904 F.3d at 56.

To determine rates under that standard, the Board has relied on various modes of economic analysis to best approximate the price at which a willing seller would sell and at which a willing buyer would buy.    *See Intercollegiate I*, 574 F.3d at 757; *Music Choice*, 774 F.3d at 1010.    One approach is to consider "the rates and terms negotiated for comparable services and 'comparable circumstances under voluntary license agreements.'"    *SoundExchange*, 904 F.3d at 47 (quoting 17 U.S.C. § 114(f)(2)(B)).    To that end, parties in a proceeding may submit examples of voluntary license agreements that they argue are sufficiently analogous to inform

36

the appropriate statutory royalty rate for ad-supported, non-interactive services. Because those proposed benchmarks come from real-world markets that may not map perfectly onto the Board's hypothetical market, the parties commonly submit expert economic analyses with their proposed benchmarks that propose adjustments to account for any potential variance.

The Board then evaluates each license agreement's economic merits to determine which proposals, if any, could be a useful touchstone in setting the statutory rate. In some instances, the Board has accepted multiple proffered benchmarks, and used the array to establish a "zone of reasonableness" into which the final rate should fall. *Web III*, 79 Fed. Reg. at 23,110–23,115.

Another approach the Board uses is economic modeling submitted by parties and their experts that are designed to produce an appropriate rate. These models often employ game theory to make and justify certain assumptions about the hypothetical market, comb relevant data to calculate inputs, and essentially solve for what parties contend is an appropriate royalty rate. *See, e.g.*, *Web V*, 86 Fed. Reg. at 59,522–59,546 (Evaluation of Game Theoretic Modelling Evidence); *Johnson v. Copyright Royalty Board*, 969 F.3d 363, 372 (D.C. Cir. 2020) (discussing the Board's use of specific game theoretic model known as Shapley Analysis).[9]

---

[9] Game theory "uses equations to model the behavior of decision-makers whose choices affect one another." Peter H. Huang, *Strategic Behavior and the Law*, 36 JURIMETRICS J. 99, 100 (1995) (quoting Rob Norton, *A New Tool to Help Managers*, FORTUNE, May 30, 1994, at 136). Most relevant here, game theory can help model the likely, hypothetical behavior of both negotiating buyers and sellers in an effectively competitive market.

37

In assessing economic models and their outputs, the Board evaluates a model's utility as well as its flaws, and decides whether a model can reasonably assist the Board's calculation of the statutory willing buyer/willing seller rate.  *See, e.g.*, *Phonorecords III*, 84 Fed. Reg. at 1947–1950.

**2**

In this case, the Board considered both benchmarking analyses and economic models utilizing game-theory concepts.

With respect to benchmarking analyses, the Board reviewed benchmarks submitted by SoundExchange, Pandora, and Google, along with supplemental submissions by the parties' experts.  *See Web V*, 86 Fed. Reg. at 59,491–59,522. Making relevant adjustments, the Board found that both SoundExchange's and Pandora's analyses yielded a royalty rate of $0.0023 per play, while Google's analysis yielded a rate of $0.0021 per play.  *Id.* at 59,589.

The Board also discussed the "Game Theoretic Modelling Evidence" submitted by SoundExchange through its expert, Professor Willig, and by the Services through their expert, Professor Shapiro.  As relevant here, the Board evaluated Professor Willig's "Shapley Value Model," a game-theoretic model that focused on "how to apportion among the members of a multi-party bargaining group the surplus created by their productive cooperation with each other."  *Web V*, 86 Fed. Reg. at 59,522 (internal quotation marks omitted).  That is, when the parties get together and work out a deal, there is an independent value derived from that agreement that is greater than the sum of what every party could get on its own.  The Willig model sought to divide up this surplus.  The Willig model also assumed a small number of actors would get together to split

A-38

38

up market share, presupposing a state of limited competition otherwise known as an oligopoly.

One of the inputs that the Willig model used was the "fallback value," or the money a record company could make with its repertoire through avenues beyond entering into a voluntary licensing agreement with the streaming services. *Web V*, 86 Fed. Reg. at 59,522. That fallback value was the party's "opportunity cost": The party forgoes these alternative money-making options when it enters into a specific licensing agreement. "The opportunity cost of anything of value is what you must give up to get it[.]" *Id.* at 59,522 n.220 (quoting JOHN QUIGGIN, ECONOMICS IN TWO LESSONS: WHY MARKETS WORK SO WELL, AND WHY THEY CAN FAIL SO BADLY 15 (2019)) (internal quotation marks omitted). Because opportunity cost represents what a party gives up in taking a particular option, that opportunity cost necessarily sets a floor for the statutory rate under the willing buyer/willing seller standard. That is because no willing buyer or seller would agree to a rate below the cost borne for the choice made.

As part of its overall review of Professor Willig's model, the Board evaluated his opportunity cost figure, and found salient Professor Shapiro's criticism that the Willig model's opportunity cost input was artificially inflated. *Web V*, 86 Fed. Reg. at 59,538–59,539. As a result, the Board adjusted the Willig model estimate of the opportunity cost down, and recalculated a proposed royalty rate using that new number. *Id.*[10]

Even with those adjustments, however, the Board ultimately found that Professor Willig's model was fatally

---

[10]   The precise numbers are sealed as proprietary commercial information.

39

flawed because it baked in certain oligopoly power of the major record labels. Oligopolies, of course, are not present in effectively competitive markets. So a model premised on oligopoly power by definition did not produce a royalty rate reflective of what a willing buyer and seller would agree to in an *effectively competitive* environment. As a result, the Board concluded that the Willig model and the rate it produced could only serve as a "limited guidepost" in determining a statutory royalty rate. *Web V*, 86 Fed. Reg. at 59,540 ("[T]he evidentiary record only allows the Judges to state with regard to the royalty rates they have determined [from Professor Willig's model] that those 2021 rates * * * exceed an effectively competitive rate by an indeterminate amount.").

The Board likewise rejected Professor Shapiro's game theoretic modeling. The Board found that "new evidence" Professor Shapiro relied on in his model was fundamentally flawed in multiple ways and some key information was absent. *Web V*, 86 Fed. Reg. at 59,540–59,546. Because the missing evidence was the "*sine qua non*" of Professor Shapiro's modelling, its absence made Professor Shapiro's models "unusable." *Id.* at 59,546.

Having found both game theoretic models to be fundamentally unsound, the Board determined that the separate benchmarking analyses submitted by the parties provided more reliable evidence of an appropriate royalty rate on this record, and that Google's proposed benchmark in particular was the most convincing. The Board emphasized that Google's benchmark provided "more granular, [record] label-specific, analysis," as well as a more reliable application of adjustments to account for known concerns, all of which ultimately lent more weight to Google's proposed rate. *Web V*, 86 Fed. Reg. at 59,589.

40

On that basis, the Board set the commercial ad-supported, noninteractive royalty rate at Google's proposed adjusted benchmark of $0.0021 per play. *Web V*, 86 Fed. Reg. at 59,589. In so finding, the Board noted that its chosen royalty rate was only slightly below that produced by Professor Willig's adjusted model, which served as a relevant, though quite limited, guidepost. That further buttressed the Board's judgment that its final royalty rate accurately reflected the willing buyer/willing seller standard in a hypothetical, effectively competitive market.

**3**

SoundExchange's entire argument is premised on the contention that the Board necessarily erred because it specifically adopted the Willig model's adjusted opportunity cost for the ad-supported, noninteractive market, and yet set a royalty rate that fell below that amount.

But the factual premise on which SoundExchange's argument rests is no fact at all. The Board never made a definitive finding that the true opportunity cost was the adjusted Willig value. In fact, the Board ultimately rejected the Willig model, and the game theoretic models more generally, for use in calculating the appropriate royalty rate, opportunity cost and all.

Remember, the Board rejected Professor Willig's opportunity cost figure as inflated. The Board then noted Professor Shapiro's proposed downward adjustment of the Willig model's number. The Board took that into account and concluded that, "[b]ased on the foregoing adjustments accepted by the Judges, Professor Willig's opportunity cost calculation must be adjusted, as set forth [below in Figure 8]." *Web V*, 86 Fed. Reg. at 59,538.

41

SoundExchange argues that this one sentence renders the Board's entire rate-setting arbitrary and capricious. But all the Board said was that it accepted Professor Shapiro's specific adjustments to Professor Willig's calculations in the broader context of Professor Willig's game theoretic model. The Board did not go further and make a definitive determination that the adjusted Willig model number was, in fact, the actual opportunity cost for sellers that would govern the entire rate-setting procedure. Especially not since the Board ultimately abandoned altogether the use of economic models like Professors Shapiro's and Willig's as a reliable basis for calculating the royalty rate.

On top of that, the statement on which SoundExchange relies only addressed *one* of the Board's multiple critiques of the Willig model's initial opportunity cost calculation. The Board, for instance, repeatedly objected to Professor Willig's failure to factor opportunity *benefits* into his opportunity cost calculation. *See Web V*, 86 Fed. Reg. at 59,523, 59,537.

Notably, SoundExchange lodges no criticism of the Board's decision to use, instead, the benchmarking process to set the royalty rate. That benchmarking process itself accounted for opportunity cost, as the voluntary agreements naturally involve a party's own estimation of its opportunity cost. And the Board considered that opportunity cost where relevant in adjusting the benchmark proffered. *See Web V*, 86 Fed. Reg. at 59,496–59,497.

In sum, because the Board never found as fact that the opportunity cost input to Professor Willig's model, even as adjusted, represented the record companies' true opportunity cost, the Board's decision to set a royalty rate that was slightly below the Willig model's flawed opportunity-cost measure is

42

neither here nor there.  And so this court has no occasion to decide, as SoundExchange urges, whether it would, as a matter of law, violate the willing buyer/willing seller standard for the Board to set a royalty rate below some definitive measure of opportunity cost.

**IV**

For the foregoing reasons, we affirm the Final Determination of the Copyright Royalty Board.

*So ordered.*

## <u>CERTIFICATE OF PARTIES AND AMICI</u>

Pursuant to Circuit Rules 28(a)(1)(A) and 35(c), the National Religious Broadcasters Noncommercial Music License Committee hereby certifies as follows:

In the proceeding below before the Copyright Royalty Board, the following parties appeared by filing a petition to participate:

AccuRadio, LLC*;

The American Association of Independent Music;

The American Federation of Musicians of the United States and Canada;

College Broadcasters Inc.;

Dash Radio, Inc.*;

David Powell;

Educational Media Foundation;

Feed Media, Inc.*;

Google Inc.;

ICON Health & Fitness Inc.*;

iHeart Media Inc.*;

Jagjaguwar Inc.;

Live365 Broadcaster LLC*;

LA RAZA MEDIA GROUP LLC*;

National Association of Broadcasters;

National Public Radio, Inc.;

National Religious Broadcasters Noncommercial Music License Committee;

Pandora Media LLC;

Radio Coalition LLC*;

Radio Paradise Inc.*;

Screen Actors Guild-American Federation of Television and Radio Artists;

Sirius XM Radio Inc.;

Sony Music Entertainment;

SoundExchange, Inc.;

Tunein Inc.*;

UMG Recordings, Inc.; and

Warner Music Group Corp.

*Parties whose names are followed by an asterisk withdrew their petitions to participate. In addition, David Powell was dismissed from the case.

The parties before this Court are as follows:

In Case No. 21-1243, the Appellant is NRBNMLC, and the Appellees are the Copyright Royalty Board and the Librarian of Congress. The Intervenors are Google Inc. ("Google"), the National Association of Broadcasters ("NAB"), Pandora Media LLC ("Pandora"),

Sirius XM Radio Inc. ("Sirius XM"), and SoundExchange, Inc. ("SoundExchange").

In Case No. 21-1244 (consolidated with Case No. 21-1243), the Appellant is SoundExchange, Inc., and the Appellees are the Copyright Royalty Board and the Librarian of Congress.  The Intervenors are Google, NAB, NRBNMLC, Pandora, and Sirius XM.

In Case No. 21-1245 (consolidated with Case No. 21-1243), the Appellant is the National Association of Broadcasters, and the Appellees are the Copyright Royalty Board and the Librarian of Congress.  The Intervenors are Google, NRBNMLC, Pandora, Sirius XM, and SoundExchange.

No amici have appeared before this Court.

## CORPORATE DISCLOSURE STATEMENT

Appellant the National Religious Broadcasters Noncommercial Music License Committee ("NRBNMLC") is the noncommercial arm of the National Religious Broadcasters Music License Committee ("NRBMLC"). NRBMLC, in turn, is a standing committee of the National Religious Broadcasters ("NRB"), a trade association representing more than 1,300 radio and television stations, program producers, multimedia developers, and related organizations around the world. NRB is a non-profit corporation that has no parent companies, and no publicly held company has a 10% or greater ownership interest in NRB. The purpose of NRBNMLC is to represent the interests of religious noncommercial radio stations in issues of music licensing. Many of the stations represented by NRBNMLC simultaneously transmit their broadcast programming online ("simulcast") pursuant to the 17 U.S.C. §§112 and 114 statutory licenses at issue in the decision by the Board challenged in this proceeding.

NRBNMLC was a party to and an active participant in the proceeding that led to the Determination under review in this appeal.