**Fletcher, Heald & Hildreth**

1300 NORTH 17th STREET, 11th FLOOR
ARLINGTON, VIRGINIA  22209

OFFICE:  (703) 812-0400
FAX:  (703) 812-0486
www.fhhlaw.com
www.commlawblog.com

KARYN K. ABLIN
(703) 812-0443
ablin@fhhlaw.com

February 23, 2023

Mark Langer, Clerk
United States Court of Appeals for the D.C. Circuit
E. Barrett Prettyman United States Courthouse
333 Constitution Ave., NW
Washington, DC 20001

Re:   **No. 21-1243 (Consolidated with Nos. 21-1244, 21-1245)**
      **Correction to Response Made During Oral Argument**

Dear Mr. Langer:

Counsel for Appellant National Religious Broadcasters Noncommercial Music License Committee ("NRBNMLC") respectfully submits this letter to correct a response made during the oral argument in the above-referenced appeal held on Friday, February 17, 2023.  The need for correction was discovered upon a recent review of the transcript.  Specifically, counsel was asked by Judge Millett (at 57:50-58:12 in the recording) whether NRBNMLC's proposed rate alternative not involving a lump sum component "would have been for members of [its] trade association only."  Counsel misunderstood the question and incorrectly answered "yes."  The correct answer is "no."  NRBNMLC did not propose those rates only for NRBNMLC-represented entities but proposed them as statutory rates for noncommercial webcasters generally pursuant to the Copyright Royalty Judges' general rate-setting authority under 17 U.S.C. § 801(b)(1), as further described in 17 U.S.C. § 112(e) and § 114(f)(1).

NRBNMLC's rate proposal is listed in the "Certified Index to Record" at JA43 (Doc. #22427).  A copy of the cover submission and Exhibit A to the submission are attached for the Court's convenience.  The language pertinent to Judge Millett's question appears on page 9 of Exhibit A.

Counsel apologizes for the misunderstanding.

                        Respectfully submitted,

                        /s/ *Karyn K. Ablin*
                        Karyn K. Ablin
                        *Counsel for Appellant National Religious Broadcasters*
                        *Noncommercial Music License Committee*

Attachment

# ATTACHMENT 1

Electronically Filed
Docket: 19-CRB-0005-WR (2021-2025)
Filing Date: 07/31/2020 10:45:24 PM EDT

Before the
**UNITED STATES COPYRIGHT ROYALTY JUDGES**
**LIBRARY OF CONGRESS**
Washington, D.C.

| | |
|---|---|
| **In the Matter of:**<br><br>**Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate those Performances (*Web V*)** | Docket No. 19-CRB-0005-WR (2021-2025) |

## THE NATIONAL RELIGIOUS BROADCASTERS NONCOMMERCIAL MUSIC LICENSE COMMITTEE'S AMENDED PROPOSED RATES AND TERMS

Pursuant to 37 C.F.R. § 351.4(b)(3), the National Religious Broadcasters Noncommercial Music License Committee ("NRBNMLC") respectfully proposes that the Copyright Royalty Judges set the rates for the 2021-2025 license term for the public performance of sound recordings in certain digital transmissions by certain noncommercial licensees under applicable provisions of 17 U.S.C. § 114 and for the making of ephemeral recordings by those licensees under 17 U.S.C. § 112(e) in accordance with the proposed rates and terms set forth in either Alternative 1 or Alternative 2 of Exhibit A hereto. A clean version of the NRBNMLC's proposal is attached as Exhibit A hereto, and a redlined version of the proposal is attached as Exhibit B hereto. Proposed Alternative 1 is redlined against current rates and terms, and proposed Alternative 2 is redlined against the rates and terms that the Judges recently adopted for noncommercial radio broadcasters affiliated with National Public Radio, Inc.

Respectfully submitted,

*/s/ Karyn K. Ablin*
Karyn K. Ablin (D.C. Bar No. 454473)
ablin@fhhlaw.com
FLETCHER, HEALD & HILDRETH, PLC
1300 N. 17th St., Suite 1100
Arlington, VA 22209
Tel: (703) 812-0443

*Counsel for the National Religious Broadcasters Noncommercial Music License Committee*

July 31, 2020

# EXHIBIT A

**The NRBNMLC's Proposed Noncommercial Webcaster Rates and Terms**[1]

**37 C.F.R. Part 380
(Rates and Terms Applicable to Noncommercial Webcasters)**

**Alternative 1**

**Subpart A— Regulations Of General Application**

**§ 380.1   Scope and compliance.**

(a) *Scope.* Subparts A and B of this part codify rates and terms of royalty payments for the public performance of sound recordings in certain digital transmissions by certain Licensees in accordance with the applicable provisions of 17 U.S.C. 114 and for the making of Ephemeral Recordings by those Licensees in accordance with the provisions of 17 U.S.C. 112(e), during the period January 1, 2021, through December 31, 2025.

(b) *Limited application of terms and definitions.* The terms and definitions in Subpart A apply only to Subpart B, except as expressly adopted and applied in subpart C or subpart D of this part.

(c) *Legal compliance.* Licensees relying upon the statutory licenses set forth in 17 U.S.C. 112(e) and 114 must comply with the requirements of this part 380 and any other applicable regulations.

---

[1] The National Noncommercial Religious Broadcasters Noncommercial Music License Committee ("NRBNMLC") is aware that the National Association of Broadcasters ("NAB") has been participating in the Copyright Royalty Judges' separate rulemaking on notice and recordkeeping (including reports of use) on behalf of both commercial and noncommercial broadcasters.  Docket No. 14-CRB-0005 (RM).  The NRBNMLC understands that to be the proceeding in which the Judges have been considering notice and recordkeeping issues and that that proceeding remains pending.  Therefore, the NRBNMLC does not address such issues in this proceeding or in these proposed rates and terms.  The NRBNMLC's position on notice and recordkeeping issues and its proposed regulations remains generally consistent with those set forth in the Joint Comments of the National Association of Broadcasters and the Radio Music License Committee Regarding the Copyright Royalty Judges' Notice and Recordkeeping Rulemaking, filed on June 30, 2014 ("NAB's Comments")**,** and those parties' Joint Reply Comments in that same rulemaking, filed on September 5, 2014 ("NAB's Reply Comments").  For example, the NRBNMLC continues to oppose any requirement that broadcasters report International Standard Recording Codes ("ISRCs") for the reasons stated in Part III.C of NAB's Comments and Part I.C.2.a of NAB's Reply Comments.

(d) *Voluntary agreements.* Notwithstanding the royalty rates and terms established in any subparts of this part 380, the rates and terms of any license agreements entered into by Copyright Owners and Licensees may apply in lieu of these rates and terms.

## § 380.2   Making payment of royalty fees.

(a) *Payment to the Collective.* A Licensee must make the royalty payments due under subpart B to SoundExchange, Inc., which is the Collective designated by the Copyright Royalty Board to collect and distribute royalties under this part 380.

(b) *Monthly payments.* A Licensee must make royalty payments on a monthly basis. Payments are due on or before the 45th day after the end of the month in which the Licensee made Eligible Transmissions.

(c) *Minimum payments.* A Licensee must make any minimum annual payments due under Subpart B by January 31 of the applicable license year. A Licensee that as of January 31 of any year has not made any eligible nonsubscription transmissions, noninteractive digital audio transmissions as part of a new subscription service, or Ephemeral Recordings pursuant to the licenses in 17 U.S.C. 114 and/or 17 U.S.C. 112(e), but that begins making such transmissions after that date must make any payment due by the 45th day after the end of the month in which the Licensee commences making such transmissions.

(d) *Late fees.* A Licensee must pay a late fee for each payment and each Statement of Account that the Collective receives after the due date. The late fee is 1.5% (or the highest lawful rate, whichever is lower) of the late payment amount per month. The late fee for a late Statement of Account is 1.5% of the payment amount associated with the Statement of Account. Late fees accrue from the due date until the date that the Collective receives the late payment or late Statement of Account.

(1) *Waiver of late fees.* The Collective may waive or lower late fees for immaterial or inadvertent failures of a Licensee to make a timely payment or submit a timely Statement of Account.

(2) *Notice regarding noncompliant Statements of Account.* If it is reasonably evident to the Collective that a timely-provided Statement of Account is materially noncompliant, the Collective must notify the Licensee within 90 days of discovery of the noncompliance.

## § 380.3   Delivering statements of account.

(a) *Statements of Account.* Any payment due under this Part 380 must be accompanied by a corresponding Statement of Account that must contain the following information:

(1) Such information as is necessary to calculate the accompanying royalty payment;

(2) The name, address, business title, telephone number, facsimile number (if any), electronic mail address (if any) and other contact information of the person to be contacted for information or questions concerning the content of the Statement of Account;

(3) The signature of:

(i) The Licensee or a duly authorized agent of Licensee;

(ii) A partner or delegate if the Licensee is a partnership; or

(iii) An officer of the corporation if the Licensee is a corporation.

(4) The printed or typewritten name of the person signing the Statement of Account;

(5) If the Licensee is a partnership or corporation, the title or official position held in the partnership or corporation by the person signing the Statement of Account;

(6) A certification of the capacity of the person signing;

(7) The date of signature; and

(8) An attestation to the following effect:

I, the undersigned owner/officer/partner/agent of the Licensee have examined this Statement of Account and hereby state that it is true, accurate, and complete to my knowledge after reasonable due diligence and that it fairly presents, in all material respects, the liabilities of the Licensee pursuant to 17 U.S.C. 112(e) and 114 and applicable regulations adopted under those sections.

(b) *Certification.* Licensee's Chief Financial Officer or, if Licensee does not have a Chief Financial Officer, a person authorized to sign Statements of Account for the Licensee must submit a signed certification on an annual basis attesting that Licensee's royalty statements for the prior year represent a true and accurate determination of the royalties due and that any method of allocation employed by Licensee was applied in good faith and in accordance with U.S. GAAP.

**§ 380.4   Distributing royalty fees.**

(a) *Distribution of royalties.* (1) The Collective must promptly distribute royalties received from Licensees to Copyright Owners and Performers that are entitled thereto, or to their designated agents. The Collective shall only be responsible for making distributions to those who provide the Collective with information as is necessary to identify and pay the correct recipient. The Collective must distribute royalties on a basis that values all performances by a Licensee equally based upon the information provided under the Reports of Use requirements for Licensees pursuant to §370.4 of this chapter and this subpart.

(2) The Collective must use its best efforts to identify and locate copyright owners and featured artists in order to distribute royalties payable to them under §112(e) or 114(d)(2) of title 17, United States Code, or both. Such efforts must include, but not be limited to, searches in Copyright Office public records and published directories of sound recording copyright owners.

(b) *Unclaimed funds.* If the Collective is unable to identify or locate a Copyright Owner or Performer who is entitled to receive a royalty distribution under this part 380, the Collective must retain the required payment in a segregated trust account for a period of three years from the date of the first distribution of royalties from the relevant payment by a Licensee. No claim to distribution shall be valid after the expiration of the three-year period. After expiration of this period, the Collective must handle unclaimed funds in accordance with applicable federal, state, or common law.

(c) *Retention of records.* Licensees and the Collective shall keep books and records relating to payments and distributions of royalties for a period of not less than the prior three calendar years.

(d) *Designation of the Collective.* (1) The Judges designate SoundExchange, Inc., as the Collective to receive Statements of Account and royalty payments from Licensees and to distribute royalty payments to each Copyright Owner and Performer (or their respective designated agents) entitled to receive royalties under 17 U.S.C. 112(e) or 114(g).

(2) If SoundExchange, Inc. should dissolve or cease to be governed by a board consisting of equal numbers of representatives of Copyright Owners and Performers, then it shall be replaced for the applicable royalty term by a successor Collective according to the following procedure:

(i) The nine Copyright Owner representatives and the nine Performer representatives on the SoundExchange board as of the last day preceding SoundExchange's cessation or dissolution shall vote by a majority to recommend that the Copyright Royalty Judges designate a successor and must file a petition with the Copyright Royalty Judges requesting that the Judges designate the named successor and setting forth the reasons therefor.

(ii) Within 30 days of receiving the petition, the Copyright Royalty Judges must issue an order designating the recommended Collective, unless the Judges find good cause not to make and publish the designation in the FEDERAL REGISTER.

## § 380.5   Handling Confidential Information.

(a) *Definition.* For purposes of this part 380, "Confidential Information" means the Statements of Account and any information contained therein, including the amount of royalty payments and the number of Performances, and any information pertaining to the Statements of Account reasonably designated as confidential by the party submitting the statement. Confidential Information does not include documents or information that at the time of delivery to the Collective is public knowledge. The party seeking information from the Collective based on a claim that the information sought is a matter of public knowledge shall have the burden of proving to the Collective that the requested information is in the public domain.

(b) *Use of Confidential Information.* The Collective may not use any Confidential Information for any purpose other than royalty collection and distribution and activities related directly thereto.

(c) *Disclosure of Confidential Information.* The Collective shall limit access to Confidential Information to:

(1) Those employees, agents, consultants, and independent contractors of the Collective, subject to an appropriate written confidentiality agreement, who are engaged in the collection and distribution of royalty payments hereunder and activities related directly thereto who require access to the Confidential Information for the purpose of performing their duties during the ordinary course of their work;

(2) A Qualified Auditor or outside counsel who is authorized to act on behalf of:

(i) The Collective with respect to verification of a Licensee's statement of account pursuant to this part 380; or

(ii) A Copyright Owner or Performer with respect to the verification of royalty distributions pursuant to this part 380;

(3) Copyright Owners and Performers, including their designated agents, whose works a Licensee used under the statutory licenses set forth in 17 U.S.C. 112(e) and 114 by the Licensee whose Confidential Information is being supplied, subject to an appropriate written confidentiality agreement, and including those employees, agents, consultants, and independent contractors of such Copyright Owners and Performers and their designated agents, subject to an appropriate written confidentiality agreement, who require access to the Confidential Information to perform their duties during the ordinary course of their work;

(4) Attorneys and other authorized agents of parties to proceedings under 17 U.S.C. §§ 112, 114, acting under an appropriate protective order.

(d) *Safeguarding Confidential Information.* The Collective and any person authorized to receive Confidential Information from the Collective must implement procedures to safeguard against unauthorized access to or dissemination of Confidential Information using a reasonable standard of care, but no less than the same degree of security that the recipient uses to protect its own Confidential Information or similarly sensitive information.

## § 380.6   Auditing payments and distributions.

(a) *General.* This section prescribes procedures by which any entity entitled to receive payment or distribution of royalties may verify payments or distributions by auditing the payor or distributor. The Collective may audit a Licensee's payments of royalties to the Collective, and a Copyright Owner or Performer may audit the Collective's distributions of royalties to the owner or performer. Nothing in this section shall preclude a verifying entity and the payor or distributor from agreeing to verification methods in addition to or different from those set forth in this section.

(b) *Frequency of auditing.* The verifying entity may conduct an audit of each licensee only once a year for any or all of the prior three calendar years. A verifying entity may not audit records for any calendar year more than once.

(c) *Notice of intent to audit.* The verifying entity must file with the Copyright Royalty Judges a notice of intent to audit the payor or distributor, which notice the Judges must publish in the FEDERAL REGISTER within 30 days of the filing of the notice. Simultaneously with the filing of the notice, the verifying entity must deliver a copy to the payor or distributor.

(d) *The audit.* The audit must be conducted during regular business hours by a Qualified Auditor who is not retained on a contingency fee basis and is identified in the notice. The auditor shall determine the accuracy of royalty payments or distributions, including whether an underpayment or overpayment of royalties was made. An audit of books and records, including underlying paperwork, performed in the ordinary course of business according to generally accepted auditing standards by a Qualified Auditor, shall serve as an acceptable verification procedure for all parties with respect to the information that is within the scope of the audit.

(e) *Access to third-party records for audit purposes.* The payor or distributor must use commercially reasonable efforts to obtain or to provide access to any relevant books and records maintained by third parties for the purpose of the audit.

(f) *Duty of auditor to consult.* The auditor must produce a written report to the verifying entity. Before rendering the report, unless the auditor has a reasonable basis to suspect fraud on the part of the payor or distributor, the disclosure of which would, in the reasonable opinion of the auditor, prejudice any investigation of the suspected fraud, the auditor must review tentative written findings of the audit with the appropriate agent or employee of the payor or distributor in order to remedy any factual errors and clarify any issues relating to the audit; Provided that an appropriate agent or employee of the payor or distributor reasonably cooperates with the auditor to remedy promptly any factual error[s] or clarify any issues raised by the audit. The auditor must include in the written report information concerning the cooperation or the lack thereof of the employee or agent.

(g) *Audit results; underpayment or overpayment of royalties.* If the auditor determines the payor or distributor underpaid royalties, the payor or distributor shall remit the amount of any underpayment determined by the auditor to the verifying entity, together with interest at the post-judgment rate specified in 28 U.S.C. § 1961. In the absence of mutually-agreed payment terms, which may, but need not, include installment payments, the payor or distributor shall remit promptly to the verifying entity the entire amount of the underpayment determined by the auditor. If the auditor determines the payor or distributor overpaid royalties, the Licensee may deduct the amount of overpayment from its next payment(s) due to the Collective until the full amount of the overpayment has been recouped.

(h) *Paying the costs of the audit.* The verifying entity must pay the cost of the verification procedure, unless the auditor determines that there was a net underpayment (*i.e.*, underpayments less any overpayments) of 10% or more, in which case the payor or distributor must bear the reasonable costs of the verification procedure, in addition to paying or distributing the amount of any underpayment.

(i) *Retention of audit report.* The verifying party must retain the report of the audit for a period of not less than three years from the date of issuance.

**§ 380.7   Definitions.**

*For purposes of this subpart, the following definitions apply:*

*Aggregate Tuning Hours (ATH)* means the total hours of programming that the Licensee has transmitted during the relevant period to all listeners within the United States from all channels and stations that provide audio programming consisting, in whole or in part, of eligible nonsubscription transmissions or noninteractive digital audio transmissions as part of a new subscription service, less the actual running time of any sound recordings for which the Licensee has obtained direct licenses apart from 17 U.S.C. 114(d)(2) or which do not require a license under United States copyright law. By way of example, if a service transmitted one hour of programming containing Performances to 10 listeners, the service's ATH would equal 10 hours. If three minutes of that hour consisted of transmission of a directly-licensed recording, the service's ATH would equal nine hours and 30 minutes (three minutes times 10 listeners creates a deduction of 30 minutes). As an additional example, if one listener listened to a service for 10 hours (and none of the recordings transmitted during that time was directly licensed), the service's ATH would equal 10 hours.

*Collective* means the collection and distribution organization that is designated by the Copyright Royalty Judges, and which, for the current rate period, is SoundExchange, Inc.

*Commercial Webcaster* means a Licensee, other than a Noncommercial Webcaster or Public Broadcaster, that makes Ephemeral Recordings and eligible digital audio transmissions of sound recordings pursuant to the statutory licenses under 17 U.S.C. 112(e) and 114(d)(2).

*Copyright Owners* means sound recording copyright owners, and rights owners under 17 U.S.C. 1401(l)(2), who are entitled to royalty payments made under this part pursuant to the statutory licenses under 17 U.S.C. 112(e) and 114.

*Digital audio transmission* has the same meaning as in 17 U.S.C. 114(j).

*Eligible nonsubscription transmission* has the same meaning as in 17 U.S.C. 114(j).

*Eligible Transmission* means a subscription or nonsubscription transmission made by a Licensee that is subject to licensing under 17 U.S.C. 114(d)(2) and the payment of royalties under this part.

*Ephemeral recording* has the same meaning as in 17 U.S.C. 112.

*Licensee* means a Commercial Webcaster, a Noncommercial Webcaster, or any entity operating a noninteractive Internet streaming service that has obtained a license under Section 112 or 114 to transmit eligible sound recordings.

*New subscription service* has the same meaning as in 17 U.S.C. 114(j).

*Noncommercial webcaster* has the same meaning as in 17 U.S.C. 114(f)(5)(E).

*Nonsubscription* has the same meaning as in 17 U.S.C. 114(j).

*Performance* means each instance in which any portion of a sound recording is publicly performed to a listener by means of a digital audio transmission (*e.g.,* the delivery of any portion of a single track from a compact disc to one listener), but excludes the following:

(1) A performance of a sound recording that does not require a license (*e.g.,* a sound recording that is not subject to protection under title 17, United States Code);

(2) A performance of a sound recording for which the service has previously obtained a license from the Copyright Owner of such sound recording; and

(3) An incidental performance that both:

(i) Makes no more than incidental use of sound recordings including, but not limited to, brief musical transitions in and out of commercials or program segments, brief performances during news, talk and sports programming, brief background performances during disk jockey announcements, brief performances during commercials of sixty seconds or less in duration, or brief performances during sporting or other public events; and

(ii) Does not contain an entire sound recording, other than ambient music that is background at a public event, and does not feature a particular sound recording of more than thirty seconds (as in the case of a sound recording used as a theme song).

*Performers* means the independent administrators identified in 17 U.S.C. 114(g)(2)(B) and (C) and the parties identified in 17 U.S.C. 114(g)(2)(D).

*Public broadcaster* means a Covered Entity under subpart D of this part.

*Qualified auditor* means an independent Certified Public Accountant licensed in the jurisdiction where it seeks to conduct a verification.

*Simulcast transmission* means a public performance of a sound recording by means of the simultaneous or near-simultaneous retransmission, as part of an eligible nonsubscription transmission, of the same sound recording included in a "broadcast transmission," as that term is defined in 17 U.S.C. § 114.

*Subscription transmission* has the same meaning as in 17 U.S.C. § 114(j).

*Transmission* has the same meaning as in 17 U.S.C. § 114(j).

**Subpart B—Commercial Webcasters and Noncommercial Webcasters**

**§ 380.10   Royalty fees for the public performance of sound recordings and the making of ephemeral recordings.**

(a) *Royalty fees.* For the year 2021, Licensees must pay royalty fees for all Eligible Transmissions of sound recordings at the following rates:

(1) *Commercial webcasters:* […]

(2) *Noncommercial webcasters.* (i) $500 per year for each channel or station for all digital audio transmissions up to 1,909,680 ATH in a year (159,140 ATH/month * 12 months/year).  For digital audio transmissions in excess of 1,909,680 ATH in a year, a fee per performance for all simulcast transmissions equal to one-third of the fee per performance for simulcast transmissions by a commercial webcaster, a fee per performance for eligible nonsubscription transmissions equal to one-third of the fee per performance for eligible nonsubscription transmissions by a commercial webcaster, and a fee per performance for all subscription transmissions equal to one-third of the fee per performance for subscription transmissions by a commercial webcaster.

(ii) If a noncommercial Licensee paying royalty fees under this Subpart makes digital audio transmissions on a station or channel pursuant to the licenses in 17 U.S.C. 114 and/or 17 U.S.C. 112(e) for only a portion of a calendar year, the maximum ATH permitted for that calendar year before payments in addition to the annual $500 fee are due shall be equal to 1,909,680 multiplied by the fraction of that calendar year (calculated in days) during which the noncommercial Licensee made such digital audio transmissions on that station or channel.  For example, if a noncommercial Licensee makes digital audio transmissions for 180 days of a non-leap year calendar year on a station or channel, it may transmit up to 941,760 ATH (1,909,680 * (180 / 365)) in that year on that station or channel before it is required to pay per-performance fees in addition to the annual $500 fee.  If a noncommercial Licensee ceases making digital audio transmissions on a station or channel before the end of a calendar year, per-performance fees, if any, that are owed for transmissions in excess of the ATH permitted under this Section shall be due by the 45th day after the end of the month in which the noncommercial Licensee ceases making such transmissions.

(b) *Minimum fee.* Licensees must pay the Collective a minimum fee of $500 each year for each channel or station. The Collective must apply the fee to the Licensee's account as credit towards any additional royalty fees that Licensees may incur in the same year. The fee is payable for each individual channel and each individual station maintained or operated by the Licensee and making Eligible Transmissions during each calendar year or part of a calendar year during which it is a Licensee. The maximum aggregate minimum fee in any calendar year that a Commercial Webcaster must pay is $50,000. The minimum fee is nonrefundable.

(c) *Annual royalty fee adjustment.* The Copyright Royalty Judges shall adjust the royalty fees each year to reflect any changes occurring in the cost of living as determined by the most recent Consumer Price Index (for all consumers and for all items) (CPI-U) published by the Secretary of Labor before December 1 of the preceding year. […]

(d) *Ephemeral recordings royalty fees.* The fee for all Ephemeral Recordings is part of the total fee payable under this section and constitutes 5% of it. All ephemeral recordings that a Licensee makes which are necessary and commercially reasonable for making noninteractive digital transmissions are included in the 5%.

# The NRBNMLC's Proposed Noncommercial Webcaster Rates and Terms

# 37 C.F.R. Part 380
# (Rates and Terms Applicable to Noncommercial Webcasters)

## Alternative 2

The NRBNMLC proposes that the rates and terms proposed in Alternative 1 apply but with Subpart E below added to the regulations.

**Subpart E – Noncommercial Religious Broadcasters**

**§ 380.33 Definitions.**

For purposes of this subpart, the following definitions apply:

*Authorized website* is any website operated by or on behalf of any Noncommercial Religious Broadcaster that is accessed by website Users through a Uniform Resource Locator ("URL") owned by such Noncommercial Religious Broadcaster and through which website Performances are made by such Noncommercial Religious Broadcaster.

*Music ATH* is aggregate tuning hours of website Performances of sound recordings of musical works.

*The NRBNMLC* is the National Religious Broadcasters Noncommercial Music License Committee.

*Noncommercial Religious Radio Station* is a noncommercial terrestrial radio broadcast station that—

(1) Is licensed as such by the Federal Communications Commission;

(2) Originates programming and is not solely a repeater station;

(3) For one or more calendar years during the Term, has been named by the NRBNMLC as a Noncommercial Religious Radio Station pursuant to this Subpart;

(4) Qualifies as a "noncommercial webcaster" under 17 U.S.C. 114(f)(4)(E)(i); and

(5) Offers website Performances only as part of the mission that entitles it to be exempt from taxation under section 501 of the Internal Revenue Code of 1986 (26 U.S.C. 501).

*Person* is a natural person, a corporation, a limited liability company, a partnership, a trust, a joint venture, any governmental authority or any other entity or organization.

*Noncommercial Religious Broadcasters* are the NRBNMLC and up to 795 Noncommercial Religious Radio Stations as named by the NRBNMLC. The NRBNMLC shall notify SoundExchange annually of the eligible Noncommercial Religious Radio Stations to be considered Noncommercial Religious Broadcasters per this definition (subject to the numerical

limitations set forth in this definition). The number of Noncommercial Religious Radio Stations treated per this definition as Noncommercial Religious Broadcasters shall not exceed 795 for a given year without SoundExchange's express written approval, except that the NRBNMLC shall have the option to increase the number of Noncommercial Religious Radio Stations that may be considered Noncommercial Religious Broadcasters as provided in § 380.34(c).

*Side Channel* is any internet-only program available on an Authorized website or an archived program on such Authorized website that, in either case, conforms to all applicable requirements under 17 U.S.C. 114.

*Term* is the period January 1, 2021, through December 31, 2025.

*Website* is a site located on the World Wide Web that can be located by a website User through a principal URL.

*Website Performances* are all public performances by means of digital audio transmissions of sound recordings, including the transmission of any portion of any sound recording, made through an Authorized website in accordance with all requirements of 17 U.S.C. 114, from servers used by a Noncommercial Religious Broadcaster (provided that the Noncommercial Religious Broadcaster controls the content of all materials transmitted by the server), or by a contractor authorized pursuant to § 380.31(f), that consist of either the retransmission of a Noncommercial Religious Broadcaster's over-the-air terrestrial radio programming or the digital transmission of nonsubscription Side Channels that are programmed and controlled by the Noncommercial Religious Broadcaster. This term does not include digital audio transmissions made by any other means.

*Website Users* are all those who access or receive website Performances or who access any Authorized website.

**§ 380.34 Royalty fees for the public performance of sound recordings and for ephemeral recordings.**

(a) *Royalty rates.* The total license fee for all website Performances by Noncommercial Religious Broadcasters during each year of the Term, up to the total Music ATH set forth in paragraphs (a)(1) through (5) of this section for the relevant calendar year, and Ephemeral Recordings made by Noncommercial Religious Broadcasters solely to facilitate such website Performances, shall be $1,200,000 (the "License Fee"), unless additional payments are required as described in paragraph (c) of this section. The total Music ATH limits are:

(1) 2021: 540,000,000;

(2) 2022: 555,000,000;

(3) 2023: 570,000,000;

(4) 2024: 585,000,000; and

(5) 2025: 600,000,000.

(b) *Calculation of License Fee.* It is understood that the License Fee includes:

(1) An annual minimum fee for each Noncommercial Religious Broadcaster for each year during the Term;

(2) Additional usage fees for certain Noncommercial Religious Broadcasters; and

(3) A discount that reflects the administrative convenience to the Collective (for purposes of this subpart, the term "Collective" refers to SoundExchange, Inc.) of receiving annual lump sum payments that cover a large number of separate entities, as well as the protection from bad debt that arises from being paid in advance.

(c) *Increase in Noncommercial Religious Broadcasters.* If the total number of Noncommercial Religious Radio Stations that wish to make website Performances in any calendar year exceeds the number of such Noncommercial Religious Radio Stations considered Noncommercial Religious Broadcasters in the relevant year, and the excess Noncommercial Religious Radio Stations do not wish to pay royalties for such website Performances apart from this subpart, the NRBNMLC may elect by written notice to the Collective to increase the number of Noncommercial Religious Radio Stations considered Noncommercial Religious Broadcasters in the relevant year effective as of the date of the notice. To the extent of any such elections, the NRBNMLC shall make an additional payment to the Collective for each calendar year or part thereof it elects to have an additional Noncommercial Religious Radio Station considered a Noncommercial Religious Broadcaster, in the amount of the annual minimum fee applicable to Noncommercial Webcasters under subpart B of this part for each additional Noncommercial Religious Radio Station per year. Such payment shall accompany the notice electing to have an additional Noncommercial Religious Radio Station considered a Noncommercial Religious Broadcaster.

(d) *Allocation between ephemeral recordings and performance royalty fees.* The Collective must credit 5% of all royalty payments as payment for Ephemeral Recordings and credit the remaining 95% to section 114 royalties. All Ephemeral Recordings that a Licensee makes which are necessary and commercially reasonable for making noninteractive digital transmissions are included in the 5%.

(e) *Effect of non-performance by any Noncommercial Religious Broadcaster.* In the event that any Noncommercial Religious Broadcaster violates any of the material provisions of 17 U.S.C. 112(e) or 114 or this subpart that it is required to perform, the remedies of the Collective shall be specific to that Noncommercial Religious Broadcaster only, and shall include, without limitation, termination of that Noncommercial Religious Broadcaster's right to be treated as a Noncommercial Religious Broadcaster per this paragraph (e) upon written notice to the NRBNMLC. The Collective and Copyright Owners also shall have whatever rights may be available to them against that Noncommercial Religious Broadcaster under applicable law. The Collective's remedies for such a breach or failure by an individual Noncommercial Religious Broadcaster shall not include termination of the rights of other Noncommercial Religious Broadcasters to be treated as Noncommercial Religious Broadcasters per this paragraph (e), except that if the NRBNMLC fails to pay the License Fee or otherwise fails to perform any of the material provisions of this subpart, or such a breach or failure by a Noncommercial Religious

Broadcaster results from the NRBNMLC's inducement, and the NRBNMLC does not cure such breach or failure within 30 days after receiving notice thereof from the Collective, then the Collective may terminate the right of all Noncommercial Religious Broadcasters to be treated as Noncommercial Religious Broadcasters per this paragraph (e) upon written notice to the NRBNMLC. In such a case, a prorated portion of the License Fee for the remainder of the Term (to the extent paid by the NRBNMLC) shall, after deduction of any damages payable to the Collective by virtue of the breach or failure, be credited to statutory royalty obligations of Noncommercial Religious Broadcasters to the Collective for the Term as specified by the NRBNMLC.

(f) *Use of contractors.* The right to rely on this subpart is limited to Noncommercial Religious Broadcasters, except that a Noncommercial Religious Broadcaster may employ the services of a third Person to provide the technical services and equipment necessary to deliver website Performances on behalf of such Noncommercial Religious Broadcaster, but only through an Authorized website. Any agreement between a Noncommercial Religious Broadcaster and any third Person for such services shall:

(1) Obligate such third Person to provide all such services in accordance with all applicable provisions of the statutory licenses and this subpart;

(2) Specify that such third Person shall have no right to make website Performances or any other performances or Ephemeral Recordings on its own behalf or on behalf of any Person or entity other than a Noncommercial Religious Broadcaster through the Noncommercial Religious Broadcaster's Authorized website by virtue of its services for the Noncommercial Religious Broadcaster, including in the case of Ephemeral Recordings, pre-encoding or otherwise establishing a library of sound recordings that it offers to a Noncommercial Religious Broadcaster or others for purposes of making performances, but instead must obtain all necessary licenses from the Collective, the copyright owner or another duly authorized Person, as the case may be;

(3) Specify that such third Person shall have no right to grant any sublicenses under the statutory licenses; and

(4) Provide that the Collective is an intended third-party beneficiary of all such obligations with the right to enforce a breach thereof against such third Person.

**§ 380.35 Terms for making payment of royalty fees and statements of account.**

(a) *Payment to the Collective.* The NRBNMLC shall pay the License Fee to the Collective in five equal installments of $1,200,000 each. The first such installment, minus any payments already made for 2021 by any Noncommercial Religious Broadcaster named by the NRBNMLC to pay royalty fees for 2021 pursuant to this Subpart, shall be due 60 days after the later of: (a) the date on which the Copyright Royalty Judges issue their determination of rates and terms for 2021-2025 pursuant to this Part in accordance with 17 U.S.C. § 803(c)(1); or (b) the date on which any motion for rehearing submitted pursuant to 17 U.S.C. § 803(c)(2) regarding the initial determination is resolved. The remaining four installments shall be due December 31, 2021, and annually thereafter through December 31, 2024.

(b) *Reporting.* The NRBNMLC and Noncommercial Religious Broadcasters shall submit reports of use and other information concerning website Performances as agreed upon with the Collective. In the absence of such an agreement, Noncommercial Religious Radio Stations shall submit reports of use in accordance with then-applicable regulations in 37 C.F.R. Part 370.

(c) *Terms in general.* Subject to the provisions of this subpart, terms governing late fees, distribution of royalties by the Collective, unclaimed funds, record retention requirements, treatment of Licensees' confidential information, audit of royalty payments and distributions, and any definitions for applicable terms not defined in this subpart shall be those set forth in subpart A of this part.